Christopher J. Renk (*pro hac vice* to be filed)
 Chris.Renk@arnoldporter.com
Michael J. Harris (*pro hac vice* to be filed)
 Michael.Harris@arnoldporter.com
**Arnold & Porter Kaye Scholer LLP**
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Telephone: (312) 583-2300
Facsimile: (312) 583-2360

*Attorneys for Plaintiff Nike, Inc.*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF NEW YORK

NIKE, INC.,

               Plaintiff,

v.

MSCHF PRODUCT STUDIO, INC.,

               Defendant.

**Case No.  1:21-cv-01679-EK-PK**

**Date of Service: March 30, 2021**

**NIKE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A
TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     FACTUAL BACKGROUND ......................................................................... 3

    A.   Nike .................................................................................................... 3

    B.   The Famous Swoosh Design Mark and NIKE Word Mark ....................... 4

    C.   Nike Maintains Strict Control Over Its Trademarks and Its Related Business Reputation and Goodwill ................................................. 6

    D.   MSCHF's Unlawful Activities .............................................................. 7

III.    LEGAL STANDARDS ................................................................................. 8

IV.     ARGUMENT ................................................................................................. 9

    A.   Nike Is Likely to Succeed on the Merits of Its Trademark Infringement Claim and Related Claims ........................................... 9

        1.   Nike's Asserted Marks Are Valid and Protectable ........................ 9

        2.   MSCHF's Use of the Asserted Marks Has Caused Actual Confusion and Is Likely to Continue Causing Confusion ............... 10

        3.   The First Sale Doctrine Does Not Apply ....................................... 17

    B.   Nike Is Likely to Succeed on the Merits of Its Dilution Claim ......... 18

    C.   Nike is Likely to Suffer Irreparable Harm ........................................ 19

    D.   The Balance of Equities Tips Decidedly in Nike's Favor .................. 23

    E.   An Injunction Is in the Public Interest ............................................... 23

    F.   The Bond Should Be Minimal ............................................................ 24

V.      CONCLUSION ............................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
  457 F.3d 1062 (9th Cir. 2006) ...................................................................4, 19

*Bel Canto Design, Ltd. v. MSS Hifi, Inc.*,
  837 F. Supp. 2d 208 (S.D.N.Y. 2011) .................................................17

*BOSE Corp. v. OSC Audio Products, Inc.*,
  293 F.3d 1367 (Fed. Cir. 2002) ..........................................................18

*Bulman v. 2BKCO, Inc.*,
  882 F. Supp. 2d 551 (S.D.N.Y. 2012) ........................................*passim*

*Cadbury Beverages v. Cott Corp.*,
  73 F.3d 474 (2d Cir. 1996) .................................................................14

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master
  Fund Ltd.*,
  598 F.3d 30 (2d Cir. 2010) ...................................................................9

*Doctor's Associates, Inc. v. Stuart*,
  85 F.3d 975 (2d Cir. 1996) .................................................................25

*GeigTech E. Bay LLC v. Lutron Elecs. Co.*,
  352 F. Supp. 3d 265 (S.D.N.Y. 2018) ................................................10

*Hormel Foods Corp. v. Jim Henson Productions, Inc.*,
  73 F.3d 497 (2d Cir. 1996) .................................................................19

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*,
  176 F. Supp. 3d 137 (E.D.N.Y. 2016) ............................................9, 10

*Juicy Couture, Inc. v. Bella Int'l Ltd.*,
  930 F. Supp. 2d 489 (S.D.N.Y. 2013) ....................................12, 23, 24

*Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*,
  192 F.3d 337 (2d Cir. 1999) .................................................................9

*Lang v. Retirement Living Publ'g Co.*,
  949 F.2d 576 (2d Cir. 1991) ............................................................................12

*Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.*,
  409 F. Supp. 2d 643 (D. Md. 2006).................................................................18

*Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*,
  965 F.2d 1224 (2d Cir. 1992) .............................................................................8

*Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*,
  426 F.3d 532 (2d Cir. 2005) ...............................................................................8

*Marks Org., Inc. v. Joles*,
  784 F. Supp. 2d 322 (S.D.N.Y.2011) ...............................................................22

*Mattel, Inc. v. MGA Entm't, Inc.*,
  782 F. Supp. 2d 911 (C.D. Cal. 2011) ...............................................................18

*Metrokane, Inc. v. The Wine Enthusiast*,
  160 F. Supp. 2d 633 (S.D.N.Y. 2001) ...............................................................10

*New Kayak Pool Corp. v. R & P Pools, Inc.*,
  246 F.3d 183 (2d Cir. 2001) .............................................................................11

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
  704 F. Supp. 2d 305 (S.D.N.Y.2010) ...........................................................11, 20

*Nike Inc. v. Variety Wholesalers, Inc.*,
  274 F. Supp. 2d 1352 (S.D. Ga. 2003), *aff'd*, 107 F. App'x 183
  (11th Cir. 2004)...........................................................................................3, 18

*Paco Sport, Ltd. v. Paco Rabanne Perfumes*,
  234 F.3d 1262 (2d Cir. 2000) ...........................................................................10

*Polaroid Corp. v. Polarad Elecs. Corp.*,
  287 F.2d 492 (2d Cir. 1961) .........................................................10, 11, 12, 13

*ProFitness Phys. Therapy Ctr. v. Pro–Fit Ortho. and Sports Phys.
  Therapy P.C.*,
  314 F.3d 62 (2d Cir. 2002) ...............................................................................24

*Tecnimed SRL v. Kidz–Med, Inc.*,
  763 F. Supp. 2d 395 (S.D.N.Y.2011) ...............................................................24

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings Inc.*,
    800 F. Supp. 2d 515 (S.D.N.Y.2011) ..................................................20

*Virgin Enter., Ltd. v. Nawab*,
    335 F.3d 141 (2d Cir. 2003) .........................................................12

**Statutes**

15 U.S.C.A. § 1114(1)(a)-(b) ...........................................................9

15 U.S.C. § 1057(b) ...................................................................9

15 U.S.C. § 1065 ................................................................5, 6, 10

15 U.S.C. § 1116(a) .................................................................19

15 U.S.C. § 1125(a) ...................................................................9

15 U.S.C. § 1125(c) ...................................................................9

15 U.S.C. § 1125(c)(1) ...............................................................18

15 U.S.C. § 1125(c)(1), (c)(2)(B) .....................................................19

Lanham Act .......................................................................9, 17

**Other Authorities**

Fed. R. Civ. P. 65(c) ................................................................24

Plaintiff Nike, Inc. ("Nike" or "Plaintiff"), by and through its undersigned counsel, hereby submits this memorandum of law in support of its application for a temporary restraining order ("TRO Application" or "Application"), and motion for a preliminary injunction ("PI Motion" and together with the Application, "Motion") pursuant to the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 65(b), seeking an immediate and preliminary injunction to stop Defendant MSCHF PRODUCT STUDIO, INC. ("MSCHF" or "Defendant") from fulfilling orders for its unauthorized Satan Shoes and otherwise engaging in violations of Nike's intellectual property rights through its offers for sale of the unauthorized Satan Shoes or colorable imitations thereof.

## I.      INTRODUCTION

On March 29, 2021, MSCHF took orders for shoes it refers to as Satan Shoes, which are customized Nike Air Max 97 shoes that MSCHF has materially altered to prominently feature a satanic theme.  Ex. 2, ¶ 4.  Priced at $1,018 a pair, MSCHF's release of 666 pairs sold out in less than a minute.  *Id.*, ¶ 8.  This was done without Nike's approval or authorization, and Nike is in no way connected with this project.  Ex. 1, ¶¶ 25, 28.  Below is an image of the genuine Nike Air Max 97 shoe next to MSCHF's unauthorized Satan Shoe.  *Id.* ¶ 22.



| Genuine Nike Air Max 97 Shoe | Unauthorized Satan Shoe |
|---|---|

Nike has not and does not approve or authorize MSCHF's customized Satan Shoes.  Ex. 1 ¶¶ 25, 28.  Moreover, MSCHF and its unauthorized Satan Shoes are likely to cause confusion and

dilution and create an erroneous association between MSCHF's products and Nike.  In fact, there is already evidence of significant confusion and dilution occurring in the marketplace, including calls to boycott Nike in response to the launch of MSCHF's Satan Shoes based on the mistaken belief that Nike has authorized or approved this product.  Ex. 2, ¶ 3.

Absent a temporary restraining order and preliminary injunction, MSCHF will soon fulfill the orders causing irreparable harm to Nike and its brand.  *See*  Ex. 2, ¶¶ 4, 7; Ex. 1, ¶  29.  Indeed, at the time of filing this Motion, consumers are already confused as to the origin, sponsorship, and/or approval of the shoes.  MSCHF has deceived customers into believing that Nike is the origin of the shoes, or at least sponsored or approved the shoes.  Ex. 1, ¶ 3.  Below are just a few examples of consumers publicly stating their mistaken belief that Nike is the source or sponsor of MSCHF's sneakers:





This confusion that already exists will only escalate if MSCHF is permitted to fulfill orders for the Satan Shoes and these sneakers enter the market.  In that post-sale environment, there is virtually no opportunity to get those shoes off the market, to provide clarity between genuine, authorized Nike shoes and unauthorized "customs" like the Satan Shoe, or for Nike to maintain control over its reputation and goodwill.  *See* Ex. 1., ¶ 29.  MSCHF must be stopped from fulfilling the orders for the Satan Shoes.

## II.   FACTUAL BACKGROUND

### A.   NIKE

Nike's principal business activity is the design, development and worldwide marketing and selling of athletic footwear, apparel, equipment, accessories and services. Ex. 1, ¶ 4.  Nike is the largest seller of athletic footwear and apparel in the world.  *Id*., ¶ 5.  Nike sells its products directly to consumers through Nike-owned retail stores and digital platforms, and to retail accounts and a mix of independent distributors, licensees and sales representatives.  *Id*., ¶ 6.

Nike uses trademarks on and in connection with nearly all of its products.  *Id*., ¶ 7.  Having distinctive trademarks that are readily identifiable is an important factor in creating a market for Nike's products, in identifying Nike and its brands, and in distinguishing Nike's products from the products of others.  *Id*., ¶ 8.  As a result of continuous and long-standing promotion, substantial sales, and consumer recognition, Nike has developed powerful trademarks rights, including the trademark rights at issue in the motion: the NIKE word mark and the Swoosh design mark (collectively, the "Asserted Marks").  *Id*., ¶¶ 9-19.

### B.   THE FAMOUS SWOOSH DESIGN MARK AND NIKE WORD MARK

One of Nike's most iconic assets is the Swoosh  design, as well as the NIKE word mark. Ex. 1, ¶ 10. Nike has continuously promoted and sold products bearing the Swoosh design and/or NIKE word mark since 1971. *Id*., ¶ 11. Nike has used, and continues to use, the Swoosh design and/or NIKE word mark on almost all of its products, including dozens of iconic products, and in connection with its retail sales of those products. *Id.*

Nike has sold billions of products bearing the Swoosh design and/or NIKE word mark in the United States, accounting for hundreds of billions of dollars in revenue. *Id*., ¶¶ 12. Nike has also spent tens of billions of dollars promoting the NIKE word mark and/or Swoosh design branded products in the United States. *Id*., ¶ 13. Nike advertises and promotes products bearing the Swoosh design and/or NIKE word mark through a wide variety of traditional and non-traditional means, including print advertising, event sponsorship, and athlete and team endorsements, to name a few. *Id*., ¶ 14. For example, Nike provides the official uniforms of the National Football League, the National Basketball League, and Major League Baseball, all of which prominently bear the Swoosh design. *Id.*

As a result of Nike's promotional and sales efforts over the past nearly fifty years, the Swoosh design is one of the most famous, recognizable, and valuable trademarks in the world. *Id*., ¶¶ 15. It has received unsolicited publicity and praise among consumers and in the media. *Id*. And it has received judicial and administrative recognition as a famous, recognizable, and valuable trademark. *Id*., ¶ 16. For example, the U.S. Court of Appeals for the Ninth Circuit has referenced the Swoosh design as an example of a "famous trademark [that has] assumed an exalted status...Consumers sometimes buy products bearing marks such as the Nike Swoosh...for the appeal of the mark itself, without regard to whether it signifies the origin or sponsorship of the product." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1067 (9th Cir. 2006).

These facts evidence the great strength of the Swoosh design mark and NIKE word mark. As such, the U.S. Patent and Trademark Office has examined and allowed numerous applications to register the Swoosh design mark and NIKE word mark on the Principal Register in connection with a wide array of goods and services.  Ex. 1, ¶¶ 17, 19.

Relevant to this Motion, Nike owns all right, title, and interest in the U.S. Trademark Registrations identified below (the "Swoosh Design Registrations"):

| Reg. No. | Trademark | Reg. Date | Goods |
|---|---|---|---|
| 977,190 |  | Jan. 22, 1974 | Athletic shoes with or without spikes |
| 1,264,529 |  | Jan. 17, 1984 | Retail footwear and apparel store services |
| 1,323,343 | | Mar. 5, 1985 | Footwear |
| 1,323,342 |  | Mar. 5, 1985 | Footwear |
| 1,238,853 |  | May 17, 1983 | Retail footwear and apparel store services |
| 1,325,938 | | Mar. 19, 1985 | Footwear |

*Id.*, ¶ 17.  Pursuant to 15 U.S.C. § 1065, Nike's Swoosh Design Registrations are incontestable and constitute conclusive evidence of the validity of the Swoosh design mark, Nike's ownership of the Swoosh design mark, and Nike's exclusive right to use the Swoosh design mark.

In addition, Nike has registered the NIKE word mark on the Principal Register of the U.S. Patent and Trademark Office in connection with a wide array of goods and services.  Ex. 1, ¶ 19.

Among others, Nike owns all right, title, and interest in the U.S. Trademark Registrations identified below (the "NIKE word mark Registrations"):

| Reg. No. | Reg. Date | Goods |
|---|---|---|
| 0,978,952 | Jan. 31, 1972 | Athletic shoes with or without spikes |
| 1,214,930 | Nov. 2, 1982 | Footwear |
| 1,243,248 | Jun. 21, 1983 | Retail footwear and apparel store services |
| 6,124,779 | Aug. 11, 2020 | Retail store services and on-line retail store services featuring apparel, footwear, sporting goods and equipment, and sports and fitness products and accessories |

*Id*.  Pursuant to 15 U.S.C. § 1065, the first three NIKE word mark Registrations are incontestable and constitute conclusive evidence of the validity of the NIKE word mark, Nike's ownership of the NIKE word mark, and Nike's exclusive right to use the NIKE word mark.

### C. NIKE MAINTAINS STRICT CONTROL OVER ITS TRADEMARKS AND ITS RELATED BUSINESS REPUTATION AND GOODWILL

Nike maintains strict quality control standards for its products bearing the Asserted Marks. Ex. 1, ¶¶ 20-21.  Genuine Nike products bearing the Asserted Marks are inspected and approved by Nike prior to distribution and sale. *Id.*, ¶ 20 .  Nike also maintains strict control over the use of the Asserted Marks in connection with its products, so that Nike can maintain control over its business reputation and goodwill.  *Id.*, ¶ 21.  Nike, for example, carefully determines how many products bearing the Asserted Marks are released, where the products are released, when the products are released, and how the products are released.  *Id.*  Nike occasionally partners with athletes, artists, designers, and others in connection with its products, including through collaborations, but it does so carefully and strategically to maintain control over its reputation and goodwill.  *Id.*

D.     MSCHF'S UNLAWFUL ACTIVITIES

MSCHF has attempted to capitalize on the strength and fame of Nike and its Asserted Marks by promoting, advertising, marketing, offering to sell, and selling products bearing the Asserted Marks.[1]  MSCHF's products at issue in this Motion (the "Infringing Sneakers") are pictured below alongside genuine Nike Air Max 97 sneakers (Ex. 1, ¶ 22):



| Genuine Nike Air Max 97 Shoe | Unauthorized Satan Shoe |
| --- | --- |

On March 29, 2021, MSCHF took orders for the Infringing Sneakers, which are customized Nike Air Max 97 shoes that MSCHF has materially altered to prominently feature a satanic theme.[2]  Priced at $1,018 a pair, MSCHF's release of 666 pairs of the Infringing Sneakers sold out in less than a minute.  Ex. 2, ¶¶ 7-8.

On information and belief, MSCHF uses the website satan.shoes/product to promote its Satan Shoes.  Ex. 2, ¶ 5.  According to this website, the body of the Satan Shoe is a "NIKE AIR MAX 97."  *Id*.  The website further states that each shoe "CONTAINS:  60CC INK AND 1 DROP HUMAN BLOOD."  *Id*.  According to media reports, the red ink and drop of literal human blood is incorporated into the sole of each shoe.  *Id.*, ¶¶ 8-9.  According to the website Snopes.com, a representative of MSCHF told Snopes in an email "that MSCHF buys the shoes from Nike, then MSCHF artists make their own creative modifications before selling them."  Ex. 2, ¶ 9.

---

[1] Nike is aware of another product previously sold by MSCHF under the name "Jesus Shoes" that also infringes upon Nike's intellectual property rights at issue in this case.  While Nike reserves the right to amend its complaint to add allegations of infringement against MSCHF's sale of the Jesus Shoes, these sneakers are not at issue in this Motion because MSCHF is not currently selling those shoes.

[2] *See* satan.shoes/product (last accessed March 29, 2021).

Indeed, the pictures of the customized Satan Shoes on MSCHF's webpage show numerous significant alterations from genuine Nike Air Max 97 shoes. Ex. 2, ¶ 6. For example, the side of the shoe features red embroidery that states "LUKE 10:18." Ex. 1, ¶ 24. The New International Version translation of the Bible verse Luke 10:18 states "He replied, 'I saw Satan fall like lightning from heaven.'"[3] Also embroidered in red on the side of the shoe is the number "666." Ex. 1, ¶ 24. The numbers 666 is commonly associated with Satan. Further, a circular pendent with a pentagram is attached to the laces of each shoe. A pentagram also appears inside the shoe on the heel. *Id.* The pentagram is also commonly associated with satanic imagery. Furthermore, the tab at the top of the tongue of the shoe depicts a red inverted cross. *Id.* As can be seen from the back view of the shoe, the left shoe displays the letters "MSCHF" and the right shoe displays the letters "LIL NAS X," a rap artist who apparently collaborated with MSCHF on the Satan Shoes. *Id.* The air bladder in the sole of each shoe is filled with a red liquid, presumably the ink and blood mixture described on MSCHF's website. *Id.* A genuine Nike Air Max 97 shoe does not contain any of these customized features. *Id.*, ¶ 25.

## III.    LEGAL STANDARDS

"To obtain a preliminary injunction, a plaintiff must establish: '(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly' in its favor.'" *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.,* 426 F.3d 532, 537 (2d Cir. 2005). The "standards which govern consideration of an application for a temporary restraining order… are the same standards as those which govern a preliminary injunction." *Local 1814, Int'l Longshoremen's*

---

[3] *See* https://www.biblestudytools.com/luke/10.html (last accessed March 29, 2021).

8

*Ass'n v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992).  A court can also grant preliminary relief "in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claim, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).  As detailed below, Nike has met the standard for a preliminary injunction, and thus, a temporary restraining order should also issue against MSCHF.

## IV.   ARGUMENT

### A.   NIKE IS LIKELY TO SUCCEED ON THE MERITS OF ITS TRADEMARK INFRINGEMENT CLAIM AND RELATED CLAIMS

To prevail on its trademark infringement claim, Nike must show: (1) it owns a valid, protectable mark; (2) that the defendant used the mark in commerce without consent; and (3) that there is a likelihood of consumer confusion.  *See* 15 U.S.C.A. § 1114(1)(a)-(b).  Nike's other trademark-related claims for false designation of origin/unfair competition under the Lanham Act (Count II) and common law trademark infringement and unfair competition (Count IV) require essentially the same showing.  *See, e.g.,* 15 U.S.C. § 1125(a); 15 U.S.C. § 1125(c); *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 157-158 (E.D.N.Y. 2016).

#### 1.   Nike's Asserted Marks Are Valid and Protectable

Nike's certificates of trademark registration are *prima facie* evidence of the validity, ownership, and exclusive right by Nike to use the Asserted Marks. 15 U.S.C. § 1057(b); *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999) (A certificate of registration establishes that a mark is "valid (i.e., protectable), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce."). Moreover, Nike's rights in the Asserted Marks have become incontestable and, thus, "are conclusively presumed to

be valid and entitled to protection." *Paco Sport, Ltd. v. Paco Rabanne Perfumes*, 234 F.3d 1262 (2d Cir. 2000); 15 U.S.C. § 1065; Ex. 1, ¶¶ 17-19.

The Court, however, need not rest on Nike's incontestable federal registrations. The Swoosh design mark and NIKE word mark are amongst the most well-known, famous trademarks ever. As evidenced in Section II above, Nike owns strong rights in the Asserted Marks as a result of its continuous and substantially exclusive use of the marks for many decades, including:

- Nike has continuously and substantially exclusively promoted and sold sneakers bearing the Swoosh Design and NIKE word mark for nearly fifty years. Ex. 1, ¶ 11;
- Nike has sold hundreds of billions of dollars' worth of sneakers bearing the Swoosh design and NIKE word mark. *Id.*, ¶ 12;
- Nike has invested tens of billions advertising and promoting the Asserted Marks. *Id*., ¶ 13; and
- The Swoosh design mark and NIKE word mark are undisputedly famous designators associated with Nike. *Id*, ¶ 16.

All of these facts evidence Nike's ownership of valid and enforceable rights in the Asserted Marks. *See, e.g., GeigTech E. Bay LLC v. Lutron Elecs. Co.*, 352 F. Supp. 3d 265, 282 (S.D.N.Y. 2018); *Metrokane, Inc. v. The Wine Enthusiast*, 160 F. Supp. 2d 633, 639 (S.D.N.Y. 2001).

### 2.    MSCHF's Use of the Asserted Marks Has Caused Actual Confusion and Is Likely to Continue Causing Confusion

To determine likelihood of confusion, courts in the Second Circuit ordinarily apply the eight-factor test set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). *See Innovation Ventures,* 176 F. Supp. 3d at 153. This test requires analysis of several nonexclusive factors, including: (1) the strength of the senior user's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will bridge the gap; (5) actual confusion; (6) the junior user's good faith in adopting its own mark; (7) the quality of defendant's product; and (8) the sophistication of buyers. *Polaroid Corp.*, 287 F.2d at 495. "[A]pplication of the *Polaroid* test need not be rigid," and although "no

single factor is determinative," "the first three factors are perhaps the most significant." *New Kayak Pool Corp. v. R & P Pools, Inc.*, 246 F.3d 183, 185 (2d Cir. 2001); *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 341 (S.D.N.Y.2010) (quoting *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987)).  All of these factors weigh in favor of a likelihood of confusion in this case.

### a.     Factor #1:  Strength of the Senior User's Mark

The Asserted Marks are strong, with the Swoosh design and NIKE word marks being amongst of the most famous and valuable trademarks of all time. *See supra*, Section II(B).  As set forth above in Section II(B), Nike has: (i) continuously promoted and sold products bearing the Swoosh design and/or NIKE word mark since 1971 (Ex. 1, ¶ 11); (ii) used, and continues to use, the Swoosh design and/or NIKE word mark on almost all of its products, including dozens of iconic products, and in connection with its retail sales of those products (*id.*); (iii) sold billions of products bearing the Swoosh design and/or NIKE word mark in the United States, accounting for hundreds of billions of dollars in revenue, and has spent tens of billions of dollars promoting the NIKE word mark and/or Swoosh design branded products in the United States (*id.*, ¶¶ 12-13); and (iv) advertised and promoted products bearing the Swoosh design and/or NIKE word mark through a wide variety of traditional and non-traditional means, including print advertising, event sponsorship, and athlete and team endorsements (*id.*).  Further, the Asserted Marks have received unsolicited publicity and praise among consumers and in the media, as well as judicial and administrative recognition as a famous, recognizable, and valuable trademark.  *Id.*, ¶¶ 15-16.

Accordingly, the first *Polaroid* factor weighs strongly in favor of granting preliminary relief in this case.

**b.     Factor #2:  Degree of Similarity Between the Marks**

The second *Polaroid* factor, the degree of similarity between the marks at issue, also weighs in favor of Nike because the Swoosh mark on the Infringing Sneakers is *identical* to Nike's Swoosh design.  *See supra*, Section I.  Furthermore, MSCHF uses "NIKE" on its Satan.Shoes website, which is *identical* to Nike's famous house mark.  *See* Ex. 2, ¶ 5.

**c.     Factor #3:  Competitive Proximity**

"The closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source." *Virgin Enter., Ltd. v. Nawab,* 335 F.3d 141, 150 (2d Cir. 2003).  Here, the goods are exactly the same—sneakers.  In addition, the Infringing Sneakers are sold through the same marketing channels—Nike and MSCHF sell sneakers to the same customers through digital platforms, and both parties market their high-heat offerings via a mobile app.  *See supra*, Section II.  Further, the products are marketed to the same sets of consumers.  Thus, because the Infringing Sneakers are the same as those sold by Nike bearing the Asserted Marks and are available online to United States consumers, this factor weighs in favor of Nike.  *See Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 501 (S.D.N.Y. 2013) ("[I]nsofar as Defendants' products are available online to United States consumers, the parties' products are in close competitive proximity.  Accordingly, this factor weighs in favor of Plaintiff.").

**d.     Factor #4:  Likelihood of "Bridging the Gap"**

The fourth *Polaroid* factor looks to whether the senior user is likely to enter the junior user's market and whether prospective customers are aware of this intention.  *See Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 582 (2d Cir. 1991).  This factor is neutral because the parties are operating in an identical market. *See Bulman v. 2BKCO, Inc.*, 882 F. Supp. 2d 551, 562

(S.D.N.Y. 2012) ("[B]ecause the two products are largely operating in the same market, the Court agrees with Plaintiffs that this *Polaroid* factor is not relevant to the Court's analysis.").

e.      <strong>Factor #5:  Actual Confusion</strong>

Although it is not essential to demonstrate actual confusion to find trademark infringement, "there can be no more positive proof of likelihood of confusion than evidence of actual confusion." *See Bulman,* 882 F. Supp. 2d at 562.  Here, confusion as to the source or sponsorship of MSCHF's Infringing Sneakers is not only likely, it is actual and it is already happening.  Nike provided examples of actual confusion above.  *See supra*, Section I; *see also* Ex. 2, ¶ 3.  These examples represent just a handful of hundreds (most likely thousands) of examples of consumer confusion that presently exists over Nike's involvement (*i.e.,* sponsorship, approval, affiliation, and/or source) with the Infringing Sneakers.

This actual confusion that already exists will only escalate as MSCHF's Infringing Sneakers enter the market with Nike's genuine, authorized sneakers.  *See* Ex. 1, ¶ 29.  Customers who ordered MSCHF's Infringing Sneakers are already offering the sneakers for resale in secondary sneaker markets, and as a direct result of MSCHF's unlawful activities, they are promoting the sneakers as genuine Nike products.  Ex. 2, ¶ 4.  Below is just one of many examples where a customer attempting to resell MSCHF's Infringing Sneaker on eBay believes and represents the sneaker is a genuine, approved Nike sneaker and/or is affiliated with Nike.  *Id.*



Accordingly, this factor also favors Nike.

### f.     Factor #6:  Bad Faith

Under this factor, courts look to the conduct of the defendant, assessing whether "defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Bulman*, 882 F. Supp. 2d at 563.  Here, it cannot be disputed that MSCHF used the Asserted Marks with the intention of capitalizing on Nike's reputation and goodwill, or at the very least with the intention of implying Nike's affiliation, approval, or source of the Infringing Sneakers.  Indeed, at the top of the product launch webpage for the Infringing Sneakers, MSCHF promoted the Infringing Sneakers as "Nike Air Max 97" Sneakers:



Ex. 2, ¶ 5.  As shown in the product photos above in Section II, Nike's Swoosh design is prominently visible on the upper and tongue of the Infringing Sneakers.  *See supra*, Section II(D).  This evidence suggests MSCHF's bad faith and, accordingly, this factor weighs in Nike's favor.

### g.     Factor #7:  Quality of Defendant's Product

This factor requires the Court to "consider[ ] whether the senior user's reputation could be 'tarnished by [the] inferior merchandise of the junior user.' " *Cadbury Beverages v. Cott Corp.*, 73 F.3d 474, 483 (2d Cir. 1996) (quoting *Scarves by Vera, Inc. v. Todo Imps. Ltd*., 544 F.2d 1167, 1172 (2d Cir. 1976)).

This factor favors Nike.  Indeed, Nike is already suffering reputational harm from consumers' confusion as to its affiliation, sponsorship, approval, or source of the Infringing

Sneakers and the satanic theme apparent thereon.  Upon announcement of the Infringing Sneakers,
many consumers took to social media to express their disgust with Nike's affiliation, sponsorship,
approval,   and/or   involvement   with   the   Infringing   Sneakers,   many   using   the   hashtag
"#boycottnike" (*see* Ex. 2, ¶ 3):



Further, MSCHF has made various material alterations to the Infringing Sneakers that
impair the quality of the sneakers.  Ex. 1, ¶¶ 23-25.  For example, the material alterations include
at least adding red ink and human blood to the midsole, adding red embroidered satanic-themed
detailing, adding a bronze pentagram to the laces, and adding a new sock liner.  *Id.*  Putting aside
the health risks associated with human blood, the compromising of the airbag poses safety risks
for consumers.  *Id.*, ¶ 23.  Thus, this factor favors Nike.

h.      **Factor #8:  Sophistication of Buyers**

In considering the sophistication of the relevant purchasers, courts must evaluate "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving attention such purchasers usually give in buying that class of goods." *Bulman*, 882 F. Supp. at 563.  This factor favors Nike because the market for sneakers is the general public, rather than a sophisticated group of buyers.

Furthermore, as shown by the examples of actual consumer confusion on social media where MSCHF primarily promotes its products, many consumers exercise little to no diligence before assuming that shoes with a Nike Swoosh that appear on their social media feed must be approved by Nike, and it is completely reasonable for individual consumers, at all sophistication levels, to assume Nike's affiliation, sponsorship, and/or approval of products such as the Infringing Sneakers that bear Nike's Swoosh Design and/or the NIKE word mark.  Ex. 2, ¶ 3.  Moreover, there has been actual confusion amongst "sneakerheads," or people who collect sneakers as a hobby:



Mr. Blount @CultureMisfit · Mar 27

@**Nike** wow really. All I've been seeing is bad feedback from these. Who at your company **approved** this? I literally want to know who **thought** this was a good idea. Literally makes me want to stop buying your brand and I'm a SNKR head. Smh definitely left a bad taste in my mouth!



Zephyr Siete
@ZephyrSiete

Replying to @MediaNextStudio @nicekicks and 2 others

Of course. I'm a sneakerhead. I have more pairs than you do.

666 pairs doesn't get done without Nike being involved somehow.

1:27 AM · Mar 30, 2021 · Twitter Web App



*See id.* Accordingly, this factor favors Nike. *See Bulman*, 882 F. Supp. at 564.

### 3.   The First Sale Doctrine Does Not Apply

While trademark law, pursuant to the first sale doctrine, does not generally prohibit the resale of a genuine trademarked article, the first sale doctrine does not apply where the product is altered to be "materially different" from the original product. *Bel Canto Design, Ltd. v. MSS Hifi, Inc.*, 837 F. Supp. 2d 208, 223 (S.D.N.Y. 2011). A difference is material if "consumers [would] consider [it] relevant to a decision about whether to purchase a product." *Id.* (internal quotation omitted). "Because many factors influence such considerations, the threshold must be kept low to include even subtle differences between products." *Id.* (internal quotation omitted). "[T]he 'first sale doctrine' and its 'material difference exception' are proxies for the ultimate inquiry in a Lanham Act infringement case: did the defendant's use of the plaintiff's mark risk consumer confusion and consequent[ly] damage the plaintiff's good will." *Id.*

Here, as discussed above, the Satan Shoes are materially different from the genuine Air Max 97 shoes in numerous respects, including a potentially compromised air bladder, the inclusion of human blood, and a satanic-themed design and marketing. Ex. 1, ¶¶ 23-28. Moreover, as shown above, these differences are causing harm to Nike's goodwill because consumers are falsely associating Nike with MSCHF's Satanic Shoes and causing many to call for a boycott of Nike. *Id.*

¶ 29; Ex. 2, ¶ 3.  Thus, MSCHF is not likely to succeed in establishing a first sale defense to Nike's infringement claims.

## B.   NIKE IS LIKELY TO SUCCEED ON THE MERITS OF ITS DILUTION CLAIM

Even if there were no evidence of a likelihood of confusion, which is not the case, a preliminary injunction is still appropriate because Nike is likely to succeed on the merits of its dilution claim (Count III). The owner of a famous mark is "entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark … in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1).

This is a textbook case of dilution, by both blurring and tarnishment.  First, MSCHF cannot credibly dispute that Nike's Swoosh design is famous, or that it achieved fame long before MSCHF launched its Infringing Sneakers.  *See supra*, Section II.  The Swoosh design is one of the strongest marks ever.  *Id.*; *see also Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 1008 (C.D. Cal. 2011) (strength of a mark rests on its distinctiveness, which is "related to the questions of secondary meaning").  The commercial successes embodied in the Swoosh design—hundreds of billions in sales revenue and tens of billions in brand valuation—far exceed levels for other marks that courts have held to be famous.  *See BOSE Corp. v. OSC Audio Products, Inc.*, 293 F.3d 1367, 1371-73 (Fed. Cir. 2002) ("The [WAVE] product has enjoyed vast commercial success, with current annual sales of $100 million … and sales since inception of $250 million.").  Furthermore, other courts have found the Swoosh design mark achieved fame long ago.  *See, e.g., Nike Inc. v. Variety Wholesalers, Inc.*, 274 F. Supp. 2d 1352, 1356 (S.D. Ga. 2003) ("The Nike trademarks are famous as trademarks for apparel and sporting goods in the United States."), *aff'd*, 107 F. App'x 183 (11th Cir. 2004); *see also Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.*, 409 F. Supp.

2d 643, 652 n.12 (D. Md. 2006) ("[I]t is clear that the Nike 'swoosh' . . . indeed, is famous."); *Au-Tomotive Gold,* 457 F.3d at 1067 (noting the Swoosh design mark as an example of a "famous trademark [that has] assumed an exalted status").

Second, the factors set forth in § 1125(c)(2)(B) demonstrate that MSCHF's Infringing Sneakers are likely to impair the distinctiveness of the famous Swoosh mark based on the factors. Specifically, to obtain injunctive relief, Nike "must show, based on the factors set forth in § 1125(c)(2)(B), including the degree of similarity, that [MSCHF's mark] is likely to impair the distinctiveness of the famous [Swoosh] mark."[4]  *Id*.  All of these factors weigh in Nike's favor. *See supra*, Section II.  Indeed, the Swoosh mark MSCHF uses on its Infringing Sneakers is *identical* to Nike's Swoosh design and there is concrete evidence that MSCHF's use of the mark is likely to impair the distinctiveness of the famous Swoosh mark.  *Id*.

Lastly, Nike is likely to succeed in showing dilution by tarnishment.  "The *sine qua non* of tarnishment is a finding that the plaintiff's mark will suffer negative associations through defendant's use."  *Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497 at 507 (2d Cir. 1996).  The satanic theme of the Infringing Sneakers has already caused a significant uproar amongst customers offended by the sneakers and directing their frustration towards Nike, as shown by the consumer reactions above.  *See supra*, Section IV(A)(2).

## C.   NIKE IS LIKELY TO SUFFER IRREPARABLE HARM

Where a trademark plaintiff establishes a likelihood of success on liability, irreparable harm is presumed.  15 U.S.C. § 1116(a).  In addition, evidence of actual confusion is sufficient to establish a likelihood of irreparable harm.  *See Bulman,* 882 F. Supp. 2d at 562.  Here, Nike has

---

[4] The relevant factors include: (i) the degree of similarity between the mark and the famous mark; (ii) the degree of inherent or acquired distinctiveness of the famous mark; (iii) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (iv) the degree of recognition of the famous mark; (v) whether the user of the mark intended to create an association with the famous mark; (vi) any actual association between the mark and the famous mark. 15 U.S.C. § 1125(c)(1), (c)(2)(B).

presented evidence of numerous instances of actual confusion caused by MSCHF's Infringing Sneakers.  Ex. 2, ¶ 3; *see also supra* Sections I and IV(A)(2)(e).  That evidence alone supports a finding of likely irreparable harm.

But the Court need not rely only on the evidence of actual confusion.  It is established that "[i]rreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark ... because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *U.S. Polo Ass'n, Inc. v. PRL USA Holdings Inc.*, 800 F. Supp. 2d 515, 540 (S.D.N.Y.2011); *NYC Triathlon LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 343 (S.D.N.Y.2010) ("Prospective loss of ... goodwill alone is sufficient to support a finding of irreparable harm.").  Here, there is concrete evidence of loss of control over Nike's business reputation and damage to the goodwill Nike has built in its trademarks.

Nike has presented evidence of its storied history cultivated under the Asserted Marks.  *See* Ex. 1; *supra,* Section II.  Nike maintains strict quality control measures over the products bearing the Asserted Marks and, as a result, Nike has a worldwide reputation for fashion, quality, styling, and authenticity.  *Id*. MSCHF's continued use of the Asserted Marks to promote and sell its Infringing Sneakers effectively saddles Nike's carefully curated reputation and goodwill with the wrongful activities of MSCHF.  This is real, not speculative, irreparable harm.  Nike stands to lose significant credibility as consumers will be confused that MSCHF's Infringing Sneakers are associated with or approved by Nike.

The likely irreparable injury here is particularly concrete and acute for several reasons. First, Nike will lose control over its reputation, and the goodwill it has carefully curated with its products will be damaged, if MSCHF is allowed to fulfill the orders for its unauthorized Infringing

20

Sneakers.  *See* Ex. 1, ¶ 29.  Indeed, if MSCHF is allowed to release even a limited number of fake Infringing Sneakers, Nike will no longer have control over the market and consumer perception for its products, including at least consumer perception around who Nike collaborates with, the design of collaborations, the quality of collaborations, how many collaborations are released, where collaborations are released, when collaborations are released, and how collaborations are released.  *See id.*, ¶ 21.

Second, Nike's Asserted Marks inform consumers that the marked products meet Nike's strict quality control standards and are approved by Nike prior to distribution and sale.  *See* Ex. 1, ¶¶ 20-21.  Nike carefully controls the promotion and the supply of its products to prevent damage to its reputation and goodwill.  *Id.*  But MSCHF does not have the same standards, and MSCHF's material alterations are likely to impair the structural integrity of the sneakers, as well as impose possible health risks to consumers.  *Id.* ¶ 23.  As noted above, the Infringing Sneakers contain human blood, which MSCHF's co-founder Daniel Greenberg confirmed was collected from MSCHF employees.  Ex. 2, ¶ 8.  When asked who collected the blood for the Infringing Sneakers, Mr. Greenberg replied "Uhhhhhh yeah hahah not medical professionals we did it ourselves lol." *Id.*  To state the obvious, Nike would never approve the inclusion of human blood in any of its products, and these practices fall far short of Nike's strict standards.

Defects, objections, and faults found in MSCHF's Infringing Sneakers will negatively reflect upon and will continue to injure the reputation and goodwill Nike has established for itself and in connection with its Asserted Marks.  *See* Ex. 1, ¶ 29.  Moreover, consumers viewing others wearing MSCHF's Infringing Sneakers will attribute the lesser quality and design defects to Nike. *Id.*  In fact, consumers are already confused as to Nike's involvement affiliation, sponsorship, and/or approval of the Infringing Sneakers due to the presence of the Asserted Marks:



See Ex. 2, ¶ 3. Thus, absent a temporary restraining order and preliminary injunction, MSCHF will fulfill the orders for its Infringing Sneakers, causing irreparable harm to Nike's reputation and the goodwill Nike has built in its trademarks over many decades. This factor favors granting a preliminary injunction. *See Bulman*, 882 F. Supp. 2d at 565 (Finding irreparable harm from plaintiff's examples of customer frustration and confusion, such harm being "a virtual certainty."); *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 329 (S.D.N.Y.2011) ("[W]here the likelihood of confusion is so high, it is impossible to disaggregate lost good will from confusion.... The extreme

likelihood of confusion (as well as evidence of actual confusion) makes it clear that Plaintiff has lost good will because of this confusion.").

### D.   THE BALANCE OF EQUITIES TIPS DECIDEDLY IN NIKE'S FAVOR

A court must also "consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor." *See Juicy Couture*, 930 F. Supp. 504. Here, the balance of the equities tip sharply in favor of granting preliminary injunctive relief.

Without injunctive relief, Nike's long-standing goodwill and reputation will suffer substantial loss based on dilution and confusion with respect to its Swoosh design mark and NIKE word mark, both used since 1971. Ex. 1, ¶ 11. In stark contrast to the harm to Nike's reputation and marks that have been in use for many decades, any harm MSCHF might suffer from an injunction is with respect to *recently* announced unauthorized sneakers it took orders for on March 29, 2021. Ex. 2, ¶ 4. The preliminary relief Nike seeks is narrowly tailored to those Infringing Sneakers and will not preclude MSCHF from making and selling other non-infringing products. Furthermore, any harm MSCHF faces from a preliminary injunction is self-inflicted and of its own making, as MSCHF is knowingly selling illegal sneakers[5] that attempt to capitalize on the strength and fame of Nike. Accordingly, this factor weighs strongly in favor of granting a preliminary injunction.

### E.   AN INJUNCTION IS IN THE PUBLIC INTEREST

Granting an injunction would benefit the public because it is in the public's interest not to be deceived or confused. This interest will not be served by allowing MSCHF to infringe and dilute Nike's trademarks. Here, the public is likely to fall prey to MSCHF's deception for all the

---

[5] In an interview with Complex.com prior to the launch of the Satan Shoes, MSCHF's co-founder acknowledged that "[e]very outlet always asks, 'How have you guys not been sued into oblivion yet?' We haven't, obviously. We're still here…" Ex. 2, ¶ 10.

reasons discussed above.  *See supra,* Section IV(A)(2).  Consumers will likely purchase fakes, both from MSCHF and then from resellers in the secondary sneaker markets, mistakenly believing they are the product of, associated with or sponsored by Nike.  *Id*.  An injunction will protect unsuspecting consumers from being deceived by MSCHF and prevent the misappropriation of the skills, creative energies, and resources which Nike has invested over the years in the Asserted Marks and the products bearing those marks.

Further, the Second Circuit has long held that there is a "strong interest in preventing public confusion."  *ProFitness Phys. Therapy Ctr. v. Pro–Fit Ortho. and Sports Phys. Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002).  Because Nike has established that MSCHF's actions have caused actual consumer confusion and are likely to continue to confuse consumers (*see supra*, Section IV(A)(2)(e)), the public interest would not be disserved by the issuance of a preliminary injunction. *See Juicy Couture*, 930 F. Supp. 504 (finding that "the public interest would not be disserved by the issuance of a preliminary injunction" because the plaintiff established that defendants' actions were likely to cause consumer confusion); *Bulman*, 882 F. Supp. 566 ("[T]he public interest is best served by removing confusingly similar marks so that the public can more freely access the parties' products."); *Tecnimed SRL v. Kidz–Med, Inc.*, 763 F. Supp. 2d 395, 417 (S.D.N.Y.2011) (holding this prong serves the public interest by removing confusing marks from the marketplace).

Accordingly, because Nike has demonstrated that it is "likely to succeed on the merits, that [it is] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest," this Court should grant Nike's Motion for a preliminary injunction. *Juicy Couture*, 930 F. Supp. 2d at 505.

### F.    THE BOND SHOULD BE MINIMAL

Under Fed. R. Civ. P. 65(c), district courts have "wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of

likelihood of harm." *Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). Here, MSCHF will not be harmed by a preliminary injunction. *See* Section IV(D), *supra*. MSCHF will not be restrained from using non-infringing marks to promote its products and business. *Id.* Moreover, Nike's likelihood of succeeding on the merits at trial is high (*see supra*, Section IV(A)), making the likelihood of a "wrongful" injunction low.

## V.   CONCLUSION

For all the reasons Nike set forth in its motion and this supporting memorandum, Nike requests that the Court grant Nike's application for a temporary restraining order and motion for a preliminary injunction, and issue Nike's proposed preliminary injunction against MSCHF.

Dated: March 30, 2021              ARNOLD & PORTER KAYE SCHOLER LLP

                                   By:  */s/ Kyle A. Schneider*

                                        Kyle A. Schneider
                                          Kyle.Schneider@arnoldporter.com
                                        ARNOLD & PORTER KAYE SCHOLER LLP
                                        250 West 55th Street
                                        New York, NY 10019-9710
                                        Telephone: (212) 836-8000
                                        Facsimile: (212) 836-8689

                                        Christopher J. Renk (*pro hac vice* to be filed)
                                          Chris.Renk@arnoldporter.com
                                        Michael J. Harris (*pro hac vice* to be filed)
                                          Michael.Harris@arnoldporter.com
                                        ARNOLD & PORTER KAYE SCHOLER LLP
                                        70 West Madison Street, Suite 4200
                                        Chicago, Illinois 60602-4231
                                        Telephone: (312) 583-2300
                                        Facsimile: (312) 583-2360

                                        Rhonda R. Trotter (*pro hac vice* to be filed)
                                          Rhonda.Trotter@arnoldporter.com
                                        Oscar Ramallo (*pro hac vice* to be filed)
                                          Oscar.Ramallo@arnoldporter.com
                                        ARNOLD & PORTER KAYE SCHOLER LLP
                                        777 South Figueroa Street, 44th Floor
                                        Los Angeles, California 90017-5844
                                        Telephone: (213) 243-4000
                                        Facsimile: (213) 243-4199

Bridgette C. Boyd (*pro hac vice* to be filed)
 Bridgette.Boyd@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, D.C. 20001
Telephone:  (202) 942-6745
Facsimile:  (202) 942-5999

*Attorneys for Plaintiff Nike, Inc.*