# EXHIBIT 1

Christopher J. Renk (*pro hac vice* to be filed)
 Chris.Renk@arnoldporter.com
Michael J. Harris (*pro hac vice* to be filed)
 Michael.Harris@arnoldporter.com
**Arnold & Porter Kaye Scholer LLP**
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Telephone: (312) 583-2300
Facsimile: (312) 583-2360

*Attorneys for Plaintiff Nike, Inc.*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| NIKE, INC., | **Case No.  1:21-cv-01679-EK-PK** |
| Plaintiff, | |
| v. | |
| MSCHF PRODUCT STUDIO, INC., | |
| Defendant. | |

**DECLARATION OF JOE PALLETT IN SUPPORT OF NIKE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION & TEMPORARY RESTRAINING ORDER**

I, Joe Pallett, declare and state as follows:

1.      This declaration is based upon my personal knowledge of the facts or on business records that were made in the regular course of business. If called as a witness, I could and would testify to the statements made herein.

**Nike's Business**

2.      Founded January 25, 1964, Nike, Inc. ("Nike) is an Oregon corporation with a principal place of business at One Bowerman Drive, Beaverton, Oregon 97005.

3.      I am Director Brand Protection, Authentication and Innovation for Nike. As part of my role at Nike, I am intimately familiar with Nike products and I am knowledgeable of or have access to business records concerning all of the information in this declaration, including Nike's sales, advertising, marketing, media coverage, and trademarks.

4.      Nike's principal business activity is the design, development, and worldwide marketing and selling of athletic footwear, apparel, equipment, accessories and services.

5.      Nike is the largest seller of athletic footwear and apparel in the world.

6.      Nike sells its products directly to consumers through Nike-owned retail stores and digital platforms, and to retail accounts and a mix of independent distributors, licensees and sales representatives.

7.      Nike uses trademarks on and in connection with nearly all of its products.

8.      Having distinctive trademarks that are readily identifiable is an important factor in creating a market for Nike's products, in identifying Nike and its brands, and in distinguishing Nike's products from the products of others.

9.      The Nike brand is a multi-billion-dollar brand, and Nike spends considerable resources marketing and protecting it. Nike branded products have become enormously popular and even iconic, driven by Nike's arduous quality standards and innovative design. Among the purchasing public, genuine Nike products are instantly recognizable as such. In the United States and around the world, the Nike brand has come to symbolize high quality, and Nike products are among the most recognizable products in the world.

**Nike's Asserted Marks**

10.     One of Nike's most iconic assets is the Swoosh design . The 

Swoosh deign is among the most widely recognized marks and indicates the origin of Nike

products. Consumers in the United States and throughout the world associate the Swoosh design

as a source identifier for Nike products.

11.     Nike adopted the Swoosh design in 1971. Since that time, Nike has consistently

and continuously used the Swoosh design in United States and global commerce in connection

with its promotion and sales of many different products and services, including footwear. Nike has

used, and continues to use, the Swoosh design on almost all of its products, including dozens of

iconic products, and in connection with its retail sales of those products.

12.     Nike has sold billions of products bearing the Swoosh design in the United States,

accounting for hundreds of billions of dollars in revenue.

13.     Nike advertises and promotes products bearing the Swoosh design through a wide

variety of means, including print advertising, event sponsorship, and athlete and team

endorsements. Nike has spent tens of billions of dollars promoting Swoosh design branded

products in the United States.

14.     Nike provides the official uniforms of the National Football League, the National

Basketball League, and Major League Baseball, all of which prominently bear the Swoosh design.

15.     The Swoosh design is one of the most famous, recognizable, and valuable

trademarks in the world. The Swoosh design has received unsolicited publicity and praise among

consumers and in the media. For example, Nike consistently ranks among the highest valued

brands in the world worth tens of billions of dollars, according to *Interbrand's* annual publication

of the 100 "Best Global Brands." Nike consistently ranks among the most valuable brands in

*BrandFinance's* annual report, "Global 500." Nike consistently ranks among the top brands in the

world in *Brandz's* annual publication, "The 100 Most Powerful Brands." Nike consistently appears

in *Fortune Magazine's* annual ranking of "The World's Most Admired Companies." Nike

consistently appears in *FastCompany's* annual ranking of "The World's Most Innovative Companies."

16.     The Swoosh design has received judicial and administrative recognition as a famous, recognizable, and valuable trademark. Attached hereto as **Exhibit A** are true and correct copies of a representative collection of such recognitions. Attached hereto as **Exhibit B** is a chart summarizing key portions of U.S. cases and decisions acknowledging the well-known and famous status of the Swoosh design.

17.     The U.S. Patent and Trademark Office has examined and allowed numerous applications to register the Swoosh design mark on the Principal Register in connection with a wide array of goods and services. For example, Nike owns all right, title, and interest in the U.S. Trademark Registrations identified below.   Attached hereto as **Exhibit C** are true and correct copies of the United States Registration Certificates for the below-listed trademarks.

| Reg. No. | Trademark | Reg. Date | Goods |
|---|---|---|---|
| 977,190 |  | Jan. 22, 1974 | Athletic shoes with or without spikes |
| 1,264,529 |  | Jan. 17, 1984 | Retail footwear and apparel store services |
| 1,323,343 | | Mar. 5, 1985 | Footwear |
| 1,323,342 |  | Mar. 5, 1985 | Footwear |
| 1,238,853 |  | May 17, 1983 | Retail footwear and apparel store services |
| 1,325,938 | | Mar. 19, 1985 | Footwear |

18.     The above-listed Swoosh registrations are incontestable pursuant to 15 U.S.C. § 1065, and thus they constitute conclusive evidence of the validity of the Swoosh design mark, Nike's ownership of the Swoosh design mark, and Nike's exclusive right to use the Swoosh design mark.

19.     In addition, Nike has registered the NIKE word mark on the Principal Register of the U.S. Patent and Trademark Office in connection with a wide array of goods and services.  For example, Nike owns all right, title, and interest in the U.S. Trademark Registrations identified below.  Attached hereto as **Exhibit D** are true and correct copies of the United States Registration Certificates for the below-listed trademarks.

| Reg. No. | Reg. Date | Goods |
|---|---|---|
| 0,978,952 | Jan. 31, 1972 | Athletic shoes with or without spikes |
| 1,214,930 | Nov. 2, 1982 | Footwear |
| 1,243,248 | Jun. 21, 1983 | Retail footwear and apparel store services |
| 6,124,779 | Aug. 11, 2020 | Retail store services and on-line retail store services featuring apparel, footwear, sporting goods and equipment, and sports and fitness products and accessories |

20.     Nike maintains strict quality control standards for products bearing its trademarks. Genuine Nike products bearing Nike trademarks are inspected and approved by Nike prior to distribution and sale.

21.     Nike also maintains strict control over the use of its trademarks in connection with its products. Nike carefully determines how many products are released, where the products are released, when the products are released, and how the products are released.  Nike occasionally partners with athletes, artists, designers, and others in connection with its products, including

through collaborations, but it does so carefully and strategically to maintain control over its reputation and goodwill.

**MSCHF's Deviation From Nike's Standards**

22.    As described in media reports and Defendant MSCHF Product Studio, Inc.'s ("MSCHF") website, the "Satan Shoe" does not meet Nike's quality control standards and contains material alterations to the genuine Nike Air Max 97 Shoe.  Pictures of a genuine Nike Air Max 97 Shoe and the unauthorized "Satan Shoe" are reproduced below.

| Genuine Nike Air Max 97 Shoe | Unauthorized Satan Shoe |
|---|---|



23.    According to MSCHF and media reports, MSCHF modifies the Air Max 97 shoe by adding red ink and human blood to the airbag in the midsole of the shoe.  Nike does not condone any post-market alteration to the airbag of  its sneakers.  Any compromise to the integrity of the airbag can lessen the stability of the shoe and thus pose a potential safety threat to the consumer. The use of human blood poses additional safety concerns, and Nike does not wish to be associated with the sale of human biological material.

24.    The Satan Shoe also contains material physical modifications to the genuine Air Max 97 shoe to support the satanic theme.  These modified elements include:

  a.   Embroidery stating "LUKE 10:18."

  b.   Embroidery of the number "666."

  c.   A circular pendent with a pentagram attached to the laces of each shoe.

    d.   A pentagram inside the shoe on the heel in a newly added sock liner.

    e.   A red, inverted cross on the tab at the top of the tongue.

    f.   An apparent red liquid in the airbag of each shoe.

    g.   The letters "MSCHF" and "LIL NAS X" in a red, pseudo-runic font.

25.    None of these physical alterations to the Air Max 97 were approved by Nike.

26.    Furthermore, the Satan Shoe is marketed in a manner that supports the satanic theme, as exemplified in the screenshot of MSCHF's website reproduced below.



27.     The satanic theme elements, include, among others:

    a.  The shoe is called the "Satan Shoe."

    b.  The website domain name is "satan.shoes."

    c.  The website's wallpaper evokes Renaissance depictions of Dante's Inferno.

    d.  A pentagram appears between "MSCHF" and "LIL NAS X" at the header of the page.

    e.  The website uses pseudo-runic fonts, with inverted crosses used to separate groups of words.

28.      None of MSCHF's marketing of the Satan Shoe was approved by Nike.

29.     The satanic theme of MSCHF's marketing is contrary to the identity that Nike has spent decades developing into one of the world's most valuable brands.  Unless MSCHF's actions are stopped, Nike will suffer irreparable harm from the loss of its ability to control its reputation and brand identity.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 30, 2021

Joe Pallett

# EXHIBIT A

LEXSEE 84 U.S.P.Q.2D 1521

Copyright (c) 2007 The Bureau of National Affairs, Inc.

UNITED STATES PATENTS QUARTERLY

Nike Inc. v. Nikepal International Inc.

No. 2:05-cv-1468-GEB-JFM

U.S. District Court Eastern District of California

84 U.S.P.Q.2D (BNA) 1521

Decided September 10, 2007

**CASE HISTORY and DISPOSITION:** Action by Nike Inc. against Nikepal International Inc., in which plaintiff challenges decision of Trademark Trial and Appeal Board dismissing plaintiff's opposition to defendant's application for federal registration of proposed "Nikepal" mark, and asserts claims for trademark infringement, trademark dilution, and unfair competition. Following bench trial, judgment is granted in favor of plaintiff on dilution claims, TTAB's decision is reversed, and defendant is permanently enjoined from using "Nikepal" in connection with offering of goods or services in commerce.

**HEADNOTES:**
TRADEMARKS AND UNFAIR TRADE PRACTICES

[**1H]  Types of marks -- Secondary meaning (327.02)

Infringement; conflicts between marks -- Dilution (335.05)

Plaintiff's "Nike" trademark for athletic footwear, apparel, and related goods and services was famous before defendant's first use of accused "Nikepal" mark in 1998, since record shows that "Nike" mark was promoted nationally for more than two decades before defendant's first use of "Nikepal," and that plaintiff has expended more than $ 1 billion for promotion of "Nike" products in United States, since plaintiff's U.S. sales of "Nike" products reached level of $ 1 billion per year well before 1998, since recognition of success of "Nike" mark was recorded by various publications in surveys and articles written before 1998, since "Nike" has been consistently ranked as top brand in national and worldwide surveys, and since plaintiff owns 10 federal registrations for "Nike" covering uses before 1998.

[**2H]  Infringement; conflicts between marks -- Dilution (335.05)

Defendant's use of "Nikepal" mark for products distributed to analytical, environmental, and scientific laboratories is likely to dilute, by blurring, plaintiff's "Nike" mark for athletic footwear, apparel, and related goods and services, since parties' marks are nearly identical, in that dominant feature of defendant's mark is term "Nike," which is pronounced identically in both marks, and survey results show that respondents perceive marks as essentially identical, since plaintiff's "Nike" mark is at least suggestive, and thus is inherently distinctive, since plaintiff's use of "Nike" has been substantially exclusive, since degree of recognition of "Nike" mark is quite strong, since president of defendant company admitted that he was aware of "Nike" mark when he adopted "Nikepal" name, since evidence shows actual association between "Nikepal" and "Nike" in Internet context, and since survey evidence showing association of "Nikepal" with "Nike" among survey respondents supports finding that such association exists among members of

84 U.S.P.Q.2D (BNA) 1521, *; USPQ Headnotes 1521, **2H

general public.

REMEDIES

 [**3H]  Non-monetary and injunctive -- Equitable relief -- Permanent injunctions -- Trademarks and unfair trade practices (505.0709.09)

Plaintiff that has succeeded in demonstrating dilution of its "Nike" trademark by defendant's "Nikepal" mark is granted permanent injunction, since, if injunctive relief is not granted on dilution claim, plaintiff will face increasing erosion of its famous mark, which will lose its ability to serve as source identifier, since there is no adequate remedy at law, in that monetary damages will not compensate for such harm, since balance of hardships favors plaintiff, in that defendant chose its mark with full awareness of existence and widespread use of "Nike" mark, and it should not be unduly burdensome for defendant, as small  [*1522]  business, to notify its customers of name change, and since public interest is served by preventing dilution of "Nike" in order to enable public's continued reliance on mark as designation of source.

TRADEMARKS AND UNFAIR TRADE PRACTICES

 [**4H]  Registration and its effects -- Non-registrable subject matter -- In general (315.0401)

Infringement; conflicts between marks -- Dilution (335.05)

Trademark Trial and Appeal Board's denial of plaintiff's opposition to registration of defendant's proposed "Nikepal" mark is reversed, since TTAB based its holding of no likelihood of dilution on finding that defendant's mark was not sufficiently similar to plaintiff's "Nike" mark, since plaintiff has presented new evidence of similarity, including survey evidence showing that vast majority of respondents, representing significant segment of defendant's target customer group, associate plaintiff and/or its products and services with "Nikepal," thus indicating that respondents perceive parties' marks as essentially identical, and since this new evidence compels contrary finding as to similarity of marks.

**CLASS-NO:** 315.0401, 327.02, 335.05, 505.0709.09

**COUNSEL:** Gina Durham, Keith Medansky, Jennifer J. Ruttenberg, and Monica L. Thompson, of DLA Piper US, Chicago, Ill.; Eugene M. Pak, of Piper Rudnick, San Francisco, Calif., for plaintiff.
Catherine Ashley Straight and Robert Michael West, Sacramento, Calif., for defendant.

**OPINIONBY:** Burrell, J.

**OPINION:**
The following findings of fact and conclusions of law issue as a result of a bench trial conducted in this trademark action. Plaintiff Nike, Inc. ("Nike"), a company headquartered in Beaverton, Oregon which uses the mark NIKE, contests the use of the mark NIKEPAL by Defendant Nikepal International, Inc. ("Nikepal"), a company located in Sacramento, California. Nike initially contested Nikepal's registration of the NIKEPAL mark at the Trademark Trial and Appeal Board ("TTAB") of the United States Patent and Trademark Office ("PTO"); however, the TTAB denied Nike's opposition to Nikepal's registration of the NIKEPAL mark. Nike subsequently appealed the TTAB's ruling to this court under *15 U.S.C.  Section 1071* and brought additional claims for federal and state trademark dilution under *15 U.S.C.  Section 1125*(c) and California Business and Professions Code section 14330; for trademark infringement under *15 U.S.C.  Section 1114;* and for unfair competition under *15 U.S.C.  Section 1125*(a). n1

n1 For the reasons stated herein, Nike prevails on its federal and state dilution claims. Therefore, Nike's claims for trademark infringement and unfair competition need not be reached.

Nike seeks an injunction preventing Nikepal from using the term "Nike" (or any term confusingly similar thereto) alone or as part of any trademark, domain name or business name under which Nikepal offers goods or services in commerce. Nike also seeks a reversal of the TTAB's ruling allowing Nikepal to register the NIKEPAL mark. Nikepal seeks an affirmation of the TTAB's April 21, 2005 order. (TTAB's April 21, 2005 Order ("TTAB Decision").)

Findings of Fact

I. The Parties and their Businesses

A. Nike

Nike was incorporated in 1968 under the original company name Blue Ribbon Sports. (Exs. 44, 57 at 1.) In 1971, it adopted the NIKE mark to brand its footwear products and in May 1978, the company's name was officially changed to "Nike, Inc." (Joint Pretrial Statement Undisputed Fact #2; Ex. 44.) Today, Nike is the largest seller of athletic footwear and apparel in the world. (Ex. 47 at 2.) Nike sells around 180 million pairs of shoes annually in the United States alone. (Trial Transcript ("Tr.") at 83:19-23.) Nike's principal business activity is the design, development, [*1523] and worldwide marketing and distribution of high quality and technologically advanced footwear, apparel, equipment, and accessories. (Ex. 47; Tr. at 21:9-22; 22:2-8.) Nike has continuously used the NIKE mark on and in connection with the various products offered by the company since the 1970s. (Exs. 2-4, 7, 14; Tr. at 19:3-6, 43:10-44:15.) Sometimes, the word mark NIKE is the only brand used; sometimes, Nike's Swoosh design mark (i.e. the logo which frequently appears on products along with NIKE, and in some instances alone) is also placed on the product. (Tr. at 121:4-9.)

B. Nikepal

Nikepal was incorporated on May 18, 1998 by the company's founder and president, Palminder Sandhu ("Mr. Sandhu"), who then began using the NIKEPAL mark in commerce. Nikepal provides services and products to analytical, environmental, and scientific laboratories. (Tr. at 180:14-20.) Nikepal's trademark application to the PTO requested registration for: "import and export agencies and wholesale distributorships featuring scientific, chemical, pharmaceutical, biotechnology testing instruments and glassware for laboratory use, electrical instruments, paper products and household products and cooking appliances." (Application Serial No. 76123346, filed September 6, 2000; see TTAB Decision at 1.) Nikepal distributes glass syringes in varying volumes and other laboratory products to testing and power companies and also distributes paper boxes (syringe carrying cases) and nylon valves and caps for use with the syringes. Nikepal only distributes its products to laboratories, not to individuals.

Nikepal does not have a retail office, but operates its business through its website (located at www.nikepal.com), via email, and via telephone. (Tr. at 189:17-190:2, 378:11-12; Ex. 98; Tr. at 142:16-143:10.) Nikepal is run by Mr. Sandhu, who also works as a transportation engineer. (Tr. at 125:9-17.) Currently, Nikepal has one other part-time employee. (Tr. at 202:15-22.) Nikepal has only a few hundred customers, but it has a list of thousands of prospective customers, some of whom receive materials from Nikepal advertising its product and service offerings under the mark NIKEPAL. (Tr. at 417:8-12; Ex. 147.)

II. The Parties' Marks

84 U.S.P.Q.2D (BNA) 1521, *1523; USPQ Headnotes 1521, **4H

## A. NIKE

Nike first registered the NIKE mark with the PTO in February 1974. (Ex. 2.) Nike owns ten (10) federal trademark registrations for the NIKE mark alone, covering footwear, clothing, bags, timepieces, paper products such as notebooks and binders, sport balls, swim accessories, and retail store services, all of which related to pre-May 1998 uses of the mark. (Exs. 2, 3, 4, 7, 14, 24, 26, 28, 31, 35.) By May 1998, Nike was also using and applied for trademark registrations covering the use of the NIKE mark in combination with other terms or designs for footwear, clothing, bags, timepieces, posters, sport balls, swim accessories, weights, gloves, headgear, and retail store services. (Exs. 5, 6, 15-23, 25, 27, 29, 30, 32-34, 36.) For example, Nike owns nineteen (19) federal registrations for NIKE composite marks such as: NIKE and the Swoosh design which has been in use since 1971; NIKE AIR which has been in use since 1987; NIKE-FIT which has been in use since 1990; NIKE TOWN which has been in use since 1990; NIKE SHOP which has been in use since 1991; and NIKE GOLF which has been in use since 1993. ( Id. ) From 1998 to the present, Nike has continued to use the mark NIKE alone and in combination with other terms or designs. (Exs. 37, 39, 40.)

## B. NIKEPAL

Mr. Sandhu testified that he conceived of the term Nikepal when he wanted to create a vanity license plate for his car. (Tr. at 373:17-25.) He testified that he selected the word "Nike" by opening a dictionary to a random page and choosing the first word he saw, and then combined it with the first three letters of his first name "Pal." (Tr. at 372:8-13, 373:1-6, 374:4-12.) "Pal" means friend or benefactor. (Record from the TTAB Proceeding ("TTAB Rec."), Dep. of Palminder Sandhu ("Sandhu Dep.") at 9:12-16; Tr. at 127:24-128:6.) Mr. Sandhu admits he knew of the existence of the company Nike and its use of the NIKE mark at the time he devised the term NIKEPAL. (Tr. at 127:20-23.) Despite Mr. Sandhu's trial testimony concerning the manner in which he conceived of the term NIKEPAL, the court does not find it to be credible.

The "Nike" portion of the NIKEPAL mark is pronounced the same way as the NIKE mark is pronounced: with a hard "i" (like bike) in the first syllable and a hard "e" (like [*1524] in "key") in the second syllable. n2 (Tr. at 296:1-17; Ex. 414.) The articles of incorporation signed by Mr. Sandhu for Nikepal in 1998 display the company name as "NikePal International, Inc.," with the first word of the company name spelled "NikePal," with a capital "N" and a capital "P." n3 (Tr. at 126:7-127:3; Ex. 154.)

n2 Nikepal's attorney attempted to convince the court that there is a pronunciation difference between NIKE and NIKEPAL. In her questions during trial, for example, she pronounced Nikepal's mark as "nik-a-pal." However, in answering her questions at trial, Mr. Sandhu, the president of Nikepal, alternated between the pronunciation of NIKEPAL as "nik-a-pal" and as "Ny-key-pal." Further, Nike's witness, Joseph Sheehan, a former FBI agent and now a private investigator, provided a tape recording of the outgoing message heard on Nikepal's answering machine which clearly pronounced the term "Nike" with long, or hard, vowels, that is an "i" like in "bike" and "e" like in "key" identical to the pronunciation of the Nike's trademark.

n3 However, since both parties refer to "Nikepal" with a lowercase "p" in this action, the court adopts this spelling for the purposes of this order.

In addition to using Nikepal as the company name, NIKEPAL appears directly on some of Nikepal's products, including on its syringe products, and on its marketing materials. (Tr. at 128:7-11; Ex. 127; Tr. at 135:25-136:20, at 136:21-137:7,

137:20-138:4.) Nikepal also places www.nikepal.com on its syringes to identify the source of the syringe. (Tr. at 138:5-9.) Nikepal also uses the NIKEPAL mark in a vanity phone number (1-877-N-I-K-E-P-A-L), on its website, and in its domain names, including nikepal.com, nikepal.biz, nikepal.us, nikepal.tv, nikepal.info, and nikepal.net. (Tr. at 128:12-129:9, 144:11-16.)

III. Nike's Sales

By the late 1980s, United States sales of NIKE branded products were over one billion dollars per year. (TTAB Rec., Dep. of John F. Coburn ("Coburn Dep."), Ex. 28.) Starting in 1991 and through the mid 1990s, sales of NIKE products in the United States were approximately two billion dollars per year, and were above five billion dollars per year by 1997. n4 ( Id. ; Tr. at 76:3-23; Ex. 61 at p. 10; Ex. 59 at p. 2.) By 1997, Nike was the largest seller of athletic footwear and apparel in the world. (Ex. 57; Tr. at 84:11-25.) The geographic area of Nike's sales includes the United States and 140 countries throughout the world. (TTAB Rec., Coburn Dep. at 18:9-14; Ex. 61 at 2.) Since 1997, Nike has sold over 100,000,000 pairs of NIKE shoes each year. (Tr. at 84:6-8.)

n4 Nikepal has disputed whether Nike's total sales previously testified to by Mr. Coburn in the TTAB proceeding were all attributable to NIKE, arguing that some of those sales included products that did not bear the NIKE mark. However, Mr. Farris, a high-level Nike employee who has been with the company since 1973, testified that the only portion of Nike sales that could potentially be for products bearing a mark other than NIKE would have been for the Cole Haan brand which was less than one percent of total United States sales in the 1990s. (Tr. 76:20-23.) This is also shown by Nike's 10K SEC filings. Therefore, the trial evidence clearly established that Nike's annual sales of NIKE products in the United States exceeded billions of dollars prior to May 1998.

IV. Advertising and Promotion of the NIKE

Mark Nike has undertaken significant expense to promote the NIKE mark. ( See Ex. 70 at 33.) Nike advertises in various types of media, including traditional print advertising, such as magazines (of both special and general interest), newspapers (of general circulation), leaflets, and billboards. (TTAB Rec., Coburn Dep. at 19:19-25, 20:4-13, 34:1-25.) Nike also advertises in electronic media, including radio, television, cable and internet, on sides of buildings, on taxi cabs, and through direct mailings. ( Id. ) Nike's television advertisements have run on network channels and have reached national audiences. (Tr. at 56:8-25, 60:10-61:19, 62:10-63:25, 64:16-65:9, 69:21-70:25.) Nike has also promoted its mark by associating with athletes through endorsement arrangements. (Tr. at 66:18-20; TTAB Rec., Coburn Dep. at 20:19-21:8.) By 1991, Nike was spending in excess of one hundred million dollars per year in the United States alone to advertise products bearing the NIKE mark. (TTAB Rec., Coburn Dep. Ex. 30.) By 1997, Nike had spent at least $ 1,567,900,000.00 to promote the NIKE mark in the United States. ( Id. )

V. Notoriety of NIKE

The NIKE mark has been consistently ranked as a top brand in publications that survey the top brands each year. (Ex. 112 (at NIKE04099); Ex. 113 (at NIKE04104); Ex. 121 (at NIKE04159); Ex. 122 (at NIKE04174).) Since at least 1990, Nike has been named one of the top forty (40) brands in the United States based on the EquiTrend and other studies published in BrandWeek and Financial World Magazine. ( Id .) Other brands ranked in such studies include FRITO LAY, LEVI'S, CAMPBELLS', HEWLETT-  [*1525]  PACKARD, SONY, PEPSI, and VISA. One story printed in

Forbes magazine, reported a survey conducted by Young & Rubicam that ranked the NIKE brand among the top ten (10) in the United States in 1996 with COKE, DISNEY, and HALLMARK. (Tr. at 80:7-16.)

VI. Evidence of Actual Association

A survey conducted by Phillip Johnson of Leo J. Shapiro and Associates ("Mr. Johnson's survey"), a Chicago-based market research firm, determined that a significant number of Nikepal's potential laboratory customers actually associated NIKE with NIKEPAL. Mr. Johnson is an expert at designing surveys that measure consumer behavior. (Tr. at 302:24-303:7.) The primary business of Shapiro and Associates is to explore consumer behavior through the use of surveys for businesses such as Toys-R-Us, Target, and Petsmart in order to help them better understand their marketplace when developing new retail concepts. (Tr. at 298:16-21.) Nike retained Mr. Johnson to design a survey to measure, inter alia , the likelihood of dilution of the NIKE brand as a result of Nikepal's use of the NIKEPAL mark. (Tr. at 304:18-25.)

In designing his study, Mr. Johnson used a universe of survey participants randomly selected from lists of companies that Mr. Sandhu's deposition testimony identified as the sources for Nikepal's current and prospective customers. (Tr. at 309:3-18.) Mr. Johnson conducted the survey by phone and asked respondents about their perception of a website called nikepal.com. In designing his survey, Mr. Johnson chose one of the ways that the NIKEPAL mark is used in commerce which allowed him to reasonably recreate a purchasing context while obtaining a controlled and accurate measurement. (Tr. at 312:25-314:22.) Mr. Johnson testified that this survey replicated the circumstances in which people typically encountered the NIKEPAL mark. (Tr. at 311:19-312:16, 367:8-17.)

Once survey respondents were screened to confirm that they were the persons most responsible for ordering laboratory equipment at their business, they were asked: "What if anything, came to your mind when I first said the word Nikepal?" Many survey respondents who were not actually confused about the source of the Nikepal website nonetheless identified Nike. Mr. Johnson testified that his survey revealed that the vast majority of respondents, 87%, associated Nikepal with Nike; that is, when they encounter the mark NIKEPAL, they think of Nike and/or its offerings. (Tr. at 324:3-325:23, 326:19-24.)

Evidence of actual association of the NIKEPAL mark with the NIKE mark also exists beyond the results demonstrated in Mr. Johnson's survey. Mr. Sandhu registered the domain names nikepal.biz, nikepal.us, nikepal.tv, nikepal.net, and nikepal.info with Network Solution, and until just prior to trial, those websites were inactive. Mr. Sandhu testified that at the time he registered those domains he chose not to link them to an active website. (Tr. at 130:8-131:2, 131:17-19.) As a result, Network Solutions assigned those domains an "under construction" page and then associated with that page promotions and advertisement links to product and service offerings of its choice. (Ex. 443; Tr. at 232:21-233:9.) These promotions and advertisements all referred to NIKE products or those of one of its competitors. (Ex. 434; Tr. at 210:25, 213:6-8, 214:7-12, 214:19-21, 216:22-25; Ex. 438; Tr. at 218:11-13; Ex.440; Tr. at 219:1-3, 219:4-5, 219:17-19; Ex. 442; Tr. at 219:14-16, 235:12-15.) Thus, when accessing Nikepal's NIKEPAL domain names (other than nikepal.com), users received information about Nike or its competitors, but not Nikepal. ( Id. )

Conclusions of Law

I. Dilution

Under the Federal Trademark Dilution Revision Act n5 : *15 U.S.C.  Section 1125*(c)(1) ("TDRA"). To prevail on its dilution claim, Nike must prove 1) that its mark was famous as of a date prior to the first use of the NIKEPAL mark and 2) that Nikepal's use of its allegedly diluting mark creates a likelihood of dilution by blurring or tarnishment. n6

[T]he owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a

mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury. [*1526]

n5 The TDRA, signed into law on October 6, 2006, amended the previous federal anti-dilution statute (the Federal Trademark Dilution Act ("FTDA")). The TDRA revises the FTDA in three ways: it establishes that likelihood of dilution, and not actual dilution, is a prerequisite to establish a dilution claim; it sets forth four relevant factors courts may consider in determining famousness; and it also lists six relevant factors that courts may consider in determining whether a likelihood of dilution exists. *Century 21 Real Estate LLC v. Century Surety Co. , 2007 WL 433579,* at *1 (D. Ariz. Feb. 6, 2007).

n6 California's anti-dilution statute, under which Nike also brings a claim, prescribes:Likelihood of injury to business reputation or a dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between parties or the absence of confusion as to the source of goods or services.

Cal. Bus. & Prof. Code Section 14330.If Nike prevails on its federal dilution claim, it will also prevail on its dilution claim under California law.  See *Jada Toys, Inc. v. Mattel, Inc. , 2007 WL 2199286,* at *4 *[83 USPQ2d 1591* ] (9th Cir. Aug. 2, 2007); see also *Panavision Int'l v. Toeppen , 141 F.3d 1316, 1324 [46 USPQ2d 1511* ] (9th Cir. 1998) ("[Plaintiff's] state law dilution claim [under California Business and Professions Code section 14330] is subject to the same analysis as its federal [dilution] claim.").

A. Whether NIKE Was Famous Prior to the First Use of NIKEPAL

A "famous" mark is one that "is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." *15 U.S.C.  Section 1125*(c)(2)(A).  Id.  Since Nikepal's first use of NIKEPAL commenced in May 1998, Nike must show that NIKE was famous before that date.

In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:

(i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

Go to Headnotes  [**1R]  With regard to the first factor, the evidence clearly establishes that through various combinations of athlete endorsements, television, radio, print media, and billboard placements, NIKE was promoted nationally for more than two decades before 1998. By the 1990s, Nike had spent in excess of a billion dollars for

promotion of NIKE products in the United States.

With regard to the second factor, Nike's sales of NIKE products reached the billion dollar per year level in the United States well before May 1998. By 1997, Nike had spent in excess of one billion dollars to promote the NIKE mark in the United States.

Nike also satisfies the third factor, since recognition of the success of NIKE has been recorded by various publications in surveys and articles written prior to May 1998. Since the early 1990s, NIKE has been consistently ranked as a top brand in brand surveys in the United States and the world. Mr. Johnson, who in his professional capacity is familiar with the reputation and methodology used in various brand surveys and literature, opined that these sources evinced that NIKE was famous during the mid 1990s, before Nikepal adopted its mark in 1998. Nikepal counters that only Nike's Swoosh design mark, and not the NIKE mark itself, is famous. However, Mr. Johnson's survey revealed that when participants were exposed solely to the word "Nike" without the Swoosh, the response overwhelmingly indicated recognition of the NIKE mark.

Finally, with regard to the fourth factor, the NIKE mark is registered on the PTO's principal register. Nike owns ten (10) federal registrations for NIKE covering uses prior to 1998 which include retail services, bags, footwear, apparel, heart monitors, electrical items and paper products. Accordingly, the court concludes that NIKE was famous under *15 U.S.C. Section 1125*(c)(2)(A), prior to Nikepal's first use of the NIKEPAL mark.

B. Likelihood of Dilution by Blurring

The TDRA defines dilution by blurring as an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." *15 U.S.C.  Section 1125*(c)(2)(A).  Id.

In determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following:

(i) The degree of similarity between the mark or trade name and the famous mark.   [*1527]

(ii) The degree of inherent or acquired distinctiveness of the famous mark.

(iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

(iv) The degree of recognition of the famous mark.

(v) Whether the user of the mark or trade name intended to create an association with the famous mark.

(vi) Any actual association between the mark or trade name and the famous mark.

(i) The Degree of Similarity

Marks in a dilution analysis must be "identical" or "nearly identical." n7 *Thane Int'l, Inc. v. Trek Bicycle Corp. , 305 F.3d 894, 906 [64 USPQ2d 1564* ] (9th Cir. 2002). "For marks to be nearly identical to one another, they must be similar enough that a significant segment of the target group of customers sees the two marks as essentially the same.'" *Playboy Enters., Inc. v. Welles , 279 F.3d 796, 806 n. 41 [61 USPQ2d 1506* ] (9th Cir. 2002) (internal citation omitted).

n7 Nike argues that the TDRA does not require that the marks be identical or nearly identical. However, the enactment of the TDRA did "not eliminate the requirement that the mark used by the alleged diluter be identical,' or nearly identical,' or substantially similar,' to the protected mark." *Century 21 Real Estate LLC , 2007 WL 433579*, at *2 (citing House Report on Trademark Dilution Act of 2005 at 8, 25).

Go to Headnotes  [**2R]  The parties' marks are nearly identical. The NIKEPAL mark is a composite of the word "Nike" with the term of affinity, "pal." The composite nature of the NIKEPAL mark is evident in the logo selected by the company which clearly features an "N" and a "P." In each case the dominant feature of the mark is the term "Nike." In addition, the term "Nike" in both marks is pronounced identically with an "i" like in "bike" and an "e" like in "key." See *Porsche Cars N. Am., Inc. , 2000 WL 641209*, at *3, (finding that the trademark PORSCHE was diluted by PORCHESOURCE.COM); see also *Jada Toys, Inc. , 2007 WL 2199286*, at *4 (concluding "that a reasonable trier of fact could find that the HOT WHEELS and HOT RIGZ marks are nearly identical.").

Further, as shown by Mr. Johnson's survey, the vast majority of the survey respondents, representing a significant segment of Nikepal's target customer group, associate Nike and/or its products and services when they encounter the mark NIKEPAL, thus perceiving the two marks as essentially the same.  See *Thane Int'l, Inc. , 305 F.3d at 906* ("The marks must be of sufficient similarity so that, in the mind of the consumer, the junior mark will conjure an association with the senior.") (citing *Nabisco, Inc. v. PF Brands , 191 F.3d 208 [51 USPQ2d 1882* ] (2d Cir. 1999)). Accordingly, this factor favors Nike.

(ii) Distinctiveness

" There are five categories of trademarks: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful.'" *Quicksilver, Inc. v. Kymsta Corp. , 466 F.3d 749, 760 [80 USPQ2d 1810* ] (9th Cir. 2006) (internal citations omitted). "[S]uggestive, arbitrary, and fanciful marks are deemed inherently distinctive and are automatically entitled to [trademark] protection because they naturally serve to identify a particular source of a product.'" Id.  Suggestive marks require the use of imagination to make a connection between the mark and an attribute of the goods or services to which it is applied.  *Official Airlines Guides, Inc. v. Goss , 6 F.3d 1385, 1391 [28 USPQ2d 1641* ] (9th Cir. 1993).

Nikepal does not dispute that NIKE is, at the very least, suggestive. ( See Nikepal's Proposed Findings and Recommendations at 42 ("[Nike's] mark is suggestive when used in connection with Plaintiff's products.").) Accordingly, NIKE is inherently distinctive and this factor favors Nike.

(iii) Substantially Exclusive Use

The law does not require that use of the famous mark be absolutely exclusive, but merely "substantially exclusive." See *L.D. Kichler Co. v. Davoil Inc. , 192 F.3d 1349, 1352 [52 USPQ2d 1307* ] (Fed. Cir. 1999) (holding that in the trademark context, "substantially exclusive" use does not mean totally exclusive use). Therefore, a limited amount of third party use is insufficient to defeat a showing of substantially exclusive use.  See *Avery Dennison Corp. v. Sumpton , 189 F.3d 868, 878 [51 USPQ2d 1801* ] (9th Cir. 1999) (finding that use of the mark was not substantially exclusive when the words "Avery" and "Dennison" were " commonly used as trademarks, both on and off of the Internet, by parties other than Avery Dennison." (emphasis added)).

Nike asserts that its use of the NIKE mark is substantially exclusive. Nikepal introduced  [*1528]  evidence of use of the term "Nike" in the company name "Nike Hydraulics, Inc.," through a bottle jack purchased from the company and a 1958 trademark registration for "Nike" owned by Nike Hydraulics. n8 However, this evidence is insufficient to disprove Nike's claim that its use of NIKE is substantially exclusive. Even Nikepal's witness, Roger Smith, admitted that he had

84 U.S.P.Q.2D (BNA) 1521, *1528; USPQ Headnotes 1521, **2R

not encountered Nike Hydraulics before hearing that name in connection with this action. Accordingly, the court finds that Nike's use of the NIKE mark is substantially exclusive and this factor therefore favors Nike. n9

n8 While a trademark registration owned by one of the parties in a trademark lawsuit may be prima facie evidence of the facts contained therein, the introduction of a trademark registration of a non-party to a lawsuit does not provide evidence of any of the recorded information, including date of first use. See *15 U.S.C. Section 1057*(b); see also *AMF Inc. v. Am. Leisure Prod., Inc. , 474 F.2d 1403, 1406 [177 USPQ 268* ] (C.C.P.A. 1973) (finding that third-party registrations are "not evidence of what happens in the market place" nor are they evidence of consumer familiarity with the mark).

n9 Nikepal also introduced evidence that the term "Nike" appears in dictionaries referring to the Greek goddess of victory, that the image of Nike the goddess appeared on some Olympic medals, and that the United States Government named one of its missile programs "Nike." However, Nikepal did not show that these uses were made in commerce in association with the sale or marketing of goods or services as required under the TDRA. ( See *15 U.S.C. Section 1125*(c)(1) (providing that under the TDRA, only "use of a mark or trade name in commerce" is actionable as diluting a famous mark.).)

(iv) Degree of Recognition

The degree of recognition of NIKE is quite strong. Millions of NIKE products are sold in the United States annually and the evidence demonstrates that NIKE is readily recognized. This factor therefore favors Nike.

(v) Intent to Create Association

Mr. Sandhu admitted that he was aware of the existence of the NIKE mark before he adopted the company name. Although he testified at trial that he came up with the term Nikepal by opening the dictionary to a random page and essentially finding that word by "fate," his testimony was not credible. ( See Tr. at 372:8-13, 373:1-6.) Therefore, this factor favors Nike.

(vi) Actual Association

Nikepal registered the domain names nikepal.biz, nikepal.net, nikepal.us, nikepal.info and nikepal.tv. The evidence shows that the domain registrar assigned the domain names an "under construction" page and then associated with that page promotions and advertisement links to a number of web pages that offered NIKE products (or products of Nike's competitors in the shoe and apparel field). Thus, in the internet context, there is actual association between NIKEPAL and NIKE.

Further, Mr. Johnson's survey also evinced that there is a strong degree of association between NIKEPAL and NIKE. Mr. Johnson's survey showed over 87% of the people in Nikepal's own customer pool associated the stimulus "Nikepal" with NIKE. The survey presents ample proof of association between the marks to support a finding that such exists in the general public. Accordingly, the court finds that there is actual association between the NIKEPAL and NIKE marks and this factor favors Nike.

In conclusion, since the six factors considered in the likelihood of dilution analysis favor Nike, there is a likelihood that

84 U.S.P.Q.2D (BNA) 1521, *1528; USPQ Headnotes 1521, **2R

NIKE will suffer dilution if Nikepal is allowed to continue its use of NIKEPAL. Accordingly, Nike prevails on its federal and state dilution claims.

II. Permanent Injunction

Nike seeks an injunction for violation of the TDRA pursuant to *15 U.S.C.  Section 1116*(a). To establish entitlement to an injunction, Nike must show that: it has suffered an irreparable injury; that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; that considering the balance of hardships between Plaintiff and Defendant, a remedy in equity is warranted; and that the public interest would not be disserved by a permanent injunction.  e*Bay Inc. v. MercExchange, L.L.C. , 126 S. Ct. 1837, 1839 [78 USPQ2d 1577* ] (2006).

Go to Headnotes  [**3R]  With regard to irreparable harm, if relief is not granted to Nike under its dilution claim, it will face an escalating erosion of its famous mark and NIKE will lose its ability to serve as a source-identifying mark. Further, there is no adequate remedy at law because monetary damages will not compensate for this harm.

The balance of hardships also points in Nike's favor. Although Nikepal will have to choose another name, Nikepal chose to use the NIKEPAL mark with full awareness of the existence and widespread use of the NIKE mark. Further, given that Nikepal's business is still relatively small, it should not be unduly burdensome for it to notify its customers of its name change.  [*1529]

Finally, the public interest will not be disserved by the issuance of a permanent injunction against Nikepal. By preventing dilution of NIKE, the public can continue to rely on the NIKE mark serving its source designating function. Accordingly, Nike's request for an injunction against Nikepal for the use of the NIKEPAL mark is granted.

III. Reversal of TTAB Decision

Finally, Nike seeks reversal of the TTAB's decision denying its opposition to the registration of the NIKEPAL mark. (TTAB Decision at 16.) Specifically, the TTAB held there was no likelihood of dilution based on its finding that the parties' marks were not sufficiently similar. ( Id.  at 15-16.) *CAE, Inc. v. Clean Air Eng'g, Inc. , 267 F.3d 660, 674 [60 USPQ2d 1449* ] (7th Cir. 2001).

[T]he Lanham Act provides two avenues for review of TTAB decisions: review by the Federal Circuit on the closed record of the TTAB proceedings . . . or review by the district court with the option of presenting additional evidence and raising additional claims . . . . In the latter scenario, the district court sits in a dual capacity. It is an appellate reviewer of facts found by the TTAB and is also a fact-finder based on new evidence introduced to the court. Although the district court's review of the TTAB's decision is considered de novo when the parties present new evidence and assert additional claims, the district court also must afford deference to the fact findings of the TTAB.

Go to Headnotes  [**4R]  Here, Nike presented new evidence in the form of, inter alia , Mr. Johnson's survey showing that the vast majority of the survey respondents, representing a significant segment of Nikepal's target customer group, associate Nike and/or its products and services when they encounter NIKEPAL, thus perceiving the two marks as essentially the same.  See *Thane Int'l, Inc. , 305 F.3d at 906* ("The marks must be of sufficient similarity so that, in the mind of the consumer, the junior mark will conjure an association with the senior.") (citing *Nabisco, Inc. , 191 F.3d at 208); see also Playboy Enters., Inc. , 279 F.3d at 806 n.41* (holding that "[f]or marks to be nearly identical to one another, they must be similar enough that a significant segment of the target group of customers sees the two marks as essentially the same.'"). The new evidence submitted by Nike therefore compels a contrary finding on the similarity of the parties' marks. n10

84 U.S.P.Q.2D (BNA) 1521, *1529; USPQ Headnotes 1521, **4R

n10 Further, Mr. Johnson's survey is also relevant on the issue of whether consumers presented with the
NIKEPAL mark actually associate it with NIKE, a factor that the TTAB acknowledged was relevant to the
dilution analysis but on which it did not make any finding.  See TTAB Decision at 15 ("In determining whether
the mark will be diluted, the [TTAB] looks to the similarity of the marks, the renown of the party claiming fame
and whether purchasers are likely to associate two different products and/or services with the mark even if they
are not confused as to the different origins of the products and/or services.") (emphasis added)).As to the other
dilution factors that the TTAB did not make findings on (e.g., whether Nike is engaging in substantially
exclusive use of its mark, whether NIKE is distinctive, the degree of recognition of the NIKE mark, and whether
Nikepal intended to create an association with NIKE), the court's findings of fact and conclusions of law made
above apply with equal force here.

Accordingly, although the court gives deference to TTAB's fact-finding, the evidence presented by Nike in this action
compels reversal of the TTAB's decision dismissing Nike's opposition to the registration of Nikepal's mark.

Therefore, the TTAB ruling is reversed and Nike's request for an order cancelling Nikepal's registration for the
NIKEPAL mark is granted.

CONCLUSION

For the reasons stated, Nike prevails on its federal and state dilution claims, the decision of the TTAB is reversed, and
Nikepal's registration of the NIKEPAL mark is cancelled. Further, Nikepal is permanently enjoined from using
NIKEPAL in connection with the offering of goods or services in commerce, including its use in domain names, on web
pages, in printed matter, and on products, and shall cease any such uses of NIKEPAL within sixty (60) days of the date
on which this order is filed. Nikepal may continue to use its numeric telephone number, but may not advertise or
associate it with the designation "1-877-NIKEPAL."

IT IS SO ORDERED.   [*1530]

**LOAD DATE:** 11/06/2007

LEXSEE 457 F.3D 1062

**AU-TOMOTIVE GOLD, INC., Plaintiff-Appellee, v. VOLKSWAGEN OF AMERICA, INC.; AUDI OF AMERICA, INC; VOLKSWAGEN AKTIENGESELLSCHAFT; AUDI AKTIENGESELLSCHAFT, Defendants-Appellants.**

**No. 04-16174**

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

*457 F.3d 1062*; *2006 U.S. App. LEXIS 20581*; *80 U.S.P.Q.2D (BNA) 1293*

**February 14, 2006, Argued and Submitted, San Francisco, California
August 11, 2006, Filed**

**SUBSEQUENT HISTORY:** US Supreme Court certiorari denied by Au-Tomotive Gold v. Volkswagen of Am., 2007 U.S. LEXIS 3074 (U.S., Mar. 19, 2007)

**PRIOR HISTORY:**     [**1] Appeal from the United States District Court for the District of Arizona. D.C. Nos. CV-01-00162-WDB, CV-01-00508-WDB. William D. Browning, District Judge, Presiding.

**COUNSEL:** Gregory D. Phillips, Howard, Phillips & Anderson, Salt Lake City, Utah; Scott R. Ryther, Howard, Phillips & Anderson, Salt Lake City, Utah, for the defendant-appellant.

H. Kenneth Kudon, Kudon Law Firm, Potomac, Maryland, for the plaintiff-appellee.

**JUDGES:** Before: Arthur L. Alarcon and M. Margaret McKeown, Circuit Judges, and H. Russel Holland, * Senior District Judge. Opinion by Judge McKeown.

*    The Honorable H. Russel Holland, Senior District Judge for the District of Alaska, sitting by designation.

**OPINION BY:** McKEOWN

**OPINION**

[*1064]  McKEOWN, Circuit Judge:

This case centers on the trademarks of two well-known automobile manufacturers--Volkswagen and

Audi. [1] The question is whether the Lanham Act prevents a maker of automobile accessories from selling, without a license or other authorization, products bearing exact replicas of the trade-marks of these famous car companies. Au-Tomotive Gold, Inc. ("Auto Gold") argues that, as used on its key chains and license plate covers, the logos and marks of Volkswagen and [**2] Audi are aesthetic functional elements of the product--that is, they are "the actual benefit that the consumer wishes to purchase"--and are thus unprotected by the trademark laws.

       1   The actual parties are Volkswagen of America, Inc., Audi of America, Inc., Volkswagen Aktiengesellschaft, and Audi Aktiengesellschaft (collectively "Volkswagen and Audi").

Accepting Auto Gold's position would be the death knell for trademark protection. It would mean that simply because a consumer likes a trademark, or finds it aesthetically pleasing, a competitor could adopt and use the mark on its own products. Thus, a competitor could adopt the distinctive Mercedes circle and tri-point star or the well-known golden arches of McDonald's, all under the rubric of aesthetic functionality.

The doctrine of aesthetic functionality has a somewhat checkered history. In broad strokes, purely aesthetic product features may be protected as a trademark where they are source identifying and are not functional. On the other hand, where an [**3] aesthetic product feature serves a "significant non-trademark function," the doctrine may preclude protection as a trademark where doing so would stifle legitimate

457 F.3d 1062, *1064; 2006 U.S. App. LEXIS 20581, **3;
80 U.S.P.Q.2D (BNA) 1293

competition. *Qualitex Co. v. Jacobson Products Co., 514 U.S. 159, 170, 115 S. Ct. 1300, 131 L. Ed. 2d 248 (1995).* Taken to its limits, as Auto Gold advocates, this doctrine would permit a competitor to trade on any mark simply because there is some "aesthetic" value to the mark that consumers desire. This approach distorts both basic principles of trademark law and the doctrine of functionality in particular.

Auto Gold's incorporation of Volkswagen and Audi marks in its key chains and license plates appears to be nothing more than naked appropriation of the marks. The doctrine of aesthetic functionality does not provide a defense against actions to enforce the trademarks against such poaching. Consequently, we reverse the district court's grant of summary judgment in favor of Auto Gold on the basis of aesthetic functionality. We also reverse the denial of Volkswagen and Audi's motion for summary judgment with respect to infringement and dilution and remand for further proceedings.

## BACKGROUND

Volkswagen and Audi [**4] are manufacturers of automobiles, parts and accessories that bear well-known trademarks, including the names Volkswagen and Audi, the encircled VW logo, the interlocking circles of the Audi logo, and the names of individual car models. The marks are registered in the United States and have been in use since the 1950s. [2]

> 2   A registered mark is "prima facie evidence . . . of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration." *15 U.S.C. § 1115.* The Volkswagen marks were originally registered in the United States in 1965 for products ranging from automobiles and a host of automobile accessories, to a long list of other goods such as medical spitoons, water-skis, credit card services, and teddy bears. Volkswagen recently secured registration for its trademarks with respect to some of the specific product lines at issue in this case. These registrations were pending during the proceedings below; we take judicial notice of their issuance. *See, e.g.*, Registration No. 2,849,974 (June 8, 2006); Registration No. 2,835,662 (April 27, 2004); Registration No. 2,987,620 (Aug. 23, 2005). Audi registered its trademarks for automobiles and a host of other

products, including key fobs, in 1986. *See* Registration No. 1,416,583 (Nov. 11, 1986). Other than the recently registered marks, the marks are incontestable. *15 U.S.C. § 1065.*

[**5] [*1065] Auto Gold produces and sells automobile accessories to complement specific makes of cars, including Cadillac, Ford, Honda, Lexus, Jeep, Toyota, and others. In 1994, Auto Gold began selling license plates, license plate frames and key chains bearing Volkswagen's distinctive trademarks and, in 1997, began selling similar products bearing Audi's distinctive trademarks. The marks used are exact replicas of the registered trademarks or, in at least some cases, genuine trademark medallions purchased from Volkswagen dealers; Auto Gold states that it "applies authentic [Volkswagen and Audi] logos to its marquee license plates."

According to Auto Gold, its goods serve a unique market. Consumers want these accessories "to match the chrome on their cars; to put something on the empty space where the front license tag would otherwise go; or because the car is a [Volkswagen or Audi], they want a [Volkswagen or Audi]-logo plate." Both Auto Gold and Volkswagen and Audi serve this market. Auto Gold sells its license plates, license plate covers, and key rings with Volkswagen and Audi trademarks to the wholesale market, including car dealers, auto accessory dealers and other merchants. Volkswagen [**6] and Audi, for their operations in the United States, license an independent marketing firm to sell license plates, covers, and key chains directly to consumers.

Auto Gold has license and marketing agreements with several car manufacturers, authorizing sales of auto accessories bearing those companies' trademarks. Despite several attempts to secure similar arrangements with Volkswagen and Audi, Auto Gold is not authorized to sell products with their trademarks. Instead, Auto Gold products are accompanied by disclaimers that deny any connection to Volkswagen or Audi. The disclaimers are not visible once the product is removed from the packaging and in use, nor are the disclaimers always clear. For example, some labels state that the product "may or may not" be dealer approved, and Auto Gold's website identifies its goods as "Factory authorized licensed products."

In the mid-1990s, another car maker aggrieved by

457 F.3d 1062, *1065; 2006 U.S. App. LEXIS 20581, **6;
80 U.S.P.Q.2D (BNA) 1293

unauthorized sales of trademarked accessories sued Auto Gold for trademark infringement and obtained an injunction prohibiting Auto Gold from selling any products that incorporate replicas of its registered marks. *See BMW of North America, Inc. v. Au-Tomotive Gold, Inc., 1996 U.S. Dist. LEXIS 22828, 1996 WL 1609124* [**7] *(M. D. Fla., June 19, 1996)*. Fearful that the decision would invite further trademark claims, Auto Gold filed suit against Volkswagen and Audi in the District of Arizona in 2001. Auto Gold's complaint sought a declaratory judgment that its activities did not constitute trademark infringement or trademark counterfeiting under *15 U.S.C. § 1114*, unfair competition under *15 U.S.C. § 1125(a)*, [*1066] or trademark dilution under *15 U.S.C. § 1125(c)*. Auto Gold also included claims for interference with prospective economic advantage and trade libel.

Volkswagen and Audi filed counterclaims for trademark infringement under *15 U.S.C. § 1114(1)(a)*; false designation of origin under *15 U.S.C. § 1125(a)*; trademark dilution under *15 U.S.C. § 1125(c)*; consumer fraud under the Arizona Consumer Fraud Act; tortious interference with contract; tortious interference with business expectancy; trademark counterfeiting under the Arizona Consumer Fraud Act; and a request for declaratory judgment as to all claims. From this point, the case became a maze of counterclaims, [**8] stipulated dismissals, and new complaints. This procedural morass was made all the more complicated when some of Volkswagen and Audi's complaints migrated from the original counterclaim to a separate complaint that was later consolidated with the original action. After discovery, Auto Gold filed a motion for partial summary judgment seeking a declaratory judgment that its products do not infringe or counterfeit the Volkswagen and Audi trademarks and do not unfairly compete. Auto Gold's primary argument was that its products were lawful under the "first sale" doctrine. In response, Volkswagen and Audi filed a motion for summary judgment on their trademark infringement, trademark dilution, and unfair competition claims.

In ruling for Auto Gold, the district court found that "[t]he VW and Audi logos are used not because they signify that the license plate or key ring was manufactured or sold (i. e., as a designation of origin) by Volkswagen or Audi, but because there is a[n] aesthetic quality to the marks that purchasers are interested in having." Concluding that the marks were "protected

under the aesthetic functionality doctrine," the district court granted Auto Gold's motion [**9] for partial summary judgment, denied the motion for summary judgment filed by Volkswagen and Audi, and entered an order declaring that Auto Gold's "license plates, license plate frames and key chains displaying Volkswagen and Audi trademarks . . . are not trademark infringements and/or trademark counterfeiting."

After supplemental briefing identifying the remaining claims, the district court held that the parties had stipulated to dismiss the trademark dilution claim without prejudice. [3] Volkswagen and Audi moved for leave to amend the complaint to include a dilution claim, which the district court construed as a request for leave to file a second amended counterclaim. The district court denied the motion, holding that amendment would be futile because Volkswagen and Audi could not prevail on the merits of the claim. The court declined to rule on Auto Gold's "first sale" defense. All remaining claims were dismissed with prejudice. On the basis of its previous rulings, the district court enjoined Volkswagen and Audi from enforcing their trademarks against Auto Gold or its customers.

> 3   The record does not contain any record of a stipulation to dismiss the dilution claim. Volkswagen and Audi argued to the district court that they did not dismiss, but rather inadvertently forgot to include the claim in a later pleading.

[**10] On appeal, Volkswagen and Audi ask us to (1) reverse the district court's grant of summary judgment and declaratory relief in favor of Auto Gold, (2) reverse the district court's dismissal of their counterclaims, (3) reverse the district court's denial of their motion for summary judgment, and (4) remand for entry of summary [*1067] judgment with respect to trademark infringement and trademark dilution.

## ANALYSIS

The central question before us, discussed in Part I, is the scope of the doctrine of the "aesthetic functionality" and its application to the Volkswagen and Audi trademarks as they appear on Auto Gold's products. Part II discusses Volkswagen and Audi's trademark infringement claims, and Part III addresses the trademark dilution claim.

## I. AESTHETIC FUNCTIONALITY

457 F.3d 1062, *1067; 2006 U.S. App. LEXIS 20581, **10;
80 U.S.P.Q.2D (BNA) 1293

## A. TRADEMARK LAW AND AESTHETIC FUNCTIONALITY

A trademark is a "word, name, symbol, or device" that is intended "to identify and distinguish [the mark holder's] goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods." *15 U.S.C. § 1127*. A valid, registered trademark entitles the holder to prevent others from using [**11] the mark where (1) "such use is likely to cause confusion, or to cause mistake or deceive," *15 U.S.C. § 1114(1)(a)* (so-called "trademark infringement"), or (2) "such use . . . causes dilution of the distinctive quality of the mark," *15 U.S.C. § 1125(c)(1)* (so-called "trademark dilution").

The principal role of trademark law is to ensure that consumers are able to identify the source of goods. *Qualitex, 514 U.S. at 164*. Protecting the source-identifying role of trademarks serves two goals. First, it quickly and easily assures a potential customer that *this* item--the item with the mark--is made by the same producer as other similarly marked products. At the same time, the law helps "assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product." *Id.; see also Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 873 (9th Cir. 1999)*.

A functional product feature does not, however, enjoy protection under trademark law. *See Qualitex, 514 U.S. at 164*. The Supreme Court has instructed that a feature is functional [**12] if it is "essential to the use or purpose of the article [or] affects [its] cost or quality." *Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n. 10, 102 S. Ct. 2182, 72 L. Ed. 2d 606 (1982)*. The *Inwood Laboratories* definition is often referred to as "utilitarian" functionality, as it relates to the performance of the product in its intended purpose. Thus, "[t]he functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex, 514 U.S. at 164*.

Extending the functionality doctrine, which aims to protect "useful" product features, to encompass unique logos and insignia is not an easy transition. Famous trademarks have assumed an exalted status of their own in today's consumer culture that cannot neatly be reduced to the historic function of trademark to designate source.

Consumers sometimes buy products bearing marks such as the Nike Swoosh, the Playboy bunny ears, the Mercedes tri-point star, the Ferrari stallion, and countless sports franchise logos, for the appeal of the mark [**13] itself, without regard to whether it signifies the origin or sponsorship of the product. As demand for these marks has risen, so has litigation over the rights to their use as claimed "functional" aspects of products. *See, e.g., Vuitton et Fils S.A. v. J. Young Enters., Inc., 644 F.2d 769 (9th Cir. 1981)* (reversing [*1068] and remanding for trial a district court determination that the Louis Vuitton logo and trademarked purse material were functional); *Boston Prof. Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc., 510 F.2d 1004 (5th Cir. 1975)* (holding that reproductions of professional hockey franchise's logo sold alone are not "functional" and can be protected); *Ford Motor Co. v. Lloyd Design Corp., 184 F. Supp. 2d 665 (E. D. Mich. 2002)* (holding that a car maker's trademarks are not functional aspects of defendant's car accessories).

The results reached in these various aesthetic functionality cases do not easily weave together to produce a coherent jurisprudence, although as a general matter courts have been loathe to declare unique, identifying logos and names as functional. To understand how the concept of functionality applies [**14] to the case before us, broad invocations of principle are not particularly helpful. Instead, we find it useful to follow the chronological development and refinement of the doctrine.

The doctrine of aesthetic functionality is often traced to a comment in the 1938 Restatement of Torts:

> When goods are bought largely for their aesthetic value, their features may be functional because they definitely contribute to that value and thus aid the performance of an object for which the goods are intended.

Restatement of Torts § 742, comment a (1938) (see *Restatement 3d of Unfair Competition, § 17* (1995)). Two examples of products with aesthetic functional features were offered, with very little comment--a heart-shaped candy box and a distinctive printing typeface.

Nearly fifteen years later, the doctrine blossomed in *Pagliero v. Wallace China Co.*, an action by Wallace

457 F.3d 1062, *1068; 2006 U.S. App. LEXIS 20581, **14;
80 U.S.P.Q.2D (BNA) 1293

China, a manufacturer of vitrified china, to prohibit a competitor from using a series of decorative patterns and a corresponding list of names. *See 198 F.2d 339 (9th Cir. 1952)*. Neither the patterns nor the names were covered by registered trademarks [**15] or patents; instead, Wallace claimed secondary meaning, primarily that customers associated the patterns with Wallace, due to extensive advertising and a reputation for quality. *Id. at 342*. In ruling on Wallace's claim, we loosely echoed the 1938 Restatement in articulating the line between aesthetic appeal and functionality:

> [W]here the features are "functional" there is normally no right to relief. "Functional" in this sense might be said to connote other than a trade-mark purpose. If the particular feature is an important ingredient in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made. Under such circumstances, since effective competition may be undertaken without imitation, the law grants protection.

*Id. at 343* [**16] (internal citations omitted).

Applying that test, the china patterns were deemed "functional" because the "attractiveness and eye-appeal" of the design is the primary benefit that consumers seek in purchasing china. *Id. at 343-44* . Thus, Wallace's designs were not "mere arbitrary embellishment," but were at the heart of basic consumer demand for the product and could not be protected as trademarks.

[*1069] Almost thirty years later, *Pagliero* was revived in a Ninth Circuit case involving an effort by the International Order of Job's Daughters to preclude a jewelry maker from selling jewelry bearing the Job's Daughters insignia. *See International Order of Job's Daughters v. Lindeburg & Co., 633 F.2d 912 (9th Cir.*

*1980)*. Because the defendant's products bearing the Job's Daughters mark were sold "on the basis of their intrinsic value, not as a designation of origin or sponsorship," the defendant argued that they were functional under *Pagliero*. *Id. at 918*.

The court acknowledged that a "name or emblem" could, in some cases, "serve simultaneously as a functional component of a product and a trademark," and accordingly called for a "close [**17] analysis of the way in which [the defendant] is using the Job's Daughters insignia." *Id. at 917-19*. The court observed that Job's Daughters had submitted no evidence that the defendant's use of the mark either caused confusion as to source or was likely to do so and suggested that the emblem did not designate a source at all. [4] Accordingly, the Job's Daughters insignia, as used by the defendant, was unprotected. *Id. at 920*.

> 4   The marks at issue in *Job's Daughters* were "collective marks," which are trademarks "used by the members of a cooperative, an association, or other collective group or organization, . . . and include[] marks indicating membership in a union, an association, or other organization." *15 U.S.C. § 1127*. This explains, in part, why there was no likelihood of confusion. Because the Job's Daughters insignia was sold by numerous unlicensed jewelers, the possibility that consumers might think that it denoted source was insubstantial. *Accord Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co., 676 F.2d 1079, 1083 (5th Cir. 1982)* ("[T]here is no historical custom or practice--either as to fraternal jewelry or Rainbow jewelry--that would provide a reasonable basis for buyers of Rainbow jewelry to assume that such jewelry can only be manufactured with Rainbow's sponsorship or approval . . . [and] most fraternal associations exercise little control over the manufacture of jewelry bearing their fraternal emblems.").

[**18] *Job's Daughters*, with its collective mark, was a somewhat unique case and its broad language was soon clarified and narrowed. In *Vuitton*, we confronted bare counterfeiting of Louis Vuitton handbags with minor alterations to the familiar LV logo and fleur-de-lis insignia. *644 F.2d at 774*. Not unlike Auto Gold here, the defendant argued that, under *Pagliero* and *Job's Daughters*, its use of the Vuitton marks was functional

because the marks were "related to the reasons consumers purchase [the] product" and that without using the marks, it could not compete with Vuitton in selling Louis Vuitton-marked purses. We rejected these arguments. *Id. at 773*. First, the defendant's use of the Vuitton marks was not functional in a utilitarian sense. *Id. at 776-77* ("Vuitton luggage without the distinctive trademark would still be the same luggage. It would carry the same number of items, last just as long, and be just as serviceable."). Significantly, in *Vuitton*, we emphatically rejected the notion that "any feature of a product which contributes to the consumer appeal and saleability of the product is, as a matter of law, a functional [**19] element of that product." *Id. at 773*. Indeed, "a trademark which identifies the source of goods and incidentally services another function may still be entitled to protection." *Id. at 775*. Under *Vuitton*, the mere fact that the mark is the "benefit that the consumer wishes to purchase" will not override trademark protection if the mark is source-identifying. *Id. at 774*. With *Vuitton*, aesthetic functionality was dealt a limiting but not fatal blow; the case was remanded for trial. *Id. at 776*.

Since *Vuitton*, the Ninth Circuit has not directly revisited aesthetic functionality in the context of unique source-identifying [*1070] trademarks. Several oft-quoted cases involving trade dress claims have criticized the doctrine. *See Clicks Billiards Inc. v. Sixshooters Inc., 251 F.3d 1252, 1260 (9th Cir. 2001)* ("Nor has this circuit adopted the 'aesthetic functionality' theory, that is, the notion that a purely aesthetic feature can be functional."); *First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1382 n. 3 (9th Cir. 1987)* ("In this circuit, the 'aesthetic' functionality test has [**20] been limited, if not rejected, in favor of the 'utilitarian' functionality test.") (citations omitted). [5] Although a leading commentator described *Clicks Billiards* as "appear[ing] to mark the final end of the Ninth Circuit's fifty year flirtation with the aesthetic functionality theory," 1 *McCarthy on Trademarks and Unfair Competition* § 7:80 (4th ed.), the doctrine, albeit restricted over the years, retains some limited vitality.

5   At least one earlier case explicitly excluded the application of *Pagliero* in the trade dress context, without comment as to its application outside of trade dress. *See Fabrica Inc. v. El Dorado Corp., 697 F.2d 890, 895 (9th Cir. 1983)* (noting "this court has specifically limited application of the *Pagliero* functionality test to product features and

has refused to apply the test to cases involving trade dress and packaging").

The Supreme Court has yet to address aesthetic functionality as it applies to logos and insignia, in contrast to product [**21] features. The Court has, however, outlined the general contours of functionality and aesthetic functionality. As noted earlier, in *Inwood Laboratories*, the Court offered a simple definition of functionality: "a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *456 U.S. at 850 n. 10* (citing *Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 122, 59 S. Ct. 109, 83 L. Ed. 73, 1939 Dec. Comm'r Pat. 850 (1938))*.

More recently, in *Qualitex*, the Court considered whether a color (a distinctive green-gold used on dry cleaning press pads) could be protected as a trademark. Observing that color alone can meet the basic legal requirement for a trademark, namely that it acts "as a symbol that distinguishes a firm's goods and identifies their source," the Court concluded that the use of color as a trademark is not *per se* barred by the functionality doctrine. *Qualitex, 514 U.S. at 165-66* ("And, this latter fact--the fact that sometimes color is not essential to a product's use or purpose and does not affect cost or quality--indicates that the doctrine of 'functionality' does not create an [**22] absolute bar to the use of color alone as a mark"). The green-gold color of the dry cleaner pads served a trade-mark (i.e., source-identifying) function. Additionally, the use of *some* color on the pads served a non-trademark function--namely, to "avoid noticeable stains." *Id. at 166*. The Court underscored, however, that functionality protects against a competitive disadvantage "unrelated to recognition or reputation." *Id. at 169*. Accordingly, because "the [district] court found 'no competitive need in the press pad industry for the green-gold color, since other colors are equally usable, '" functionality did not defeat protection. *Id. at 166*. [6]

6   In contrast, an example of an aesthetic product feature the protection of which *would* hinder legitimate competition is the use of color to signify the type of medication in pills--the question addressed in *Inwood Laboratories*. *See 456 U.S. at 853* (noting that "[s]ome patients commingle medications in a container and rely on color to differentiate one from another").

[**23]   The Court's most recent explication of

aesthetic functionality is found in a case surprisingly not cited by the parties-- [*1071] *TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 121 S. Ct. 1255, 149 L. Ed. 2d 164 (2001).* In *TrafFix*, a company that held an expired patent for a dual-spring road sign design argued that the visible appearance of the design constituted protectable trade dress. In considering whether the dual spring mechanism was a functional aspect of the product, the Court clarified *Qualitex's* emphasis on competitive necessity and the overall test for functionality. Rather than paraphrase the decision, and to be absolutely clear, we quote extensively from the passages that set out the appropriate inquiry for functionality.

The Supreme Court emphasized that *Qualitex* did not displace the traditional *Inwood Laboratories* utilitarian definition of functionality. "'[I]n general terms, a product feature is functional, 'and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article. '"*TrafFix, 532 U.S. at 32* (quoting *Qualitex, 514 U.S. at 165*); [**24] *see also Inwood Labs., 456 U.S. at 850 n. 10.* The Court noted that *Qualitex* "expand[ed] upon" the *Inwood Laboratories* definition, by observing that "a functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'"*TrafFix, 532 U.S. at 32* (quoting *Qualitex, 514 U.S. at 165*) (alteration in original).

The Court explained the interplay between these two statements of functionality. If a feature is functional under *Inwood Laboratories*, the inquiry ends and the feature cannot be protected under trademark law. *Id.* As the Court elaborated, "there is no need to proceed further to consider if there is a competitive necessity for the feature." *Id. at 33.* Thus, in *Traf-Fix*, once the dual-spring mechanism met the traditional functionality test by making the signs more wind resistant, "there [was] no need to proceed further to consider if there is competitive necessity for the feature" and likewise no need "to engage . . . in speculation about other design possibilities." *Id. at 33.*

By contrast, the Court went on to suggest that "[i]t is [**25] proper to inquire into a 'significant non-reputation-related disadvantage' in cases of aesthetic functionality, the question involved in *Qualitex." Id.* The Court described aesthetic functionality as "the central question [in *Qualitex]*, there having been no indication

that the green-gold color of the laundry press pad had any bearing on the use or purpose of the product or its cost or quality." *Id.* [7]

> [7] The Court's treatment of *Qualitex* in *TrafFix* has caused some consternation among commentators. *See, e.g.,* 1 *McCarthy on Trademark and Unfair Competition* § 7.80 (4th ed.) (describing as "amazing and incomprehensible" the statement in *TrafFix* "that in the 1995 *Qualitex* case, 'aesthetic functionality was the central question.'"); Jerome Gilson, *Trademark Protection and Practice* § 2A.04[5][b] (2006) ("The Supreme Court was incorrect in *TrafFix* to declare that aesthetic functionality was the 'central question' in the *Qualitex* case. The central question in *Qualitex* was whether color alone could serve as a valid trademark.").

[**26] As to functionality, we read the Court's decision to mean that consideration of competitive necessity may be an appropriate but not necessary element of the functionality analysis. If a design is determined to be functional under the traditional test of *Inwood Laboratories* there is no need to go further to consider indicia of competitive necessity, such as the availability of alternative designs. *Accord Valu Eng'g, Inc. v. Rexnord Corp., 278 F.3d 1268, 1275-76 (Fed. Cir. 2002).* However, [*1072] in the context of aesthetic functionality, such considerations may come into play because a "functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation related disadvantage.'"*TrafFix, 532 U.S. at 32* (quoting *Qualitex, 514 U.S. at 165*); *see also Dippin' Dots, Inc. v. Frosty Bites Distrib., L.L.C., 369 F.3d 1197, 1203 (11th Cir. 2004); Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH, 289 F.3d 351, 356 (5th Cir. 2002).*

## B. AESTHETIC FUNCTIONALITY AND AUTO GOLD'S USE OF VOLKSWAGEN AND AUDI'S PRODUCTS

So where do we stand in the wake of forty years of trademark [**27] law scattered with references to aesthetic functionality? After *Qualitex* and *TrafFix*, the test for functionality proceeds in two steps. In the first step, courts inquire whether the alleged "significant non-trademark function" satisfies the *Inwood Laboratories* definition of functionality--"essential to the

use or purpose of the article [or] affects [its] cost or quality." *TrafFix, 532 U.S. at 32-33* (citing *Inwood Laboratories, 456 U.S. at 850, n. 10*). If this is the case, the inquiry is over--the feature is functional and not protected. [8] *TrafFix, 532 U.S. at 33*. In the case of a claim of aesthetic functionality, an alternative test inquires whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage. *Id.; and see also Qualitex, 514 U.S. at 165*.

[8]  Our long-standing test for functionality largely excluded aesthetic considerations, instead asking: (1) whether the feature delivers any utilitarian advantage, (2) whether alternative designs are possible, (3) whether advertising touts utilitarian benefits of the feature, and (4) whether the feature results in economies in manufacture or use. *See Disc Golf Ass'n v. Champion Discs, Inc., 158 F.3d 1002, 1006-09 (9th Cir. 1998)* (applying the four factors to conclude that the design of disc golf holes was utilitarian). Following *TrafFix*, we reiterated the *Disc Golf* factors as legitimate considerations in determining whether a product feature is functional. *Talking Rain Beverage Co. v. South Beach Beverage Co., 349 F.3d 601, 603-04 (9th Cir. 2003)* (applying the four factors to conclude that a bottle design was utilitarian). We noted that "the existence of alternative designs cannot negate a trademark's functionality," but "may indicate whether the trademark itself embodies functional or merely ornamental aspects of the product." *Id. at 603*.

[**28]  We now address the marks at issue in this case. Volkswagen and Audi's trademarks are registered and incontestable, and are thus presumed to be valid, distinctive and non-functional. *Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 868-69 (8th Cir. 1994)*. Auto Gold, thus, must show that the marks are functional under the test set forth above. To satisfy this requirement, Auto Gold argues that Volkswagen and Audi trademarks are functional features of its products because "the trademark is the feature of the product which constitutes the actual benefit the consumer wishes to purchase." While that may be so, the fact that a trademark is desirable does not, and should not, render it unprotectable. Auto Gold has not shown that Volkswagen and Audi's marks are functional features of Auto Gold's products. The marks are thus entitled to trademark protection.

At the first step, there is no evidence on the record, and Auto Gold does not argue, that Volkswagen and Audi's trademarks are functional under the utilitarian definition in *Inwood Laboratories* as applied in the Ninth Circuit in *Talking Rain. See 349 F.3d at 603-04* . That is to say, Auto Gold's [**29] products would still frame license plates and hold keys just as well without [*1073] the famed marks. Similarly, use of the marks does not alter the cost structure or add to the quality of the products.

We next ask whether Volkswagen and Audi's marks, as they appear on Auto Gold's products, perform some function such that the "'exclusive use of [the marks] would put competitors at a significant non-reputation-related disadvantage. '"*TrafFix, 532 U.S. at 32* (quoting *Qualitex, 532 U.S. at 165*). As an initial matter, Auto Gold's proffered rational--that the trademarks "constitute[] the actual benefit the consumer wishes to purchase"--flies in the face of existing caselaw. We have squarely rejected the notion that "any feature of a product which contributes to the consumer appeal and saleability of the product is, as a matter of law, a functional element of that product." *Vuitton, 644 F.2d at 773*. Such a rule would eviscerate the very competitive policies that functionality seeks to protect. This approach is consistent with the view of our sister circuits. *See e.g., Pebble Beach Co. v. Tour 18 I Ltd., 155 F.3d 526, 539 (5th Cir.* [**30] *1998)* ("To define functionality based upon commercial success . . . does not promote innovation, nor does it promote competition.") *superceded on other grounds as recognized in Eppendorf-Netheler-Hinz, 289 F.3d at 356*; *W.T. Rogers Co. v. Keene, 778 F.2d 334, 341-43 (7th Cir. 1985)*; *Keene Corp. v. Paraflex Indus., Inc., 653 F.2d 822, 825 (3d Cir. 1981)* ("The difficulty with accepting such a broad view of aesthetic functionality, which relates the doctrine to the commercial desirability of the feature at issue without consideration of its utilitarian function, is that it provides a disincentive for development of imaginative and attractive design. The more appealing the design, the less protection it would receive.").

Even viewing Auto Gold's position generously, the rule it advocates injects unwarranted breadth into our caselaw. *Pagliero*, *Job's Daughters*, and their progeny were careful to prevent "the use of a trademark to monopolize a design feature which, *in itself and apart from its identification of source*, improves the usefulness or appeal of the object it adorns." *Vuitton, 644 F.2d at*

*774* (discussing [**31] *Pagliero, 198 F.2d 339*) (emphasis added). The concept of an "aesthetic" function that is non-trademark-related has enjoyed only limited application. In practice, aesthetic functionality has been limited to product features that serve an aesthetic purpose wholly independent of any source-identifying function. *See Qualitex, 514 U.S. at 166* (coloring dry cleaning pads served nontrademark purpose by avoiding visible stains); *Publications Int'l, Ltd. v. Landoll, Inc., 164 F.3d 337, 342 (7th Cir. 1998)* (coloring edges of cookbook pages served nontrademark purpose by avoiding color "bleeding" between pages); *Brunswick Corp. v. British Seagull Ltd., 35 F.3d 1527, 1532 (Fed. Cir. 1994)* (color black served nontrademark purpose by reducing the apparent size of outboard boat engine); *Pagliero, 198 F.2d at 343* (china patterns at issue were attractive and served nontrademark purpose because "one of the essential selling features of hotel china, if, indeed, not the primary, is the design").

It is difficult to extrapolate from cases involving a true aesthetically functional feature, like a box shape or certain uses [**32] of color, to cases involving well-known registered logos and company names, which generally have no function apart from their association with the trademark holder. The present case illustrates the point well, as the use of Volkswagen and Audi's marks is neither aesthetic nor independent of source identification. That is to say, there is no evidence that consumers buy Auto Gold's products solely because of their "intrinsic" aesthetic appeal. Instead, [*1074] the alleged aesthetic function is indistinguishable from and tied to the mark's source-identifying nature.

By Auto Gold's strident admission, consumers want "Audi" and "Volkswagen" accessories, not beautiful accessories. This consumer demand is difficult to quarantine from the source identification and reputation-enhancing value of the trademarks themselves. *See Playboy Enters., Inc. v. Netscape Commc'ns Corp., 354 F.3d 1020, 1030-31 (9th Cir. 2004)* ("Nothing about the marks used to identify [the trademark holder's] products is a functional part of the design of those products. . . . The fact that the marks make [the junior user's product] more functional is irrelevant."). The demand for Auto Gold's products is inextricably [**33] tied to the trademarks themselves. *See Qualitex, 514 U.S. at 170* (identifying "legitimate (nontrademark-*related*) competition" as the relevant focus in determining functionality) (emphasis added). [9] Any disadvantage Auto Gold claims in not being able to sell Volkswagen or Audi marked goods is tied to the reputation and association with Volkswagen and Audi.

> 9   Auto Gold complains that if precluded from using the famous marks, it would be unable to compete in the market for auto accessories bearing Volkswagen and Audi's marks. This argument is just another way of saying "If I can't trade on your trademark, I can't compete." But this argument has no traction here because the mark is not a functional feature that places a competitor at a "significant non-reputation-related advantage." *TrafFix, 532 U.S. at 33*.

In the end, we take comfort that the doctrine of aesthetic functionality, as we apply it in this case, has simply returned from whence it came. The 1938 Restatement of [**34] Torts includes this reminder of the difference between an aesthetic function and a trademark function:

> A feature which merely associates goods with a particular source may be, like a trade-mark or trade name, a substantial factor in increasing the marketability of the goods. But if that is the entire significance of the feature, it is non-functional; for its value then lies only in the demand for goods associated with a particular source rather than for goods of a particular design.

Restatement of Torts § 742, comment a (1938). Volkswagen and Audi's trademarks undoubtedly increase the marketability of Auto Gold's products. But their "entire significance" lies in the demand for goods bearing those non-functional marks. Today, as in 1938, such poaching is not countenanced by the trademark laws.

We hold that Volkswagen and Audi's marks are not functional aspects of Auto Gold's products. These marks, which are registered and have achieved incontestable status, are properly protected under the Lanham Act against infringement, dilution, false designation of source and other misappropriations.

## II.   VOLKSWAGEN AND AUDI'S INFRINGEMENT CLAIM

Although we conclude [**35] that Volkswagen and Audi's registered trademarks are not "functional," and

thus are protectable, it remains to be determined whether Auto Gold is infringing those marks. *Cf. KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 117, 125 S. Ct. 542, 160 L. Ed. 2d 440 (2004)* (although mark was protected, "the [markholder]'s success is still subject to 'proof of infringement' "). The district court concluded that "[w]hile [Volkswagen and Audi] have attempted to make a prima facie case of trademark infringement and dilution of their mark, this situation does not rise to that level." Operating on the [*1075] premise that the Volkswagen and Audi marks were unprotectable under the doctrine of aesthetic functionality, the district court erroneously concluded Volkswagen and Audi "offered insufficient evidence to show that there is a question of material fact that might lead a fact-finder to conclude that infringement of their trademarks occurred." In particular, the district court resolved that Volkswagen and Audi "failed to offer any evidence that would have a tendency to show that there is a likelihood of or any actual confusion in the minds of consumers."

The court then [**36] granted Auto Gold's motion for partial summary judgment and denied Volkswagen and Audi's motion for summary judgment which included a claim for infringement. The court declared that Auto Gold's use of the marks on its products was neither trademark infringement nor trademark counterfeiting, and enjoined Volkswagen and Audi from asserting any trademark rights against Auto Gold. In doing so, the district court appeared to merge the aesthetic functionality analysis and the likelihood of confusion analysis as to infringement, but nonetheless based its judgment on both issues. These are distinct inquiries and thus we consider infringement on appeal.

Volkswagen and Audi seek protection under *§ 1114(1)(a)*, which provides civil penalties against:

> Any person who shall, without consent of the [registered owner] . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

It is undisputed that Volkswagen and Audi own the registered [**37] trademarks at issue, and that Auto Gold uses those trademarks in commerce, without their consent, and in connection with the sale of goods. Thus, as with many infringement claims, the central issue is whether Auto Gold's use of the marks is "likely to cause confusion" within the meaning of the Lanham Act.

Before us on appeal are the parties' crossmotions for summary judgment on the issue of trademark infringement, and in particular, the district court's determination that Volkswagen and Audi had not offered any evidence showing a likelihood of confusion. We review de novo the district court's decision on summary judgment. *Clicks Billiards, 251 F.3d at 1257.*

Because the likelihood of confusion is often a fact-intensive inquiry, courts are generally reluctant to decide this issue at the summary judgment stage. *Thane Int'l, Inc. v. Trek Bicycle Corp., 305 F.3d 894, 901-02 (9th Cir. 2002).* However, in cases where the evidence is clear and tilts heavily in favor of a likelihood of confusion, we have not hesitated to affirm summary judgment on this point. *See, e.g., Nissan Motor Co. v. Nissan Computer Corp., 378 F.3d 1002, 1019 (9th Cir. 2004)* [**38] (affirming summary judgment where the marks were "legally identical," the goods at issue were related, and the marketing channels overlapped). As part of our de novo review, we conclude as a matter of law that likelihood of confusion is clear cut here and that Volkswagen and Audi have made out a prima facie case of infringement. We do not direct judgment on this issue, however, because the district court reserved judgment on Auto Gold's defense of "first sale." The case must be remanded for consideration of Auto Gold's defenses.

A "[l]ikelihood of confusion 'exists when customers viewing [a] mark would probably assume that the product or service it represents *is associated with the source* of a different product or service [*1076] identified by a similar mark. '"*Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 845 (9th Cir. 1987)* (quoting *Lindy Pen Co. v. Bic Pen Corp., 725 F.2d 1240, 1243 (9th Cir. 1984)).* The Ninth Circuit employs an eight-factor test (the "Sleekcraft" factors) to determine the likelihood of confusion: (1) strength of the mark(s); (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; [**39] (5) marketing channels; (6) degree of consumer care; (7) defendant's intent; (8) likelihood of expansion. *Surfvivor Media, Inc. v. Survivor*

*Productions, 406 F.3d 625, 631 (9th Cir. 2005)*; *see also AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979)*. These elements are not applied mechanically; courts may examine some or all of the factors, depending on their relevance and importance. *See Surfvivor, 406 F.3d at 631*; *Thane Int'l, 305 F.3d at 901* ("The list of factors is not a score-card--whether a party wins a majority of the factors is not the point. Nor should the factors be rigidly weighed; we do not count beans.") (internal punctuation and citations omitted).

This case presents an easy analysis in terms of likelihood of confusion. The Volkswagen and Audi marks, which are registered and have been in use for more than fifty years, are strong, distinctive marks, the first factor in the *Sleekcraft* analysis. Auto Gold's products, which incorporate *exact* copies of those marks, compete with accessories sold by Volkswagen and Audi through their licensed marketers, and are related [10] to Volkswagen [**40] and Audi's primary goods--cars. Although Volkswagen and Audi license their marks to third parties, and Auto Gold sells its products to the wholesale market, the ultimate consumers are the same. In fact, according to Auto Gold, it is a very specific sub-group of consumers that wants either Auto Gold's or Volkswagen and Audi's accessories--Audi or Volkswagen car owners who want accessories to match their cars. Thus, in addition to being related products bearing identical marks, the products at issue are destined for the same buyers.

> 10   "Related goods are 'products which would be reasonably thought by the buying public to come from the same source if sold under the same mark.'"*Sleekcraft, 599 F.2d at 348 n. 10* (quoting *Standard Brands, Inc. v. Smidler, 151 F.2d 34, 37 (2d Cir. 1945))*.

We turn next to the degree of consumer care. Confusion is less likely where buyers exercise care and precision in their purchases, such as for expensive or sophisticated items. In evaluating this [**41] factor, we consider "the typical buyer exercising ordinary caution." *Sleekcraft, 599 F.2d at 353*. The class of products Auto Gold sells are relatively inexpensive and unsophisticated, and do not require a great deal of precision or care to fulfill their purpose. This factor favors Volkswagen and Audi.

Evaluation of Auto Gold's intent in using the mark is the seventh factor. "When the alleged infringer

knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Id. at 354*. Auto Gold knowingly and intentionally appropriated the exact trademarks of Volkswagen and Audi. Auto Gold argues, however, that it does not "intend" to deceive the public as to the source of the goods, but merely sought to fill a market demand for auto accessories bearing the marks. This argument is simply a recasting of aesthetic functionality. Even if we credit Auto Gold's proffered lack of intent, the direct counterfeiting undermines this argument. This factor tips against Auto Gold.

Finally, we examine the factor that is hotly contested by the parties--evidence of [*1077] actual confusion. [**42] Despite the debate, there is no material issue of fact. The district court correctly noted that Volkswagen and Audi offered no evidence of actual confusion. The question, then, is what is the legal significance of this uncontested fact?

As we noted in *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, "[t]he failure to *prove* instances of actual confusion is *not* dispositive against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy." *174 F.3d 1036, 1050 (9th Cir. 1999)*. In this case, which involves a national market and a low degree of consumer care, nothing suggests that the lack of evidence of confusion should be particularly noteworthy. *Compare Cohn v. Petsmart, Inc., 281 F.3d 837, 842-43 (9th Cir. 2002)* (ascribing some significance to the lack of evidence of confusion where "the parties used the same trademark in the same city for six years," and the product at issue, veterinary services, was one for which consumers are "particularly attentive.").

Auto Gold suggests that the disclaimers on its packaging dispel [**43] any potential for confusion. Courts have been justifiably skeptical of such devices--particularly when exact copying is involved. *See, e.g., Pebble Beach, 155 F.3d at 543* (upholding lower court determination that disclaimers were "inadequate where present and . . . absent from the majority of advertisements and promotional materials"), *superseded on other grounds as recognized in Eppendorf-Netheler-Hinz, 289 F.3d at 356*; *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d*

*1079, 1093 (7th Cir. 1988)* ("[W]here the infringement in issue is a verbatim copying . . . plaintiff's reputation and goodwill should not be rendered forever dependent on the effectiveness of fineprint disclaimers often ignored by consumers.").

Even if disclaimers may in some cases limit the potential for confusion, here they do not. Auto Gold's disclaimers were neither consistent nor comprehensive. We note, preliminarily, that the effectiveness of these disclaimers is undercut by their sometimes contradictory messages. For example, some labels placed on the cardboard inner lining of the license plate covers state that the product "may or may [**44] not" be dealer approved. Visible through the clear cellophane outer wrapping, these disclaimers are sometimes next to disclaimers stating "[t]his product is not endorsed, manufactured, or licensed by the vehicle manufacturer." There are also messages on Auto Gold's website that identify their products generally as "Factory authorized licensed products."

More importantly, "[t]he law in the Ninth Circuit is clear that 'post-purchase confusion, '*i.e.*, confusion on the part of someone other than the purchaser who, for example, simply sees the item after it has been purchased, can establish the required likelihood of confusion under the Lanham Act." *Karl Storz Endoscopy-Am., Inc. v. Surgical Techs., Inc.,* 285 F.3d 848, 854 (9th Cir. 2002); *Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817, 822 (9th Cir. 1980) (affirming a finding of infringement against a jeans maker, and noting that "point of sale materials [such as disclaimers] are removed by the purchaser and have no confusion-obviating effect when the pants are worn"). [11] Shorn of their disclaimer-covered packaging, Auto Gold's [*1078] products display no indication visible to the general public [**45] that the items are not associated with Audi or Volkswagen. The disclaimers do nothing to dispel post-purchase confusion.

> 11   This definition of confusion reflects the 1962 amendments to *§ 1114* that broadened the definition of actionable confusion to include non-purchasers (such as those seeing an item of clothing on the street), through deletion of language that limited such confusion to "purchasers as to the source or origin of such goods or services." Pub. L. 87-772 (1962). *See Karl Storz, 285 F.3d at 854.*

In sum, Volkswagen and Audi do not present

evidence of actual confusion. Neither, however, does Auto Gold present evidence that the disclaimers have any effect. At best, the confusion factor is in equipoise.

In the final analysis, we must consider the *Sleekcraft* factors as a whole to determine whether a likelihood of confusion results from Auto Gold's use of the marks. Although we do not bean count, it is significant that six of the eight *Sleekcraft* factors support a likelihood [**46] of confusion; the remaining two are either neutral or irrelevant. [12] Most importantly, the strength of Volkswagen and Audi's marks, Auto Gold's intentional and exact copying of the marks, and the direct competition for a specific and limited consumer group, all weigh heavily in favor of a likelihood of confusion. Our *Sleekcraft* analysis benefits from a record developed through lengthy discovery, and the key facts are undisputed. Volkswagen and Audi have established a prima facie "exclusive right to use the . . . mark in commerce." *15 U.S.C. § 1115(b).* Accordingly, we reverse the district court's denial of summary judgment in favor of Volkswagen and Audi on the issue of infringement and remand for consideration of the "first sale" defense and any other related claims or defenses.

> 12   The final factor, "[a] likelihood of expansion in product lines," warrants no discussion as it is "relatively unimportant where two companies already compete to a significant extent." *Brookfield Commc'ns, 174 F.3d at 1060.* The record reflects that Volkswagen and Audi compete through their licensees with Auto Gold with respect to the products at issue in this suit.

[**47] **III. OTHER CLAIMS**

The district court dismissed various of Volkswagen and Audi's counterclaims with prejudice, some because the parties stipulated to their dismissal. Among the counterclaims dismissed was the dilution claim. The procedural history surrounding this claim is murky. The district court found that Volkswagen and Audi had agreed not to litigate the claim even though the parties briefed and argued the issue on summary judgment. Nonetheless, the court denied Volkswagen and Audi's motion for leave to amend because the amendment would be futile. Because the denial of this motion was predicated in large part on the court's misapprehension of the application of aesthetic functionality, we reverse the dismissal of the dilution claim.

457 F.3d 1062, *1078; 2006 U.S. App. LEXIS 20581, **47;
80 U.S.P.Q.2D (BNA) 1293

We reverse the district court's April 7, 2003 order granting Auto Gold's Motion for Partial Summary Judgment and denying Volkswagen and Audi's Motion for Summary Judgment, vacate the May 17, 2003 Order Granting Declaratory and Injunctive Relief, reverse the June 11, 2003 Order Denying Volkswagen and Audi's Motion for Clarification and for Leave to Amend with respect to the dilution claim, vacate all other aspects of the June 11, 2003 Order, [**48] and reverse judgment in favor of Auto Gold.

**REVERSED, VACATED** and **REMANDED** for further proceedings consistent with this opinion, including our determination that Volkswagen and Audi have established a prima facie case with respect to infringement.

LEVITON MFG. v. UNIVERSAL SEC. INSTRUMENTS 643
Cite as 409 F.Supp.2d 643 (D.Md. 2006)

**B. Hepburn's Motion to Consolidate**

**[4]** Hepburn's motion to consolidate the instant action with *Hepburn I* will not cure the futility of his attempt to revive his extinguished claims. After NCIA was dismissed without prejudice from *Hepburn I*, the Hepburns moved to amend their complaint. This Court denied the motion to amend, which estops Mr. Hepburn from filing a new action adding the claims he was denied leave to amend. *Sensormatic Security Corp. v. Sensormatic Electronics Corp.*, 329 F.Supp.2d 574, 579 (D.Md.2004). Accordingly, his motion to consolidate will be denied.

CONCLUSION

**[5, 6]** For the reasons discussed above, Defendants' motion to dismiss [4] will be granted, and Plaintiff's motion to consolidate will be denied.

ORDER

For the reasons discussed in the accompanying Memorandum Opinion, it is, this 18th day of January 2006, ORDERED that:

1. Defendants' motion to dismiss Plaintiff's Complaint BE, and hereby IS, GRANTED;

2. Plaintiff's motion to consolidate BE, and hereby IS, DENIED; and

3. The Clerk of the Court shall send copies of this Memorandum Opinion and Order to counsel for the parties.



**LEVITON MANUFACTURING COMPANY, INC., Plaintiff**

**v.**

**UNIVERSAL SECURITY INSTRUMENTS, INC., et al., Defendants**

**Shanghai Meihao Electric, Inc., Plaintiff**

**v.**

**Leviton Manufacturing Company, Inc., Defendant**

**Nos. CIV.A. AMD 03–1701, CIV.A. AMD 03–2137.**

United States District Court, D. Maryland.

Jan. 18, 2006.

**Background:** Owner of patents for reset lock-out feature in ground fault circuit in-

---

**4.** Defendants argued that Mr. Hepburn's claims should be barred by the statute of limitations, because—although he is incompetent—he has a legal guardian. Defendants ask this Court to ignore *Funk v. Wingert*, 134 Md. 523, 107 A. 345 (1919), in which the Court of Appeals held that a committee for an incompetent lacks legal title to the incompetent's property; therefore, the applicable statute of limitations does not begin to run until the incompetent's disability is removed. *Id.* at 526, 107 A. at 346. Defendants argue that because Mr. Hepburn's incompetence will never be removed, Defendants will be exposed to suit from Mr. Hepburn as long as he lives.

The *Funk* case has been superseded by statute; under current law, a guardian for the property of an incompetent person holds title to the protected person's property. *See Buxton v. Buxton*, 363 Md. 634, 647, 770 A.2d 152, 159 (2001)(citing Md.Code Ann., Est. & Trusts § 13–206). The court in *Buxton* declined to decide whether the appointment of a guardian lifts the tolling provisions of the statute of limitations. *Id.* The Court of Appeals has continued to cite the *Funk* case with approval. *See Piselli v. 75th Street Medical*, 371 Md. 188, 214, 808 A.2d 508, 523 (2002)(citing *Funk* for the proposition that a suit brought by a guardian during the period of disability does not remove a case from the tolling provisions). Therefore, this Court has declined to ignore the *Funk* case and exempt Mr. Hepburn from the protection of the tolling provisions of the statute of limitations.

terrupters (GFCIs) sued competitor for patent and trade dress infringement. Following claim construction, 2005 WL 936990, parties cross-moved for summary judgment.

**Holdings:** The District Court, Davis, J., held that:

(1) fact issue existed as to whether combination of color and button arrangement on owner's faceplates was protectable trade dress, but

(2) patents were not infringed.

Plaintiff's motion denied; defendants' motion granted in part and denied in part.

**1. Trademarks ⬤1062**

"Trade dress" is product's total image and overall appearance, and it may include attributes such as color and shape. Lanham Trade–Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

See publication Words and Phrases for other judicial constructions and definitions.

**2. Trademarks ⬤1436**

Elements of trade dress infringement claim are: (1) asserted dress is primarily non-functional; (2) alleged infringement creates likelihood of confusion; and (3) asserted dress either (a) is inherently distinctive or (b) has acquired secondary meaning. Lanham Trade–Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**3. Trademarks ⬤1064**

Generally, product feature is "functional," and hence not protectable trade dress, if it is essential to use or purpose of article, it affects cost or quality of article, or if claimant's exclusive use of feature would put competitors at significant nonreputation-related disadvantage. Lanham Trade–Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

See publication Words and Phrases for other judicial constructions and definitions.

**4. Federal Civil Procedure ⬤2493**

Issue of material fact as to whether combination of color of manufacturer's ground fault circuit interrupter (GFCI) faceplates and arrangement of "test" and "reset" buttons on faceplates was non-functional, protectable trade dress precluded summary judgment of noninfringement. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**5. Trademarks ⬤1611**

To rebut presumption that trade dress has acquired secondary meaning, arising from fact infringement defendant copied it, defendant must show that its copying efforts have been unsuccessful. Lanham Trade–Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**6. Trademarks ⬤1065(2)**

Fact that ground fault circuit interrupter (GFCI) manufacturer had permitted private labeling of its product did not preclude finding of secondary meaning, as required to establish trade dress infringement claim, particularly where there was evidence of intentional copying by defendant. Lanham Trade–Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**7. Patents ⬤226.6**

Patent infringement determinations require two-step analysis: (1) asserted claims of patent must be properly construed to determine their meaning and scope, and (2) claims as properly construed must be compared to allegedly infringing device.

**8. Patents ⬤161**

Patent claims are construed from perspective of person of ordinary skill in the field of invention.

**9. Patents ⇐165(3)**

Analytical focus of patent claim construction begins with and remains centered on language of claims themselves.

**10. Patents ⇐165(1), 167(1), 168(2.1)**

Claim-construing court principally consults evidence intrinsic to patent, including claims, specification, and relevant prosecution history.

**11. Patents ⇐167(1)**

Although it is improper to read limitation from patent specification into claims, claims must be read in view of specification, of which they are part.

**12. Patents ⇐167(1)**

Patent specification is single best guide to meaning of disputed claim term.

**13. Patents ⇐235(2)**

Patent for reset lock-out mechanism that prevented ground fault circuit interrupters (GFCIs) from resetting after ground fault unless unit was "operational" was not infringed by accused mechanism that failed to test for all elements of interrupter's operability before allowing reset.

**14. Patents ⇐226.6, 237**

Accused device infringes patent claim directly only when that device embodies every limitation of that claim, literally or by substantial equivalent. 35 U.S.C.A. § 271(a).

**15. Patents ⇐226.6**

Literal infringement occurs when every element of patent claim is met exactly in accused device or process.

**16. Patents ⇐237**

Under "doctrine of equivalents," element of patent claim is present in accused device if allegedly equivalent element in device performs substantially same func-tion in substantially same way to achieve substantially same result as claimed element.

See publication Words and Phrases for other judicial constructions and definitions.

**17. Patents ⇐226.7, 237**

To infringe means-plus-function patent claim limitation, under doctrine of equivalents, accused element must perform identical function in substantially same way to achieve substantially same result as claimed element. 35 U.S.C.A. § 112(6).

**Patents ⇐328(2)**

4,595,894, 6,282,070, 6,288,882. Cited.

**Patents ⇐328(2)**

6,040,967, 6,246,558, 6,381,112, 6,437,-953. Not Infringed.

————————

Barry George Magidoff, Brad S. Needleman, Joseph G. Lee, Joseph M. Manak, Michael A. Nicodema, Paul J. Sutton, Greenberg Traurig LLP, New York, NY, D. Christopher Ohly, Blank Rome LLP, Washington, DC, Steven Edward Tiller, Whiteford Taylor and Preston LLP, Baltimore, MD, for Leviton Manufacturing Company, Inc.

Maurice U. Cahn, William E. Bradley, Cahn and Samuels LLP, Washington, DC, for Universal Security Instruments.

Gary M. Hnath, Fei Fei Chao, Bingham McCutchen LLP, Venable Baetjer Howard and Civiletti LLP, for Shanghai Meihao Electric, Inc.

MEMORANDUM OPINION

DAVIS, District Judge.

This opinion concerns two lawsuits pertaining to a device called a ground fault circuit interrupter (GFCI).[1] In the first

---

**1.** A GFCI is a type of electrical outlet that protects a consumer from electric shock when an electrical device is connected to a power source and a ground fault occurs. A ground fault occurs when a separate current path is created in addition to the current flowing from the electrical power source through the

case, No. AMD 03–1701, plaintiff Leviton Manufacturing Company, Inc., accuses defendants Universal Security Instruments, Inc., and USI Electric, Inc. (collectively "USI"), of, among other things, patent infringement and trade dress infringement. The second case, No. AMD 03–2137, was instituted by Shanghai Meihao Electric, Inc. ("Meihao"), a Chinese corporation that manufactures GFCIs for USI's distribution in the United States. Meihao (joined by USI) seeks a declaratory judgment that, *inter alia*, it did not infringe any of the patents in controversy.

Leviton's patent infringement claims are based on four patents: U.S. Patent No. 6,040,967 (the " '967 patent"), U.S. Patent No. 6,246,558 (the " '558 patent"), U.S. Patent No. 6,381,112 (the " '112 patent") and U.S. Patent No. 6,437,953 (the " '953 patent"). The trade dress infringement claims, brought under Maryland law and the Lanham Act, 15 U.S.C. § 1051, *et seq.*, concern, *inter alia*, the appearance of the face of the Leviton device.

Discovery has concluded and now pending are cross-motions for summary judgment; each has been exhaustively briefed by the parties and a hearing is not necessary. USI seeks summary judgment as to Leviton's claims of trade dress infringement. In addition, Meihao (joined by USI) and Leviton have filed motions for summary judgment on the patent infringement claims. For the reasons stated herein, I shall deny the motion filed by USI respecting the trade dress infringement claim as

well as Leviton's motion respecting patent infringement. I shall grant the motion (seeking a declaration of non-infringement of the Leviton patents) filed by Meihao (and joined in by USI).[2]

### I.

The cases have reached this point by a circuitous route. In an earlier action, filed on December, 13, 2001, Leviton alleged against USI claims for trade dress infringement and patent infringement based on U.S. Patent No. 4,595,894 (the " '894 patent"). *See Leviton Mfg. Co., Inc. v. Universal Security Instruments, Inc.*, 304 F.Supp.2d 726 (D.Md.2004) ("*Leviton I*"). The trade dress claim from *Leviton I* is essentially identical to the trade dress claim asserted in the instant controversy. The '894 patent, which expired on June 17, 2003, described an invention that used sensing circuitry to detect a current imbalance created when a ground fault occurred, and a trip mechanism to separate the electrical contacts to interrupt the flow of electrical current in response to the ground fault. In *Leviton I*, I denied USI's motion for summary judgment as to Leviton's claim for trade dress infringement, and I granted in part and denied in part USI's motion for summary judgment as to Leviton's claim for patent infringement in respect to the '894 patent. *Id.* Subsequently, I continued the trial of the surviving claims in *Leviton I* for consolidation with the trial on the claims asserted in these cases.

---

electrical device and back to the power source. This may happen, for example, due to wear and tear of the electrical device, or when the electrical device becomes wet. When a GFCI detects a ground fault, the GFCI causes the electrical circuit to "trip," i.e., to open, and the flow of current is stopped. After the circuit is interrupted, the GFCI can be reset so that electrical current is again allowed to flow through the electrical circuit. The Leviton-marketed device based

on the patents at issue in these cases is unique because it can only be reset when it is "operational," thereby preventing a consumer from resetting a GFCI that cannot detect a future ground fault.

**2.** Leviton also seeks exclusion of the testimony of a USI expert witness bearing on the trade dress infringement claim. I shall defer ruling on the motion to exclude the expert testimony until the pretrial conference.

The instant actions were filed during the pendency of *Leviton I*. On June 10, 2003, Leviton filed its action against USI for trade dress infringement and infringement of six patents.[3] On July 7, 2003, Meihao filed its own complaint requesting a declaratory judgment of non-infringement.[4] Leviton then filed a counterclaim against Meihao alleging infringement of the patents.

The patents at issue here introduced a "reset lock-out" feature that improves consumers' safety by preventing the GFCI from being reset after it has incurred some damage and can no longer provide ground fault protection. The '894 design was modified so that the sensing circuitry and, in turn, the trip mechanism, are activated when the reset button is pushed. The "reset lock-out" feature ties the resetting of the GFCI device with the circuit interrupting feature such that everything that would have to be operating properly in order to detect a ground fault and interrupt the circuit must be operating properly in order for the user to reset (and thus, to continue employing) the device.

After holding a *Markman* hearing, I issued a Claims Construction Order on April 22, 2005. *See* 2005 WL 936990 (D.Md. April 22, 2005). The Claims Construction Order considered the following claims: claims 1, 5, 7 and 12 of the '967 patent; claims 1, 5 and 22 of the '112 patent; claims 1, 8 and 10 of the '070 patent; claims 1, 2 and 4 of the '558 patent; and claims 1, 5, 7 and 14 of the '953 patent. The contested limitations revolved around five terms and phrases, which I construed in the Claims Construc-

tion Order: (1) "reset lock-out;" (2) "reset mechanism;" (3) "activates said circuit interrupter;" (4) "operational" (and "non-operational"); and (5) "trip mechanism" (as used in the '070 patent). *See* 2005 WL 936990, at *8–*13.

## II.

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate in a patent case as in any other case. *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 795–96 (Fed. Cir.1990). Pursuant to Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment if, when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In patent litigation, it is often the case that some dispositive issues present questions of law for the court rather than questions of fact for the factfinder. As to such issues, final resolution on summary judg-

---

3. In addition to the four patents mentioned above that are considered in this opinion, Leviton's complaint included U.S. Patent No. 6,282,070 (the " '070 patent") and U.S. Patent 6,288,882 (the " '882 patent"). Leviton no longer asserts the '070 patent. The '882 patent infringement allegation was dismissed without prejudice on March 3, 2005.

4. Meihao and USI initially alleged that Leviton's patents were unenforceable for various reasons. The parties, however, stipulated on July 15, 2005, to the dismissal of those allegations without prejudice.

ment is often appropriate. *Leviton Mfg. Co., Inc.*, 304 F.Supp.2d at 734 n. 4.

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). Only a "genuine evidentiary conflict created by the underlying probative evidence pertinent to the claim's interpretation" can create a factual dispute that may not be resolved as a matter of law. *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1579 (Fed.Cir.1989). Of course, the facts, as well as justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987).

### III.

I first consider USI's motion for summary judgment on the claim of trade dress infringement. As mentioned above, USI's challenge, via motion for summary judgment, was thoroughly examined in *Leviton I*, in which I ruled that Leviton had made a sufficient showing of all the elements of a trade dress claim such that USI's motion for summary judgment had to be denied. In the instant action, USI has not put forth any material facts that distinguish the new claim from the old claim. Rather, USI has relied principally on an allegedly "clarifying" decision of the Fourth Circuit, *International Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359 (4th Cir.2003), *cert. denied*, 540 U.S. 1106, 124 S.Ct. 1052, 157 L.Ed.2d 891 (2004), that it says tilts the record for summary judgment in its favor.

I am not persuaded that *International Bancorp*, which was decided well before my decision in *Leviton I*, but was not cited by the parties in that case, should alter my conclusion. To the contrary, after having carefully reviewed *International Bancorp* and the contentions of the parties, and having considered the facts in the light most favorable to Leviton, the non-movant, I conclude that Leviton's claim for trade dress infringement survives summary judgment. USI's motion shall be denied.

### A.

Leviton alleges trade dress infringement of the "non-functional appearance and arrangement" of its GFCI. Compl. ¶ 12. Leviton's trade dress is comprised of, *inter alia*, the color of the faceplates of its GFCIs and the arrangement of the "test" and "reset" buttons on the faceplate.[5] Opp'n to Mot. for Summ. J. at 10. Furthermore, Leviton argues that its GFCI has acquired secondary meaning so that

---

**5.** Just as it argued unsuccessfully in *Leviton I*, USI again asserts that Leviton has failed to sufficiently describe its asserted trade dress. As I rejected that contention in that case, 304 F.Supp.2d at 735 n. 5, I reject it here. It is clear on the face of the Leviton complaint that

its trade dress is the outward appearance of its GFCI face plate. Moreover, it is clear that the outward appearance of the faceplate is comprised of, among other things, its color and the configuration of its buttons.

consumers have "come to recognize the well-known appearance and arrangement of the elements of Leviton's GFCI product line, and [associate] that appearance and arrangement with Leviton as the source of such products." Compl. ¶ 12. USI refutes these claims by arguing that, *inter alia*, Leviton fails to show that its trade dress has secondary meaning and the faceplate's colors and configuration are functional, and thus non-protectable, elements.

**[1, 2]** Section 43(a) of the Lanham Act creates a cause of action for trade dress infringement. 15 U.S.C. § 1125(a). "Trade dress" is a product's total image and overall appearance, and it may include attributes such as color and shape. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n. 1, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). To prevail on its claim of trade dress infringement, Leviton must establish that: (1) its trade dress is primarily non-functional; (2) the alleged infringement creates a likelihood of confusion;[6] and (3) the trade dress either (a) is inherently distinctive or (b) has acquired secondary meaning. *Id.* at 769, 112 S.Ct. 2753; *Ashley Furniture Indus. v. Sangiacomo N.A.* 187 F.3d 363, 368 (4th Cir.1999); *Leviton Mfg. Co., Inc.*, 304 F.Supp.2d at 736–38.

**[3]** "In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982); *see also TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 31–34, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001). A feature is functional "if exclusive use of the feature would put competitors at a significant nonreputation-related disadvantage." *Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654, 657 (4th Cir.1996) (quoting *Qualitex Co. v. Jacobson Prods.*, 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995)); *Leviton Mfg. Co., Inc.*, 304 F.Supp.2d at 736–38.

### B.

**[4]** I concluded in *Leviton I* that Leviton put forth sufficient evidence to show non-functionality of the face of its GFCI. There is no reason to change course at this time. USI argues that, with the exception of a recently added "SmartLock®" trademark, "every feature on Leviton's GFCI faceplate is functional." Mem. Supp. Mot. for Summ. J. at 19. USI then attempts to paint a picture of GFCI configuration in which designers have no choice but to arrange the device the same way the Leviton device is arranged.[7] In addition, USI argues that the color of the Leviton faceplaces is "aesthetically functional." *Id.* at 12.[8]

---

**6.** As was the case in *Leviton I,* USI does not dispute that Leviton put forth facts alleging actual confusion. Therefore, for the purpose of this motion, USI is deemed to have conceded this point. The court will not address it any further.

**7.** USI undermines this position to some degree, however, by pointing out that Eagle Manufacturing Company makes a GFCI that differs in configuration by placing its buttons horizontally. USI also admitted that in copying the Leviton design, as discussed *infra* in text, it did not wish to "reinvent the wheel." Grossblatt Deposition, Tr. 240:7–8.

**8.** As relevant here, a design might be described as "aesthetically functional" and not protectable under trademark law if the design is "an important ingredient in the commercial success of the product." *Ives Laboratories, Inc. v. Darby Drug Co.*, 601 F.2d 631, 643 (2d Cir.1979) (affirming denial of preliminary injunction), *rev'd on other grounds sub nom.* Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). For example, a camouflage pattern appearing on jackets used by hunters may contain patterns and colors which are themselves the very essence of the product being sold—and its functionality.

Essentially, USI relies on the following flawed syllogism: (1) functional items are not protected; (2) Leviton's trade dress includes functional items; and (3) therefore, as a matter of law, Leviton's trade dress cannot be protected. This is certainly not the case. *See Taco Cabana Intern., Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1119 (5th Cir.1991) (rejecting the same line of reasoning), *aff'd,* 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). As the First Circuit pointed out in *I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 37 (1st Cir.1998): "[A] particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection." *See also Straumann Co. v. Lifecore Biomedical Inc.,* 278 F.Supp.2d 130, 134–35 (D.Mass. 2003) (quoting the same). In other words, while the buttons on the Leviton GFCI certainly have functional value, by no means does that preclude Leviton from asserting that their configuration or design is non-functional. The element of arbitrariness required in *I.P. Lund Trading ApS,* moreover, is supported by the fact that other manufacturers of GFCIs use different configurations. That much is apparent from the deposition testimony of Steve Campolo, USI's Rule 30(b)(6) corporate designee:

Q. You were asked some questions about buttons earlier, do you recall?

A. Yes.

Q. Can buttons come in different shapes as far as the outer appearance?

A. Certainly.

Q. Have you ever seen different shaped buttons on competitors?

A. Yes.

Q. Is it fair to say that a party wishing to copy another design has a choice between different shaped buttons?

\*       \*       \*       \*       \*       \*

A. Certainly.

Campolo Deposition, Tr. 198:10 to 199:14. Viewing the facts in the light most favorable to the plaintiff, this is enough to show that the configuration of the faceplate is non-functional and thus a protectable trade dress element.

USI also argues (again) that the color of the face of the Leviton GFCI cannot be protected. The law is more nuanced than USI would suggest and, ultimately, is to the contrary.[9] The "trade dress of a product is essentially its total image and overall appearance." *Two Pesos, Inc.,* 505 U.S. at 765 n. 1, 112 S.Ct. 2753 (quoting *Blue Bell Bio–Medical v. Cin–Bad, Inc.,* 864 F.2d 1253, 1256 (5th Cir.1989)). It "involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Id.* (quoting *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 980 (11th Cir.1983)). Just as the configuration of the buttons on Leviton's GFCI are part of the protected trade dress, so is the color.

The court is not persuaded by USI's argument that Leviton's distinct colors are "aesthetically functional." The fact that USI may want to match the color of its devices so that they can be used with Leviton's electrical devices does not vitiate the purpose and the right of Leviton to protect its trade dress. USI would have a stronger argument if Leviton were asserting infringement based solely on color; however, Leviton is asserting that color is

**9.** *See American Waltham Watch Co. v. United States Watch Co.,* 173 Mass. 85, 87, 53 N.E. 141, 142 (1899)(Holmes, J.)("It is true that a man cannot appropriate a geographical name; but neither can he a color, or any part of the English language, or even a proper name to the exclusion of others whose names are like his. Yet a color in connection with a sufficiently complex combination of other things may be recognized as saying so circumstantially that the defendant's goods are the plaintiff's as to pass the injunction line.").

LEVITON MFG. v. UNIVERSAL SEC. INSTRUMENTS        **651**
Cite as 409 F.Supp.2d 643 (D.Md. 2006)

*part of the GFCI trade dress,* along with the overall design of the device and the configuration of the "test" and "reset" buttons.

### C.

In order for Leviton to survive summary judgment as to trade dress infringement, it must also put forth evidence that its product either is inherently distinctive or has secondary meaning. *Two Pesos, Inc.,* 505 U.S. at 769, 112 S.Ct. 2753; *Ashley Furniture Indus.,* 187 F.3d at 368. Because Leviton's allegation of trade dress infringement involves its GFCI's configuration and color, neither of which can be inherently distinctive, Leviton must show secondary meaning. *Qualitex Co. v. Jacobson Products Co., Inc.,* 514 U.S. 159, 162–63, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (holding that color cannot be inherently distinctive); *Wal–Mart Stores, Inc. v. Samara Brothers, Inc.,* 529 U.S. 205, 212, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000) (holding that product design can never be inherently distinctive); *Leviton Mfg. Co., Inc.,* 304 F.Supp.2d at 736–38. By showing secondary meaning, Leviton demonstrates that the color and appearance if its GFCI identify Leviton as the source of the product in the minds of the public. *Inwood Laboratories, Inc.,* 456 U.S. at 851 n. 11, 102 S.Ct. 2182.

Again, the court addressed this issue, on virtually the same facts, in *Leviton I. See* 304 F.Supp.2d at 736–38. The only new element that USI brings to the instant debate is the consideration of *International Bancorp v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco,* 329 F.3d 359 (4th Cir.2003). USI asserts that "[w]hether and to what extent an accused trade dress infringer bears the burden of proof was a procedural point of confusion

that precluded summary judgment in USI's favor in *Leviton I,*" but the "Fourth Circuit clarified this point of confusion in International Bancorp." While it is true that *International Bancorp* adds some clarity to the burden shifting scheme for proving secondary meaning, that case does not persuade me to alter my ruling.

In *International Bancorp,* a casino owner, Societe des Bains de Mer et du Cercle des Estrangers a Monaco ("SBM"), accused a gambling web site of violating the Lanham Act and infringing on its rights to the name "Casino of Monte Carlo." *International Bancorp,* 329 F.3d at 361. The Fourth Circuit affirmed the trial court, which held that SBM had proved secondary meaning with a showing that the online casino "*directly* and *intentionally* copied the 'Casino de Monte Carlo' mark." *Id.* at 371. In doing so, the court relied upon the burden shifting scheme from *Larsen v. Terk Technologies,* 151 F.3d 140 (4th Cir.1998), which in turn had relied on *Osem Food Industries Ltd. v. Sherwood Foods, Inc.,* 917 F.2d 161 (4th Cir.1990), and *M. Kramer Mfg. Co., Inc. v. Andrews,* 783 F.2d 421 (4th Cir.1986). The *International Bancorp* Court took *Larsen* to stand for the proposition that "a trademark[10] plaintiff that proves that the defendant directly and intentionally copied its mark is presumed to have proved that mark's secondary meaning, and the defendant must then disprove that presumption." *International Bancorp,* 329 F.3d at 371.

Of particular interest in the instant case is the process by which a defendant can rebut the presumption that arises from proof that he copied the plaintiff's trade dress (or, in the case of *International Bancorp,* plaintiff's trademark). In the key passage from *International Bancorp*

**10.** The Fourth Circuit in *International Bancorp* also explained that *Larsen* has the same precedential force whether it is applied to a

trademark case or a trade dress case. 329 F.3d at 371.

on this issue, the Fourth Circuit hypothesizes that the plaintiff will win the battle of secondary meaning "unless the [defendant][11] companies proffered some evidence, not ultimately persuasive evidence, just some evidence, that the fact finder concluded was probative in disproving secondary meaning." *Id.* at 371 (emphasis in original).

**[5]**   What *International Bancorp* does not do is define "probative evidence" for the purpose of disproving secondary meaning after one party has copied the trade dress of another.   Direction on that issue, however, can be found in *Osem Food Industries Ltd.* In *Osem Food Industries Ltd.*, the Fourth Circuit quotes approvingly from *My–T–Fine Corp. v. Samuels*, 69 F.2d 76 (2d Cir.1934), in which Judge Learned Hand writes, "a late comer who deliberately copies the dress of his competitors already in the field, must at least prove that his effort has been futile." *Osem Food Industries Ltd.*, 917 F.2d at 164.   That principle makes sense.   Because evidence of copying is extraordinarily strong proof of secondary meaning—regardless of what the accused claims his intent to have been after the fact—a defendant is unlikely to rebut that presump-

tion unless he can show that, despite his efforts, he was unable to mimic the preexisting trade dress.[12]

**[6]**   USI is unable to satisfy this standard on the present record.   It offers no evidence that it failed in its effort to copy the Leviton GFCI.   The "evidence" it does offer, furthermore, is taken from *Leviton I* and twisted out of context.   USI asserts that Leviton's showing of secondary meaning (through proof of copying) is overcome by the fact that Leviton allows private labeling of its GFCIs.   The source of this contention is footnote 7 of *Leviton I. Leviton Mfg. Co., Inc.*, 304 F.Supp.2d at 736 n. 1. This "evidence" fails for two reasons. First, the evidence is not probative of USI's futility in copying the Leviton device.   Second, footnote 7 does not say that non-exclusivity of use is probative of a lack of secondary meaning, as USI asserts. Rather, footnote 7 says exactly the opposite: "[T]he fact that Leviton has permitted private labeling of its GFCI does not defeat its claim for trade dress infringement . . . . [N]on-exclusivity does not defeat a finding of secondary meaning, particularly here where the burden has been shifted as a result of direct evidence of copying." *Id.*

---

**11.**  The original quote says "plaintiff" because the case involved a motion for declaratory judgment of non-infringement.

**12.**  One example of such a "futile" attempt to copy can be found in *Kann v. Diamond Steel Co.*, 89 F. 706 (8th Cir.1898).   In that case, one company making crushed steel abrasives accused another company making a similar product of copying its logo, which featured a drawing of a diamond.   The picture of a diamond used in the logo of the alleged infringer looked entirely different from the original diamond—so much so that it was difficult to discern that both drawings were the same object.   Yet, the fact that a diamond had been used in both logos was at least circumstantial evidence of copying.   The court held that "[i]f the . . . appellees ever had such a purpose [to copy], they never used any means calculated

to accomplish it, and they adopted those admirably suited to defeat it.   Their intention, therefore, becomes immaterial." *Id.* at 712.

Perhaps a modern example would be if an athletic footwear company intentionally tried to copy the well-known trade dress or trade mark owned by Nike, Inc. If, for example, the alleged trade dress infringer put the famous Nike "swoosh" upside-down—such that consumers did not confuse it with the authentic Nike ® product—it could be argued that the attempt to copy had been futile, thereby rebutting the presumption of secondary meaning.   In reality, of course, it is clear that the Nike "swoosh" has attained secondary meaning and indeed, is "famous." *Nike, Inc. v. Variety Wholesalers, Inc.*, 274 F.Supp.2d 1352 (S.D.Ga.2003), *aff'd without op.*, 107 Fed. Appx. 183 (5th Cir.2004)(Table).

Direct evidence of copying certainly exists in this case. As stated in *Leviton I*, the deposition testimony of Harvey Grossblatt, President and Chief Financial Officer of USI, is sufficient evidence of copying to shift the burden of "disproving the presumption" of secondary meaning to USI:

Q: What is on [page 4893]?

A: 4893 is an e-mail from [USI Chairman Michael Kovens] to [the manufacturer's representative, Barkley Bao], dated August 23, 2000, talking about ivory and almond GFCI colors.

Q: In the second paragraph it says: This is the second time you have sent me samples to match up against Leviton.

A: Yes.

Q: What does that refer to?

A: Color samples. He sent them Leviton samples asking them to match up the colors.

Q: Those are Leviton GFCI samples?

A. Yes.

*Leviton Mfg. Co., Inc.*, 304 F.Supp.2d at 736 (quoting Dep. Test. of Harvey Grossblatt, Feb. 12, 2003).

This deposition testimony, and evidence of e-mail exchanges between Bao and Kovens,[13] is certainly enough to show that USI intentionally copied Leviton's GFCI. That evidence, in turn, establishes a rebut-table presumption of secondary meaning. Because USI offers no substantial evidence that it failed in its effort to copy Leviton's GFCIs, secondary meaning is established for purposes of the instant motion. Accordingly, Leviton has put forth sufficient evidence to survive summary judgment on its claim of trade dress infringement and USI's motion shall be denied.

## IV.

I now turn to the patent law issues. Meihao (joined by USI) seeks summary judgment of non-infringement of the four patents relating to the "reset lock-out" of the Leviton GFCI.[14] Leviton moves for summary judgment against Meihao and USI[15] for infringement of claims 5 and 22 of the '112 patent. These issues, in large part, hinge on the claims construction I issued April 22, 2005. I see no reason to change the way I construed the disputed claims. Therefore, as explained below, I shall deny Leviton's motion for summary judgment of infringement and grant Meihao's motion for summary judgment of non-infringement.

## A.

**[7]** Patent infringement determinations require a two-step analysis: (1) the asserted claims of the patent must be properly construed to determine their

---

**13.** The e-mail exchanges between Bao and Kovens, which are the subject of the excerpted deposition testimony, show USI's clear attempts to match the Leviton colors. In a July 25, 2000, letter Kovens writes Bao: "What are your comments about the [i]vory color from your perspective and do you believe that you can get it closer to the Leviton?" *Leviton Mfg. Co., Inc.*, 304 F.Supp.2d at 737.

**14.** In a Stipulation filed with the court July 15, 2005, the parties agreed that Meihao and USI would dismiss without prejudice claims and defenses asserting that the Leviton patents in suit are unenforceable. For that rea-

son, the court will not consider the issue of unenforceability.

**15.** Leviton initially brought an action against USI for patent infringement in Case No. AMD 03–1701. Meihao then brought a declaratory judgment action against Leviton, to which Leviton responded by filing a counterclaim for infringement against Meihao in Case No. AMD 03–2137. In this opinion, I will often refer to the infringing party only as "Meihao." These references should be taken to include USI, the company that sells the Meihao devices.

meaning and scope; and (2) the claims as properly construed must be compared to the allegedly infringing device. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

**[8–10]**   In the Claims Construction Order, I undertook to follow the guidelines that have been established in this area of law.   The claims are construed from the perspective of a person of ordinary skill in the field of invention. *Hoechst Celanese Corp. v. B.P. Chems. Ltd.,* 78 F.3d 1575, 1578 (Fed.Cir.1996).   The analytical focus of claim construction begins with and remains centered on the language of the claims themselves. *Honeywell Int'l, Inc. v. Int'l Trade Comm'n,* 341 F.3d 1332, 1338 (Fed.Cir.2003).   A court principally consults the evidence intrinsic to the patent, including the claims, the specification, and the relevant prosecution history. *C.R. Bard, Inc. v. U.S. Surgical Corp.,* 388 F.3d 858, 861 (Fed.Cir.2004).

**[11, 12]**   Although it is improper to read a limitation from the patent specification into claims, claims must be read in view of the specification, of which they are a part. *Markman,* 52 F.3d at 979; *see also Apple Computer, Inc. v. Articulate Sys., Inc.,* 234 F.3d 14, 25 (Fed.Cir.2000) (patent claim "must be interpreted in light of the teachings of the written description and purpose of the invention described therein").   The Federal Circuit Court of Appeals has observed:

> The specification, of which the claims are part, teaches about the problems solved by the claimed invention, the way the claimed invention solves those problems, and the prior art that relates to

the invention.   These teachings provide valuable context for the meaning of the claim language.

*Eastman Kodak Co. v. Goodyear Tire & Rubber Co.,* 114 F.3d 1547, 1554 (Fed.Cir. 1997).   The Federal Circuit recently reaffirmed this principle: "As we stated in *Vitronics,* the specification 'is always highly relevant to the claim construction analysis.   Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips v. AWH Corp.,* 415 F.3d 1303, 1327 (Fed.Cir.2005) (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996)).

## B.

In the Claims Construction Order, I gave the following constructions to four disputed terms:

Reset lock-out (means plus function):[16]   The latching finger of the latching member working in cooperation with the contact arm, and equivalents thereof that perform the identical function of inhibiting the resetting of the electrical connection unless the circuit interrupter is operational.

Reset mechanism (means plus function):   The primary function of the reset mechanism is to allow an interrupted circuit to be reset, i.e., to reestablish electrical continuity between the input and output conductive paths or conductors after continuity has been broken.   To accomplish this, the reset mechanism works in conjunction with the circuit interrupter and the reset lock-out. . . .   In other words, activation of the reset mechanism tests the operation of the circuit interrupter, which if operational, disables the reset lock-out.

Activates said circuit interrupter:[17]

---

**16.**   "Reset lock-out" was construed to be synonymous with "reset lock-out means," "reset lock-out portion," "reset lock-out device," "reset actuator lockout," and "reset lockout

portion."   Claims Construction Order, 2005 WL 936990, at *8.

**17.**   "Activates said circuit interrupter" is synonymous with "enabling said circuit inter-

This means activating or utilizing the sensing circuitry and the trip mechanism as when a fault or simulated fault occurs.

Operational: This must be construed to mean "working properly," and further, that both the sensing circuitry and the trip mechanism must be working properly. When the circuit interrupter is "operational," it is able to sense a fault and interrupt electrical continuity in response to the fault. "Non-operational" is the opposite of "operational" and must mean that the sensing circuitry or the trip mechanism, or both, are not working properly, such that the circuit interrupter is either not able to detect a fault or not able to interrupt the electrical continuity when the fault occurs.

[13] With these constructions in mind, I will consider the issue of whether Meihao infringed claims 5 and 22 of the '112 patent. Here, as is the case with all of the claims at issue, the key word is "operational." This word is important because the Leviton patents cover a device with a reset lock-out that prevents the device from resetting after a ground fault unless the unit is "operational." Thus, the gravamen of the Leviton invention lies in its ability to test itself to first determine if it is "operational," then reset, then, in the event of a second ground fault (or simulated ground fault), trip again. If the device is not "operational," the reset lock-out should prevent it from resetting—thereby preventing the consumer from using a damaged CFCI that can no longer determine whether a ground fault has occurred. The accused Meihao device, on the other hand, uses technology that falls short of the technology protected by the Leviton patents. It does test for *some elements* of "operational," but, Meihao correctly argues, it does not test for *all elements* of "operational" and therefore does not have a reset lock-out as envisioned by the Leviton patents-in-suit.

My construction of "operational" favors Meihao because its relative expansiveness comports with the elements reading on the Leviton invention. It requires both the sensing circuitry, which detects faults, and the trip mechanism, which interrupts the circuit, to be working properly. Leviton, perhaps realizing that this construction severely hampers its case for infringement, argues against it two ways. First, by moving for summary judgment only on claims 5 and 22 of the '112 patent, Leviton focuses on claims in which there is room to make semantic arguments that "operational" does not mean what it appears to mean (and therefore the reset lock-out is not what I defined it to be in the Claims Construction Order). Second, Leviton argues that the Federal Circuit's decision in *Phillips, supra,* somehow undermines my Claims Construction Order.[18] I disagree.

---

rupter," "activates said circuit interrupting mechanism," "said circuit interrupter is activated," and "circuit interruption portion is activated." Claims Construction Order, 2005 WL 936990, at *14.

18. Leviton argues in its brief as follows:

Meihao's entire non-infringement position ultimately rests on its allegation that activation of both the fault sensing circuitry and the trip mechanism is required by "each and every asserted claim." Meihao then alleges that the Meihao [GFCI] does not activate, or test, the entire "circuit interrupter," including the entire tripping mechanism and sensing circuit. However, as is detailed in this Cross-Motion, no such limitation, requiring activation of both the fault sensing circuitry and the trip mechanism, is present in the claim language of at least Claims 5 and 22 of the '112 patent. To adopt Meihao's flawed construction would improperly import a limitation from the patent specification onto the claims in violation of Federal Circuit precedent. This Court, of course, did not have the benefit of reviewing *Phillips* before issuing its [Claims Construction].

Mem. Supp. Cross–Mot. for Summ. J. at 4–5 (citations to Meihao's brief omitted).

In claims 5 and 22 of the '112 patent, the word "operational" does not stand alone. Rather, the claims refer to "non-operational" (claim 5)[19] and "operational state" (claim 22).[20]  Leviton asserts that these phrases mean something other than what would normally be construed based on the Claims Construction Order's definition of "operational."  The logic behind this assertion is somewhat difficult to follow.  When referring to claims 5 and 12, Leviton states:  "These claims do not require that the circuit interrupter be 'operational,' only that it not be 'non-operational' in order for the reset lock-out to allow resetting."  Mem. Supp. Cross–Mot. for Summ. J. at 16.  When referring to "operational state," Leviton asserts that "although this Court construed the term 'operational' in its pre-*Phillips* Opinion, the Court did not consider the meaning of 'operational state,' as used in the context of Claim 22."  *Id.* at 15.

These are arguments that only a lawyer could make.  When I defined "operational" in the Claims Construction Order, I meant exactly what I said.  "Operational" means that both the sensing circuitry and the trip mechanism are working properly.  "Operational state" means the state in which the device is "operational"—or the state in which both the sensing circuitry and the trip mechanism are working properly.

"Non-operational" means the opposite of "operational"—that the sensing circuitry or the trip mechanism, or both, are not working properly.  It is true, as Leviton points out, based on the Claims Construction Order, a device could be "non-operational" if only the sensing circuitry or the trip mechanism were not working properly (rather than requiring both to be nonfunctional).  This, however, does not mean that the invention claimed by claim 5 of the '112 patent could only test for one of those two elements.  Rather, implicit in

19.  Claim 5 reads as follows:  "A circuit interrupting device comprising: a housing; a first electrical conductor disposed at least partially within said housing and capable of being electrically connected to a source of electricity; a second electrical conductor disposed at least partially within said housing and capable of conduction electrical current to a load when electrically connected to said first electrical conductor; a circuit interrupter disposed within said housing and configured to cause electrical discontinuity between said first and second conductors upon the occurrence of a predetermined condition; a reset mechanism configured to reestablish electrical continuity between the first and second conductors after said predetermined condition occurs; and a reset lock-out that prevents reestablishment of electrical continuity between said first and second conductors if said circuit interrupter is *non-operational*."  (Italicized for emphasis).

20.  Claim 22 reads as follows:  "A circuit interrupting device comprising:  a housing; a first electrical conductor disposed at least partially within said housing and capable of being electrically connected to a phase line; a second electrical conductor disposed at least partially within said housing and capable of conducting electrical current to a phase line

of a load when electrically connected to said first electrical conductor; a third electrical conductor disposed at least partially within said housing and capable of being electrically connected to a neutral line; a fourth electrical conductor disposed at least partially within said housing and capable of conducting electrical current to a neutral line of a load when electrically connected to said third electrical conductor; a circuit interrupter disposed within said housing, the circuit interrupter having an operational state and a nonoperational state and configured to cause electrical discontinuity between said first and second conductors upon the occurrence of a predetermined condition; a reset device configured to reestablish electrical continuity between the first and second conductors after said discontinuity is caused; and a reset lockout device that prevents reestablishment of electrical continuity between said first and second conductors if said third electrical conductor is not connected to a neutral line; and wherein activation of the reset device activates the circuit interrupter to be in the *operational state* to move the reset lock-out device to a reset position."  (Italicized for emphasis)

the definition of "non-operational"—based on the Claims Construction Order's characterization of it being the opposite of "operational"—is that the invention tests both the sensing circuitry and the trip mechanism.

### C.

After I issued my Claims Construction Order, the Federal Circuit published the *Phillips* opinion. Leviton correctly points out that *Phillips* adds some clarity to the claims construction process. It gives a lengthy explanation of the relationship between a claim and a specification. *Phillips*, 415 F.3d at 1326–29. The Court warns that "the written description part of the Specification itself did not delimit the right to exclude. That was the function and purpose of the claims." *Id.* at 1326. Based on this principle, courts must always guard against importing limitations from the patent specification into the claims.

*Phillips* also details the value of the specification in claims construction: "This court and its predecessors have long emphasized the importance of the specification in claim construction." *Id.* at 1327. The Court continues:

> The importance of the specification in claim construction derives from its statutory role. The close kinship between the written description and the claims is enforced by the statutory requirement that the specification describe the claimed invention in "full, clear, concise, and exact terms." 35 U.S.C. § 112, para. 1 . . . . In light of the statutory directive that the inventor provide a "full" and "exact" description of the claimed invention, the specification necessarily informs the proper construction of the claims.

*Id.* at 1328 (citations omitted). The Court then concludes its passage on the relationship between specification and claim by stating: "It is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Id.* at 1329.

Applying the well-established principles reaffirmed in *Phillips* to the '112 patent, it is clear that "non-operational" and "operational state," like "operational," are used in a context such that they refer to a device in which both the sensing circuitry and the trip mechanism must be properly functional in order for the device to reset. By looking to the description of the patent, the court is not importing new limitations; rather it is merely seeking to clarify any ambiguity in claims 5 and 22. The specification clears up this confusion more than once: "In other words, this arrangement ensures that once the circuit interrupting device has been reset, it has the ability to again break electrical continuity between the input and output conductive paths *because the sensing circuitry and trip mechanism of the circuit interrupter are utilized for resetting the continuity.*" '112 Patent, col. 3, ll. 29–34 (italicized for emphasis). "Using the reset lock-out feature described above permits the resetting of the GFCI device . . . only if the circuit interrupter (or circuit interrupting mechanism) is operational." '112 Patent, col.6, ll. 39–44. The use of these passages from the patent specification to clarify claims 5 and 22 is well within the reasoning and the spirit of *Phillips.*

### D.

**[14, 15]** In conformity with *Markman*, I now turn my attention to the second prong of the two-part inquiry: determining whether Meihao infringed the claims I have clearly defined. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed.Cir.1995) (en banc). An accused device infringes a claim directly only when

that device embodies every limitation of that claim, literally or by substantial equivalent. *Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed.Cir.2002). Literal infringement occurs when every element of a patent claim is met "exactly" in the accused device or process. *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed.Cir.1995).

**[16]** Literal infringement, however, is not always necessary. Under the doctrine of equivalents, an element is present if it performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed element. *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934 (Fed.Cir.1987); *Sage Products, Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1424–25 (Fed.Cir.1997) (a claim element is equivalently present in an accused device only if "insubstantial differences distinguish the missing claim element from the corresponding aspects of the accused device"); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1581 (Fed.Cir.1989).

The second part of the *Markman* inquiry is easily resolved here. Meihao has offered indisputable evidence showing that its device does not activate both the fault sensing circuitry and the trip mechanism when the device resets. More specifically, Meihao, through its expert, Gene Hayes, has put forth evidence that its device does not test the differential transformer (DT) or the integrated circuit (IC) when the device is reset (by pressing the reset button). Haynes Decl. ¶¶ 17, 32; *see also* video demonstration by Lu Huayang of Meihao, attached to Haynes Decl. as Ex. D (demonstrating that the Meihao device can reset even though the DT and IC have been intentionally destroyed). This showing is enough to defeat Leviton's motion

for summary judgment of infringement as to claims 5 and 22 of the '112 Patent. The motion shall be denied.

### V.

The final matter for consideration is Meihao's motion for summary judgment (joined by USI) of non-infringement of all asserted claims. Once again, this motion hinges on the definition of the word "operational," which is present in every asserted claim through the "reset lock-out" structure. The Meihao device neither contains a "reset lock-out," nor the equivalent of a "reset lock-out." Accordingly, as a matter of law, Meihao's devices cannot infringe the Leviton patents-in-suit. Meihao's motion for summary judgment (joined by USI) of non-infringement shall be granted.

In addition to the 5 and 22 claims of the '112 patent, which are discussed above, Meihao seeks a judgment of non-infringement on the following claims: claims 1, 5, 7 and 12 of the '967 patent; claims 1 and 2 of the '558 patent; claim 1 of the '112 patent; and claims 5 and 7 of the '953 patent. Claim 1 of the '967 patent is typical of all the claims at issue:

A circuit interrupting device comprising: a housing; at least one input conductor disposed at least partially within said housing and capable of being electrically connected to a source of electricity; at least one output conductor disposed within said housing and capable of conducting electrical current to a load when electrically connected to said at least one input conductor; a circuit interrupter disposed within said housing and configured to break said electrical connection between said input and output conductors in response to the occurrence of a predetermined condition; a reset lock-out responsive to the occurrence of said predefined condition such that said reset lock-out is operable between a lock-out position wherein said reset lock-out inhibits resetting of said electrical connec-

tion between said input and output conductors and a reset position wherein said reset lock-out does not inhibit resetting of said electrical connection between said input and output conductors; and a reset mechanism operatively associated with said reset lock-out and said circuit interrupter such that activation of said reset mechanism activates said circuit interrupter which facilitates movement of said reset lock-out from said lock-out position to said reset position by said reset mechanism.

As discussed in detail above, the word "operational," as used in the Leviton patents, requires that the device test both the sensing circuitry and the trip mechanism before resetting. This word is part of the construction of the means-plus-function term "reset lock-out" that I construed in the Claims Construction Order. *See* 35 U.S.C. § 112, ¶ 6 ("An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.") A "reset lock-out" device performs the function of "inhibit[ing] the resetting of the electrical connection unless the circuit interrupter is operational." Claims Construction Order, 2005 WL 936990, at *10. Because the Meihao device does not test to see if the circuit interrupter is "operational," as envisioned by the Leviton patents, it cannot possibly have a "reset lock-out." Without a "reset lock-out," the Meihao GFCI cannot literally infringe the Leviton patents.

[17] The Meihao device also does not infringe as the equivalent of a means-plus-function claim. To infringe as a section 112, paragraph 6, equivalent, an element

must perform the identical function in substantially the same way to achieve substantially the same result as the claimed element. *Kemco Sales, Inc. v. Control Papers, Inc.,* 208 F.3d 1352, 1364 (Fed. Cir.2000). This is a heightened standard because equivalents under section 112, paragraph 6, must perform the identical function, while equivalents under the customary doctrine of equivalents need only perform a substantially similar function. *Id.* (citing *Al–Site Corp. v. VSI Int'l, Inc.,* 174 F.3d 1308, 1320–21 (Fed.Cir.1999)). Insofar as it does not test the sensing circuitry and the trip mechanism, the Meihao device does not perform the identical function as claimed in the Leviton patents.

The Meihao device also does not achieve substantially the same result. Meihao's GFCI in some instances allows a consumer to reset the device even if parts of the sensing circuitry are damaged so that it is unable to detect a ground fault. This defeats one of the core purposes of the invention claimed in the Leviton patents: to protect consumers from faulty GFCIs that are resettable and likely to give consumers a false sense of security. *See* Report of Leviton Expert Jaime De La Ree ¶ 17 (stating that "[i]n cases where the GFCI is tripped and is damaged, it is very dangerous to the consumer to allow such a GFCI to be reset"). Ironically, it is the lack of safety of the Meihao device that helps it defeat allegations of patent infringement.

To defeat Meihao's motion for summary judgment of non-infringement, Leviton must provide evidence that creates a factual dispute as to whether Meihao infringed the patents at issue. In light of the Claims Construction Order already issued by this court, this is a difficult task. Leviton arguably has created a factual dispute on some technical issues, such as whether the Meihao device has the equivalent of a "latching finger."[21] However, the court

---

**21.** The "latching finger," as construed by this    court, is the part of the reset lock-out that

need not delve into those issues because it is clear that the Meihao device does not perform the same function as the Leviton patents. Therefore, the Meihao device cannot infringe the Leviton patents. Because there is no dispute of material fact, Meihao's motion for summary judgment (joined by USI) as to non-infringement shall be granted, and an appropriate declaration shall be entered.

### VI.

For the reasons stated above, the respective motions for summary judgment shall be denied and granted, as indicated. In No. AMD 03–2137, a final declaratory judgment shall be entered as requested by Meihao. In No. AMD 03–1701, after the court confers with counsel, a prompt trial shall be calendared.



NUVOX COMMUNICATIONS, INC. and NEWSOUTH COMMUNICA-TIONS CORP., Plaintiffs,

v.

NORTH CAROLINA UTILITIES COMMISSION; Jo Anne Sanford, Chairman, J. Richard Conder, Commissioner, Robert V. Owens, Jr., Commissioner, Sam J. Ervin, IV, Commissioner, Lorinzo L. Joyner, Commissioner, James Y. Kerr, II,

Commissioner, and Michael F. Wilkins, Commissioner (in their official capacities as Commissioners of the North Carolina Utilities Commission); and Bellsouth Telecommunications, Inc., Defendants.

No. 5:05–CV–207–BR(3).

United States District Court, E.D. North Carolina, Western Division.

Jan. 20, 2006.

**Background:** Competitive local exchange carriers (CLECs) brought action against the North Carolina Utilities Commission (NCUC), NCUC commissioners in their official capacity, and incumbent local exchange carrier (ILEC), seeking declaratory and injunctive relief from NCUC orders which permitted ILEC to audit CLECs' records, pursuant to an interconnection agreement.

**Holding:** The District Court, Britt, Senior District Judge, held that CLECs' claims did not give rise to federal question jurisdiction.

Action dismissed.

**Federal Courts** ⟜**199**

Federal question jurisdiction did not exist over competitive local exchange carriers' (CLECs') action against the North Carolina Utilities Commission (NCUC), NCUC commissioners in their official capacity, and incumbent local exchange carrier (ILEC), seeking declaratory and injunctive relief from NCUC orders which permitted ILEC to audit CLECs' records, pursuant to an interconnection agreement, where interconnection agreement was gov-

___

works in cooperation with a contact arm to perform the function of inhibiting the resetting of the electrical connection unless the circuit interrupter is functional. Claims Construction Order, 2005 WL 936990, at * 10.

Leviton argues that the Meihao device has a part that is the equivalent of this latching finger. I need not consider this issue under the circumstances here.

**1352**            **274 FEDERAL SUPPLEMENT, 2d SERIES**

NIKE INC., Plaintiff,

v.

VARIETY WHOLESALERS, INC. d/b/a
Rose's Stores, Inc., Defendant.

No. CV 402–182.

United States District Court,
S.D. Georgia,
Savannah Division.

July 22, 2003.

Sports apparel manufacturer brought action alleging breach of settlement agreement, trademark counterfeiting, trademark infringement, unfair competition, trademark dilution and false designation of origin. Upon cross-motions for summary judgment, the District Court, Nangle, J., held that: (1) dismissal of prior action with prejudice precluded sports apparel manufacturer from reviving its claims that defendant violated the manufacturer's trademarks by selling and offering offending merchandise for sale; (2) defendant was liable for trademark counterfeiting; (3) defendant was not "willfully blind" so as to justify manufacturer's recovery of treble damages on its counterfeiting claim; (4) defendant was liable for trademark infringement under the Lanham Act, unfair competition and false designation of origin, and common law trade infringement; (5) defendant was liable to sports apparel manufacturer for breach of contract for having violated settlement agreement; and (6) manufacturer had option to elect award of statutory damages under Lanham Act or award of profits.

Motions denied.

**1. Trade Regulation ⟲403**

Accused goods and offending merchandise, which bore marks identical to or substantially indistinguishable from sports apparel manufacturer's registered trademarks yet did not meet with manu-

facturer's specifications, were counterfeit products for purposes of Lanham Act. Lanham Trade-Mark Act, § 45, 15 U.S.C.A. § 1127.

**2. Judgment ⟲570(4), 585(2), 668(2)**

Under doctrine of res judicata, dismissal of prior action with prejudice precluded sports apparel manufacturer from reviving its claims that defendant violated the manufacturer's trademarks by selling and offering offending merchandise for sale; prior action involved the same parties, and involved manufacturer's same claims with respect to defendant's sale of the offending merchandise.

**3. Trade Regulation ⟲403**

Defendant, which sold and offered for sale goods bearing counterfeit trademarks, was liable for trademark counterfeiting pursuant to the Lanham Act; defendant's use of marks identical or substantially identical to sports apparel manufacturer's registered trademarks was likely to cause confusion in the minds of potential buyers as to the source, affiliation or sponsorship of the accused goods. Lanham Trade-Mark Act, § 32(1)(a), 15 U.S.C.A. § 1114(1)(a).

**4. Trade Regulation ⟲408**

A showing of intent or bad faith is unnecessary to establish trademark counterfeiting in violation of Lanham Act. Lanham Trade-Mark Act, § 32(1)(a), 15 U.S.C.A. § 1114(1)(a).

**5. Trade Regulation ⟲683**

"Willful blindness" is sufficient to satisfy Lanham Act's intent requirement for recovering treble damages on counterfeiting claim. Lanham Trade-Mark Act, § 35(b), 15 U.S.C.A. § 1117(b).

**6. Trade Regulation ⟲408**

Under the doctrine of willful blindness, knowledge of trademark counterfeit-

NIKE INC. v. VARIETY WHOLESALERS, INC.          **1353**
Cite as 274 F.Supp.2d 1352 (S.D.Ga. 2003)

ing can be imputed to a party who knows of a high probability of illegal conduct and purposefully contrives to avoid learning of it.  Lanham Trade-Mark Act, § 35(b), 15 U.S.C.A. § 1117(b).

**7. Trade Regulation ⟨⟩683**

Willful blindness justifying recovery of treble damages under Lanham Act on counterfeiting claim requires more than mere negligence or mistake; standard is a subjective one which asks what the defendant suspected, and what he did with such suspicion.  Lanham Trade-Mark Act, § 35(b), 15 U.S.C.A. § 1117(b).

**8. Trade Regulation ⟨⟩683**

Although defendant may have been grossly negligent in failing to suspect that the accused goods might be counterfeit, it was not "willfully blind" so as to justify sports apparel manufacturer's recovery of treble damages under Lanham Act on its counterfeiting claim; while a reasonably prudent company with 450 stores and nearly $600 million in annual gross revenue would have suspected that the goods bearing manufacturer's trademark which it purchased might be counterfeit, while such a company would not have entrusted an attorney who admittedly spent most of his time on "slip and fall" cases and who had minimal experience in trademark matters as the final arbiter of whether branded goods were authentic, and while reasonably prudent company would not have expected manufacturer to inform it of whether particular products were genuine after manufacturer specifically had refused to accept such a responsibility, defendant did not know of a high probability of illegal conduct and purposefully contrive to avoid learning of it.  Lanham Trade-Mark Act, § 35(b), 15 U.S.C.A. § 1117(b).

**9. Trade Regulation ⟨⟩332, 870(2)**

Because defendant, which sold and offered for sale goods bearing counterfeit trademarks, was liable to sports apparel manufacturer for trademark counterfeiting, defendant was liable for trademark infringement under the Lanham Act, unfair competition and false designation of origin, and common law trade infringement.  Lanham Trade-Mark Act, § 32, 15 U.S.C.A. § 1114.

**10. Compromise and Settlement ⟨⟩20(1)**

Defendant was liable to sports apparel manufacturer for breach of contract for having violated settlement agreement by continuing to sell and offer for sale counterfeit products bearing manufacturer's registered trademark after the settlement agreement was entered.

**11. Trade Regulation ⟨⟩366**

Elements of a dilution claim are that: (1) plaintiff is the owner of a mark which qualifies as a "famous" mark; (2) defendant is making commercial use; (3) in interstate commerce; (4) of a mark or trade name; (5) defendant's use began after plaintiff's mark became famous; and (6) defendant's use causes dilution by lessening the capacity of plaintiff's mark to identify and distinguish goods or services.  Lanham Trade-Mark Act, § 43(c)(1), 15 U.S.C.A. § 1125(c)(1).

**12. Trade Regulation ⟨⟩366**

A showing of actual dilution, rather than a likelihood of dilution, is required to establish a dilution claim.  Lanham Trade-Mark Act, § 43(c)(1), 15 U.S.C.A. § 1125(c)(1).

**13. Trade Regulation ⟨⟩366**

For purposes of dilution claim, sports apparel manufacturer's swoosh design trademarks qualified as famous marks in light of the inherent distinctiveness of the marks, the length of use of the marks, the extensive advertising on a worldwide basis, the global presence of manufacturer's apparel and products, the lack of evidence of any third party use, and the existence of

federal trademark registrations for the marks. Lanham Trade-Mark Act, § 43(c)(1), 15 U.S.C.A. § 1125(c)(1).

**14. Trade Regulation ⟠366**

Defendant diluted sports apparel manufacturer's famous trademarks due its sale of counterfeit products bearing marks identical or virtually identical to manufacturer's marks. Lanham Trade-Mark Act, § 43(c)(1), 15 U.S.C.A. § 1125(c)(1).

**15. Trade Regulation ⟠573.1, 576**

In assessing profits for purposes of calculating damages under Lanham Act for trademark counterfeiting, plaintiff is required to prove defendant's sales only, and defendant must prove all elements of cost or deduction claimed; plaintiff need show only the defendant's gross sales, and thereafter, burden shifts to the defendant to demonstrate that the plaintiff's sales calculations are fallacious, and costs may be deducted only when they are actually related to the sale of the infringing product. Lanham Trade-Mark Act, § 35(a), 15 U.S.C.A. § 1117(a).

**16. Trade Regulation ⟠685**

In assessing profits for purposes of calculating damages under Lanham Act for trademark counterfeiting, a proportionate share of overhead is not deductible when the sales of an infringing product constitute only a small percentage of total sales. Lanham Trade-Mark Act, § 35(a), 15 U.S.C.A. § 1117(a).

**17. Trade Regulation ⟠685**

Defendant's advertising expenses, payroll costs, and operating expenses were not deductible in assessing profits for purposes of calculating damages under Lanham Act for trademark counterfeiting where defendant failed to show that those costs were actually related to the sale of an infringing product. Lanham Trade-Mark Act, § 35(a), 15 U.S.C.A. § 1117(a).

**18. Trade Regulation ⟠674**

Sports apparel manufacturer, which prevailed on trademark counterfeiting, had option to elect award of statutory damages under Lanham Act or award of profits. Lanham Trade-Mark Act, § 35(a, c), 15 U.S.C.A. § 1117(a, c).

**19. Trade Regulation ⟠729**

Sports apparel manufacturer, which prevailed on trademark counterfeiting, was not entitled to award of attorney fees pursuant to the Lanham Act where infringing party did not act in a malicious, fraudulent, deliberate, or willful manner. Lanham Trade-Mark Act, § 35(a), 15 U.S.C.A. § 1117(a).

**20. Trade Regulation ⟠729**

Exceptional case warranting an award of fees under Lanham Act is one in which the infringing party acts in a malicious, fraudulent, deliberate, or willful manner. Lanham Trade-Mark Act, § 35(a), 15 U.S.C.A. § 1117(a).

———

Patrick T. O'Connor, Paul Hughes Threlkeld, Oliver, Maner & Gray, LLP, Savannah, GA, Louis S. Ederer, Neil S. Goldstein, Michael D. Pantalony, Gursky & Ederer, LLP, New York, NY, for Nike, Inc., plaintiff.

Glen M. Darbyshire, Roy Robinson Kelly, IV, Inglesby, Falligant, Horne, Courington & Chisholm, PC, Savannah, GA, W. Thad Adams, III, Matthew J. Ladenheim, Adams, Schwartz & Evans, PA, Charlotte, NC, for Varsity Wholesalers, Inc. dba Rose's Stores, Inc., defendant.

### ORDER

NANGLE, District Judge.

Plaintiff Nike Inc. ("Nike") alleges that defendant Variety Wholesalers, Inc. ("Va-

riety") breached a settlement agreement between the parties and engaged in trademark counterfeiting, trademark infringement, unfair competition, trademark dilution and false designation of origin. Specifically, Nike claims that Variety breached a settlement agreement and violated Nike's trademarks when it sold counterfeit Nike socks, t-shirts and fleece items bearing designs similar to Nike's trademarks. On June 30 through July 2, 2003, the Court tried the case without a jury. The Court now makes the following rulings.

### RULINGS ON PRE–TRIAL MOTIONS

At the end of the discovery period, both Nike and Variety moved for partial summary judgment on the issue of willful blindness (Docs.60, 65). The Court hereby DENIES such motions (Docs.60, 65) on the grounds that a determination on the question of willfulness is not appropriate on a motion for summary judgment. *See Chanel, Inc. v. Italian Activewear of Fla., Inc.,* 931 F.2d 1472, 1476 (11th Cir.1991) (reversing district court's grant of summary judgment on issue of intent and stating, "As a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial.").

The Court DENIES as MOOT Nike's motion for the assignment of a trial date (Doc. 98).

The Court DENIES Nike's motion in limine (Doc. 92) in its entirety. In its motion, Nike moved to: preclude Variety from contesting the authenticity of certain purported Nike garments bought by Variety; preclude Variety from contesting Nike's calculation of Variety's income from the sale of certain purported Nike t-shirts; preclude Variety from offering evidence of its overhead costs; impose sanctions on Variety; and permit Nike to enter Variety's premises and obtain documents relevant to the calculation of Variety's income.

The Court DENIES Variety's motion in limine (Doc. 83) in its entirety. In its motion, Variety moved to: exclude the testimony of David Simpson, Nike's director of security; exclude the testimony of any witness other than David Simpson; exclude the accused garments; exclude third party Fifth Amendment pleas[1]; and exclude materials not previously disclosed as responsive to discovery requests.

### TRIAL ORDER

Based upon the evidence submitted at trial, as well as the post-trial submissions of the parties, the Court makes the following findings of fact and conclusions of law.

---

1. *See Pyles v. Johnson,* 136 F.3d 986, 997 (5th Cir.1998) (Fifth Amendment does not forbid adverse inferences against third party witnesses in a civil action when such witnesses refuse to testify in response to probative evidence offered against them); *LiButti v. United States,* 107 F.3d 110, 120 (2d Cir.1997) (same); *Davis v. Mut. Life Ins. Co. N.Y.,* 6 F.3d 367, 384–85 (6th Cir.1993)(in a civil case, a non-party witness's invocation of the Fifth Amendment gives rise to a legitimate inference that the witness was engaged in criminal activity); *RAD Servs., Inc. v. Aetna Cas. & Sur. Co.,* 808 F.2d 271, 275 (3d Cir.1986) (allowing the trier of fact in civil case to consider evidence of a non-party's refusal to testify); *Rosebud Sioux Tribe v. A & P Steel, Inc.,* 733 F.2d 509, 521–22 (8th Cir.1984) (under certain circumstances, a party to a civil case may call a witness to the stand even when that witness has made known an intention to invoke the Fifth Amendment). In any event, the Court notes that its determination that the Accused Goods are counterfeit is based not on any inference from the Fifth Amendment pleas of non-party witnesses, but rather on the live trial testimony of David Simpson and Stephen Kirkman. The Court thus allows into evidence, but does not rely on, the Fifth Amendment testimony of non-parties to this case.

## I.  Findings of Fact

### A.  The Parties and the Trademarks

1.  Nike is an Oregon corporation with its principal place of business in Beaverton, Oregon.

2.  Nike is engaged in the manufacture, distribution and sale in interstate commerce of high quality apparel and other merchandise, including sportswear and sporting goods for men, women and children.

3.  Nike is the holder of several registered trademarks including NIKE, NIKE/SWOOSH DESIGN, SWOOSH DESIGN, SWOOSH AIR DESIGN, and NIKE/SWOOSH/AIR DESIGN (collectively, the "Nike trademarks").

4.  The Nike trademarks are well known to the consuming public and trade as identifying and distinguishing Nike exclusively and uniquely as the source of high quality products to which such trademarks are applied.

5.  The Nike trademarks are famous as trademarks for apparel and sporting goods in the United States.

6.  The Nike trademarks have, at all times, been owned exclusively by Nike or its predecessor.

7.  The Nike trademarks are the subject of the following registrations in the United States Patent and Trademark Office:

a.  Reg. No. 1,277,066 for NIKE, issued on May 8, 1984;

b.  Reg. No. 1,945,654 for NIKE, issued on January 2, 1996;

c.  Reg. No. 1,237,469 for NIKE/SWOOSH DESIGN, issued on May 10, 1983;

d.  Reg. No. 1,284,385 for SWOOSH DESIGN, issued on July 3, 1984;

e.  Reg. No. 2,068,075 for SWOOSH AIR DESIGN, issued on June 3, 1997;

f.  Reg. No. 2,203,050 for SWOOSH AIR DESIGN, issued on November 10, 1998; and

g.  Reg. No. 1,571,066 for NIKE/SWOOSH/AIR DESIGN, issued on December 12, 1989.

8.  Each of the Nike trademarks is valid and subsisting and is in full force and effect.

9.  The Nike trademarks listed in subparagraphs 7(a) through (e) have achieved incontestable status pursuant to 15 U.S.C. § 1065.

10.  Variety is a North Carolina corporation with its principal place of name-brand owner or licensed manufacturer, and on the "secondary market," i.e., from other sources.

### B.  The Hilfiger Action, the Polo Action and the Prior Action

17.  On August 18, 1997, Variety commenced a civil action against Tommy Hilfiger Licensing, Inc. ("Hilfiger") in this Court (Moore, J.) seeking a declaratory judgment that certain purported Tommy Hilfiger garments sold by Variety were not counterfeit (the "Hilfiger Action").

18.  Variety had purchased the garments at issue in the Hilfiger Action on the secondary market.

19.  On or about December 1998, Hilfiger and Variety entered into a settlement agreement resolving the Hilfiger Action.

20.  G. Templeton Blackburn II, Esq. ("Blackburn"), Variety's vice president and general counsel, was directly involved in the settlement of the Hilfiger Action.  Pursuant to

the settlement agreement, Variety agreed to stop selling goods bearing counterfeits of the Hilfiger trademarks, stop manufacturing or offering for sale items with a Bahama Bay Logo which Hilfiger alleged infringed upon Hilfiger trademarks, and modify the Bahama Bay Logo on other items which had already been manufactured. Variety further agreed to pay Hilfiger $975,000.

21. On June 10, 1998, PRL USA Holdings, Inc. ("Polo") commenced a civil action against Variety in this Court (Edenfield, J.) asserting claims of trademark counterfeiting, trademark infringement, unfair competition and trademark dilution arising out of Variety's sale of apparel bearing counterfeits of Polo's registered trademarks (the "Polo Action").

22. On January 12, 1999, Polo and Variety entered into a settlement agreement resolving the Polo Action.

23. Blackburn was directly involved in the settlement of the Polo Action. In the settlement agreement, Variety agreed to stop selling goods bearing counterfeits of the Polo Trademarks and to pay Polo $50,000.

24. On or about September 16, 1999, Randall Rabenold, a private investigator hired by Nike ("Rabenold") contacted Blackburn. Rabenold informed Blackburn that he had purchased a t-shirt at a Rose's Store which bore a purported Nike trademark which Rabenold believed to be counterfeit (the "Rabenold t-shirt"). Blackburn requested that Nike provide written reasons as to why the Rabenold t–shirt was counterfeit.

25. On or about October 6, 1999, David W. Simpson, Nike's director

of security ("Simpson") signed and provided to Blackburn an affidavit indicating that the Rabenold t-shirt was counterfeit because it had an incomplete Nike label and had no Nike hang tag.

26. Simpson has been Nike's director of security for approximately ten years. He deals in all aspects of counterfeit goods for Nike. He works with in-house counsel, outside counsel and outside investigators with respect to counterfeit investigations.

27. In many cases, Simpson can determine whether a garment is counterfeit by examining its neck label or hang tag. When inspection of a neck label or hang tag does not conclusively determine a garment's authenticity, Simpson consults with members of Nike's production department or product identification group. Simpson's determination that a garment is counterfeit, however, is his own, based on his own knowledge, from his experience or his review of Nike business records and materials.

28. On or about October 18, 1999, Blackburn had a telephone conversation with Simpson about the Rabenold t-shirt. In this conversation, Blackburn asked Simpson how to identify authentic Nike goods as opposed to counterfeit goods. Simpson responded that Nike did not sell authentic Nike goods that did not have intact hang tags and neck labels. Simpson also informed Blackburn that Variety should watch out for Nike invoices that were being redacted by counterfeiters and reproduced and furnished with goods that were not authentic.

29.  On October 18, 1999, Simpson faxed Blackburn a letter confirming that "Nike, Inc. does not sell T-shirts in which the brand label has been removed," and that "[a]ll Nike T-shirts sold in the retail arena will have a complete Nike label in the shirt." Simpson's letter also stated, "If I am able to be of further assistance please do not hesitate to contact me at [telephone number]."

30.  Following Blackburn's exchange with Simpson, Variety did not purchase Nike t-shirts in the secondary market unless such t-shirts had both complete hang tags and neck labels.

31.  By letter dated October 25, 1999, Blackburn advised Rabenold that Variety was withdrawing from sale the Rabenold t-shirt.

32.  By letter dated January 18, 2000, Blackburn wrote to Simpson enclosing a copy of a redacted Nike invoice and advising that Variety was considering the purchase on the secondary market "of a quantity of the enclosed item which bears both the hang tags and interior labels and otherwise appears to us in all respects to be genuine Nike goods." The enclosed redacted invoice indicated that Nike had sold the referenced goods to Nzania, Inc., an authorized distributor of genuine Nike closeout goods.

33.  Nike did not respond to Blackburn's January 18, 2000 letter.

34.  After receiving Blackburn's January 18, 2000 letter, Simpson gave the garment that Blackburn had enclosed to Nike's outside counsel, Gursky & Ederer P.C.

35.  Nike cooperates with other apparel sellers and manufacturers on issues regarding trademarks and counterfeiting. The factors influencing Nike's decision to pursue a particular case are not set out in a book, a memorandum, or other written guidelines. Nike, however, considers the volume of the goods and the ability to locate their source or location. Nike has general guidelines regarding a particular volume of goods that would trigger an investigation or other action. The volume would have to be substantial to cause Nike to spend the money and effort to pursue an investigation. Depending on the garment involved, Simpson might consider 150 garments to be substantial.

36.  Nike generally tries to keep confidential the manner in which it determines whether goods are counterfeit or genuine, because it does not want counterfeiters to know the mistakes that they are making.

37.  On November 29, 2000, Nike sued Variety in this Court for trademark counterfeiting, trademark infringement, unfair competition, trademark dilution and unfair trade practices (the "Prior Action"). Nike's complaint in the Prior Action alleged that Variety was offering for sale and selling various t-shirts and socks that bore counterfeits of Nike trademarks, and polo-style shirts and short sets bearing the marks "NK Air" and "N Air," which Nike alleged infringed the Nike trademarks.

38.  The complaint in the Prior Action concerned apparel which Nike alleged bore unauthorized reproductions, copies, counterfeits and/or colorable imitations of Nike trademarks. Copies of photographs of some of the allegedly counterfeit Nike apparel were attached to the complaint. These photographs depicted the Rabenold t-shirt and

eight other garments that had been purchased in Variety's Allied division. None of the garments in these photographs had Nike neck labels or hang tags.

39. By its terms, the complaint did not limit the allegedly counterfeit Nike apparel to the examples of garments pictured in the photographs. Instead, the complaint stated that "copies of examples of the" alleged counterfeit Nike apparel were attached thereto.

40. Nike and Variety entered into a written agreement settling the Prior Action on February 19, 2001 (the "Settlement Agreement"). The Settlement Agreement defined "Offending Merchandise" as "apparel which Nike alleged [in the complaint in the Prior Action] bore unauthorized reproductions, copies, counterfeits, and/or colorable imitations of the Nike Trademarks." Copies of examples of the Offending Merchandise were attached to the Settlement Agreement.

41. Variety did not acknowledge in the Settlement Agreement that any of the Offending Merchandise was counterfeit.

42. In the Settlement Agreement, each party represented that:

it and its counsel had an adequate opportunity to make whatever investigation or inquiry they may deem necessary or desirable in connection with the subject matter of this Settlement Agreement prior to the execution thereof and the delivery and acceptance of the consideration specified therein.

43. In paragraph 3 of the Settlement Agreement, Variety represented that:

it has made a diligent and good faith inquiry concerning its purchase and sale of the Offending Merchandise and believes, based on that inquiry, that the facts set forth below constitute the best information available to Variety at this time and are materially accurate....

Variety has delivered any and all documents, other than attorney/client communications or attorney work product documents ... relating, referring or reflecting the purchase, distribution, offer for sale and sale of the Offending Merchandise, including, but not limited to all purchase and sale invoices, sanitized invoices, chain of title documents, packing slips, bills of lading, brochures, advertisements, correspondence and/or notes taken between Variety and [UFI of New York, Inc., Carolina Apparel Trading, Inc., Branco Enterprises, Inc. and Walnut Grove] ... to Gursky & Ederer, P.C.

44. Nike represented that it did not:

have actual knowledge of the sale by Variety, or the report of any sale by Variety of any other (i) Offending Merchandise; (ii) any other goods bearing unauthorized reproduction, copies, counterfeits and/or colorable imitations of the Nike trademarks; or (iii) in the opinion of Nike or its legal counsel, be identical or confusingly similar to any of the Nike Trademarks, or which alone or in combination with any other indicia, is likely to cause consumers to be confused, mistaken or deceived into believing that the products to which it is affixed originate with, emanate from, or are approved or associated with Nike, other than Variety's Remaining Inventory as set forth in Subparagraph 3(b) above.

45. The Settlement Agreement required Variety to pay, and Variety did pay, $80,000 to Nike.

46. Variety also agreed to cease selling counterfeit Nike goods.

47. The Settlement Agreement required Nike to dismiss the complaint in the Prior Action with prejudice, which Nike did.

48. The Settlement Agreement provided that if Nike should prevail in any action for breach of the Settlement Agreement:

Variety consents to the entry of a permanent injunction enjoining Variety from the sale of goods bearing any unauthorized reproduction, copy, counterfeit or colorable imitation of the Nike Trademarks . . . .

49. The Settlement Agreement further provided that the prevailing party in any suit for its breach "shall recover its costs and reasonable attorneys' fees from the other party."

50. No formal discovery was taken in the Prior Action.

51. At the time the Prior Action was settled, Nike specifically advised Variety that it would not offer Variety any assistance in determining the authenticity of purported Nike goods. Variety had requested that a provision requiring such assistance be made a part of the Settlement Agreement. Nike specifically refused to include such a provision.

52. At the time it entered into the Settlement Agreement, Variety had bought and was continuing to buy purported Nike merchandise bearing the registered Nike trademarks on the secondary market from vendors other than those disclosed in paragraph 3 of the Settlement Agreement. Specifically, Variety had purchased purported Nike merchandise prior to the date of the Settlement Agreement from: Red Tag Apparel, Inc. ("Red Tag");

Jade Apparel, Inc. ("Jade"); STX International, Inc. ("STX"); Carlen Enterprises ("Carlen") and Courtside, Inc. ("Courtside,"). Variety had also purchased purported Nike merchandise prior to the date of the Settlement Agreement from: Admar Trading: Apparel Connection; Ben Elias Industries, Corp.; Great Deals; M & D Sportswear; RDRCI; Rooftop Sales and Wholesale Investment (the "Undisclosed Vendors").

54. None of the vendors mentioned in paragraph 53 was an authorized licensee or distributor of authentic Nike merchandise.

### C. Variety's policy after the Prior Action

55. After the exchange of letters between Simpson and Blackburn in October 1999, Variety implemented a policy of limiting purchases of all branded goods in general, and Nike goods in particular, to (a) goods with complete labels and hang tags, (b) submitted to and approved by Blackburn.

56. After implementing this policy, Variety bought some apparel items from an authorized Nike retailer to use as a comparison with other items purchased for sale. Variety in fact compared the authorized Nike apparel with other apparel that it purchased.

57. Variety buyers were required to present samples to Blackburn for initial purchases but not for re-orders.

58. At the time that he reviewed purported Nike samples, Blackburn was aware that counterfeit branded goods are sold on the secondary market and that counterfeiters are

capable of making counterfeit labels and hang tags. Blackburn is also aware that high-quality counterfeits exist.

59. Richard Faucher ("Faucher") was employed by Variety as a buyer of apparel from August 1999 until July 2001. Faucher was responsible for sourcing, financial planning, advertising and buying apparel. Faucher had thirty years of training in purchasing branded goods.

60. Faucher was suspicious of every transaction involving a branded product in 2000 and 2001. According to Faucher, Variety's policy was to be careful of the vendor of branded product, "the integrity of it, the authenticity of it, and whether we're allowed to buy it." From early 2000 until 2001, he was required to show Blackburn a sample of every new branded product before he bought it. During this time, Faucher submitted three samples to Blackburn.

61. When he received purported Nike goods for inspection, Blackburn would check to see whether the goods had complete hang tags and neck labels, compare the goods to the authentic Nike garments he had purchased, look at the goods's fabric, graphics and printing quality, and ask the buyer about the price of the goods and the type of vendor.

62. Faucher was aware of two or three occasions on which Blackburn reviewed and rejected samples of Nike goods because Blackburn wasn't comfortable buying them.

63. Variety had a policy of sending a "letter of indemnification" to vendors that a vendor would sign if the vendor legally could sell the product to Variety but would not sign if the

product was illegal or was not allowed to be sold to Variety.

64. When buying branded goods, Faucher would provide as much information as he could, and would ask as many questions as he knew to ask, but would allow Variety to decide, legally and "merchandising–wise," whether to buy a particular product. As far as Faucher was concerned, nothing was ever done independently.

65. Variety's buyers have been requested to seek invoices from vendors to show that branded goods emanate from an authorized source. Although Faucher asked his supplier where the purported Nike goods were coming from, the supplier never told him the answer.

66. Carl Anthony Tamborini ("Tamborini") is Variety's divisional merchandise manager. He handles the purchase of all "soft lines," i.e. apparel and accessories, for all Variety stores. Part of his responsibilities include supervising buyers John Brown and Jeff Hamm. Tamborini has been involved with purchasing Nike merchandise since he started working with Variety in 1997.

67. Tamborini was informed by Blackburn that it was a requirement to retain an invoice, either redacted or unredacted, from vendors of branded apparel products, and Tamborini instructed his buyers accordingly. Additionally, when buying any product, Tamborini would look at its price and its "colorations." According to Tamborini, "If someone was selling a $20 item for $3, something is wrong."

68. Although Tamborini's buyers have requested an unredacted invoice for every transaction involving

branded goods, he has never known them to be successful. Seventy-five percent of the time, however, his buyers would receive "sanitized," or redacted, invoices. If Blackburn approved the samples, however, Tamborini and his buyers would go ahead and purchase the branded goods.

69. It is important to Tamborini to know where branded goods come from. He believes that buyers should know the origin of every product purchased.

70. John Brown ("Brown") has been a buyer for Variety for approximately 16 years and is currently a senior buyer in menswear. Brown reports to Tamborini. Brown has been involved in purchasing branded apparel since 2000. His first purchase was made at a Las Vegas closeout show. Prior to this show, Brown was not aware of any Variety policy with respect to the purchase of branded goods. After attending this show, Brown became aware of Variety's policy not to buy branded product on the secondary market unless it possessed intact labels and hang tags, and to submit to Blackburn for inspection samples of products that buyers are considering purchasing. As far as Brown is aware, this policy has been in place since early 2000, but has not been reduced to writing.

71. Jeffrey Hamm ("Hamm") has been a buyer for Variety since April 2000, and has been involved in purchasing branded goods the entire time. Hamm described Variety's policy with respect to branded goods as to look for items with "good standards in quality" and

complete labels and hang tags and then to provide the items to Blackburn for review. Hamm is also aware that Variety requires vendors to fill out letters of indemnification. Hamm "would like to see" sanitized invoices for his branded purchases, but he has not had a situation requiring a sanitized invoice because he has been involved only with two branded reorders, not any initial branded purchases. Hamm is aware that hang tags and labels can be counterfeited.

72. Variety did not consider its inability to obtain an "unsanitized" Nike invoice an absolute impediment to the purchase of purported Nike products based on Blackburn's understanding and belief that vendors in the secondary market would not furnish such documentation for fear of being cut out of the chain of sale.[2]

73. Variety has never maintained a written policy for purchasing branded goods in the secondary market.

74. Although Blackburn prepared and gave a talk to approximately twenty–five Variety "hard line" and "soft line" buyers some time in 2001 regarding trademark and counterfeiting issues, neither Faucher, Brown nor Hamm recall attending such a meeting.

75. At the time of their depositions with respect to the instant litigation, neither Tamborini, Brown, Faucher nor Hamm had personal knowledge of the Prior Action.

**D. The Accused Goods**

76. On October 21, 2001, one of Nike's outside counsel purchased

---

**2.** There is no evidence in the record that any vendor refused to produce such documents to

Variety because of an expressed concern of being cut out of the chain of sale.

four samples of t-shirts and socks purporting to bear Nike trademarks at one of Variety's stores in Winston–Salem, North Carolina. Nike inspected the t-shirts and socks and determined that they bore counterfeits of Nike trademarks.

77. On or about November 16, 2001, Nike's counsel contacted Blackburn and asserted that Variety had breached the Settlement Agreement.

78. Between November 26, 2001 and February 1, 2002, Variety provided Nike's counsel with seventy-three samples of purported Nike goods being sold by Variety (the "Accused Goods").

79. The Accused Goods were first quality goods which had complete neck labels and hang tags. The cost to Variety of the Accused goods ranged from $2.50 for socks to $9.50 for fleece products. Variety's cost for the Accused t-shirts ranged from $4.25 to $6.45. By comparison, Nzania, an authorized distributor of Nike goods, offered Nike t-shirts for $5.00.

80. Nike subsequently represented to Variety that each of these seventy-three samples was thought by Nike to be counterfeit. Nike did not share with Variety its reasons for determining the Accused Goods to be counterfeit.

81. Variety then removed from sale the stock-keeping unit for each sample, and had all such goods returned to its central distribution centers. Approximately 67,634 items were

returned from Variety's stores to the distribution centers. Neither Nike nor Variety has ever examined these items to determine whether they are counterfeit.

82. On August 9, 2002, Nike filed the instant litigation against Variety.

83. At trial, Simpson testified that each of the Accused t-shirts and fleece items [3] was counterfeit for some or all of the following reasons:

**The remainder of this paragraph shall be filed under seal.**

84. At trial, Simpson testified that the Accused socks [4] were counterfeit for some or all of the following reasons:

**The remainder of this paragraph shall be filed under seal.**

85. At trial, Stephen Kirkman, the Vice President of Product Development at Wayne Trademark, Nike's exclusive sock wrapper supplier, testified that many of the Accused socks did not meet Nike's specifications, and thus were counterfeit, for some or all of the following reasons: [5]

**The remainder of this paragraph shall be filed under seal.**

E. **Variety's purchase of the Accused Goods**

87. Variety did not purchase any of the Accused Goods directly from Nike or an authorized Nike licensee.

---

**3.** Exhibits 28, 29, 33, 34, 77–79, 82–87, 94–95.

**4.** Exhibits 30–31, 39–44, 70–76, 80, 81, 88–93, 96–100, 103–105.

**5.** Mr. Kirkman examined and testified specifically with respect to Exhibits 44, 80, 91 and

**97.** The parties stipulated that Mr. Kirkman would find Exhibits 30, 31, 39–43, 70–76, 81, 88–90, 92, 93, 96 and 98–105 to be inconsistent with Nike specifications for the same reasons.

88. Variety purchased the Accused Goods from suppliers Jade, STX and Red Tag based on samples displayed in Las Vegas at the MAGIC Show, an annual men's apparel trade show. Ninety percent of the dollar value of the goods was bought from Jade.

89. Variety did not identify Jade, STX or Red Tag in conjunction with the Settlement Agreement in the Prior Action.

90. Nike has been aware of the MAGIC Show for a number of years, but has not sent a Nike representative to inspect the purported Nike goods being sold there.

91. Jade has identified its supplier of the Accused Goods as Pantalones de Calidad ("Pantalones"), which is located in Mexico. Variety was unable to determine any information regarding Pantalones, other than that it was not a manufacturer of Nike goods.

92. Nike makes, or has made for it, apparel products in Mexico, including t-shirts.

93. Nike has never issued a cease and desist letter to Pantalones, Red Tag or Jade.

94. Although Pantalones provided a certificate of authenticity to Jade, Variety was unable to correlate such certificate with any Accused Good that it bought from Jade.

95. Variety is aware that vendor-supplied certificates of authenticity are of very little value in determining whether goods are authentic.

96. Richard Ortiz is the president of Jade.

97. Manny Flores ("Flores") is the Jade sales representative from whom Variety purchased the Accused Goods.

98. Faucher and other Variety buyers met with Flores during every trade show they attended in Las Vegas.

99. Faucher attended at least four closeout shows when he worked for Rose's. There was a Red Tag booth at least once, and there was a Jade booth from then on. Faucher was aware that counterfeiters showed their goods at trade shows.

100. At every show that Faucher attended, Nike branded goods were available, but were not necessarily on display. Faucher could sit down with suppliers that he knew were his contact for Nike products. Flores might or might not have Nike goods on display.

101. The only invoice Variety received with respect to the Accused Goods was a redacted invoice from STX. Blackburn found this redacted invoice not to be helpful in determining whether the goods in question were authentic.

102. Variety requested Nike invoices from Jade, but never received any.

103. Tamborini first became aware of Red Tag at the February 2000 MAGIC Show. He and other Variety buyers and employees, including Faucher, visited with Flores at a Red Tag booth displaying a large number of Nike t-shirts. This was Faucher's first involvement in the purchase of branded apparel for Variety. Flores said that he would sign a letter of indemnification and provide Variety with samples of the Nike product. Tamborini and the other Variety employees told Flores they were interested in purchasing 12,000 to 18,000 t-shirts, but Flores did not have that kind of quantity available. Flores agreed to send

Variety samples of the t-shirts that he could sell, and the Variety employees told him that they had to confirm the authenticity of the product and would get back to him. Flores said that the Nike goods were excess goods which would be coming from a factory in Mexico.

104.  After the February 2000 MAGIC Show, Flores signed a letter of indemnification and sent samples to Variety, which were provided to Blackburn for review.  After Blackburn had reviewed the samples, Variety ordered some of the Accused Goods from Red Tag.  Faucher placed part of this order.  Every time that Faucher purchased Accused Goods from Flores, he asked Flores whether the goods were "okay" or "intact," whether they had complete labels, and whether it was legal for Variety to buy them.  To all of these questions, Flores answered yes.

105.  Faucher also asked specifically where Flores got the Accused Goods, but Flores refused to answer.

106.  Brown placed a different part of the order, which Tamborini approved.  Because Blackburn already had approved the Red Tag samples, Tamborini understood that Variety could now buy any t-shirts, long or short sleeve, from Red Tag.

107.  Because other persons at Variety previously had spoken with Flores about the goods, Brown did not inquire of anyone at Red Tag where Red Tag got the Accused Goods and did not request any documentation which might have assisted him in determining the origin of the Accused Goods.

108.  As far as Tamborini is aware, the company that was Tag the Apparel Group became Red Tag and then became Jade. Tamborini, however, was not certain about this. Faucher understood that Flores originally worked for Red Tag, and then tried to branch off on his own as Jade. Faucher met Flores first at a Red Tag booth and later at a Jade booth.  Faucher did not know whether Tag the Apparel Group was affiliated either with Red Tag or with Jade. Faucher's only contact with respect to the Accused Goods was Flores.

109.  Hamm was involved in two reorders of Accused Goods from Red Tag. Hamm first met Flores at the 2001 MAGIC Show. Hamm was aware that other Variety personnel had been in contact with Flores. Hamm knew that Red Tag did not manufacture the Accused Goods and that the Accused Goods had been approved by Variety as being legitimate.  Hamm believed that Jade and Red Tag were one and the same.  The only person Hamm dealt with at Jade was Flores. Hamm did not ask Red Tag where the Accused Goods originated because they had already been approved and were "to the best of standards."  Similarly, Hamm did not ask Red Tag for any documentation on the Accused Goods' origin.

110.  At his deposition for this case, Ortiz invoked the Fifth Amendment privilege when: questioned as to the companies from which Jade purchased the Accused Goods; asked whether he made any inquiries regarding the authenticity of the Accused Goods before purchasing them; asked whether he made any representations to Variety regarding the authenticity of the Accused Goods or provided any documents to Variety to verify the authenticity

of the Accused Goods; asked whether Flores is associated with Jade; and questioned about a business relationship between Jade and Red Tag.

111. At his deposition for this case, Flores testified that he has operated Red Tag for three years, prior to which he worked for The Apparel Group, which is no longer in business. Flores testified that he never worked "for" Jade and invoked the Fifth Amendment when asked if he ever worked "with" Jade. Flores testified that Carlen is a broker located in Los Angeles that used to do business with The Apparel Group. Carlen's name appeared on certain Variety purchase orders along with Red Tag's name. Flores knew Carlen and could get in touch with Carlen in case of a problem. According to Flores, there was no relationship between Carlen and Red Tag.

112. Flores invoked the Fifth Amendment when: asked whether Red Tag ever did business with Variety or ever purchased goods directly from a manufacturer; asked to identify his source for the Accused Goods; asked to explain Red Tag's procedure for purchasing goods; asked what inquiries he makes as to product authenticity before making a purchase; asked whether he knows how to determine whether a product is genuine or counterfeit; questioned with respect to his presence at the MAGIC Show or contact with Variety at such show; asked why he was listed as the sales representative on a Jade invoice; asked whether he

ever acted as a representative for Jade's inventory or had samples of Jade's inventory of Nike product at the February 2000 Magic Show; asked about his interaction with Variety's personnel at or after that show; and asked whether he had any reason to believe that the Accused Goods that he sold were not genuine.

**F. Variety's costs and profits[6]**

113. Variety's total gross income from its sales of the Accused Goods is $3,525,096.00.

114. The total cost of Accused Goods sold by Variety is $2,174,704.

115. Variety's gross income for the Accused Goods ($3,525,096) minus its cost for the Accused Goods it sold ($2,174,704), is $1,350,392.

116. Brant Sprunger, Variety's controller ("Sprunger"), testified that Variety incurred the following types of expenses in connection with its sale of the Accused Goods: payroll; rent; utilities; trash; repairs; depreciation; taxes and business licenses; warehouse and distribution; managerial personnel; merchandising; data processing; accounting and finance; security personnel; insurance; and benefits. Sprunger, however, could not determine from Variety's general ledger what percentage of the company's overall expenses for such items were directly attributable to Variety's sale of the Accused Goods.

117. Variety's total gross income from the sale of the Offending Merchandise in the Prior Action is $122,880.

---

**6.** The cost, sales and profit numbers referenced in paragraphs 113–115 are taken from Ex. 143. The cost, sales and profit numbers

referenced in paragraphs 117–119 are taken from Ex. 121.

118. Variety's total cost of the Offending Merchandise that it sold was $60,103.88.[7]

129. Variety's gross income for the Offending Merchandise ($122,880) minus its cost for the Offending Merchandise it sold ($60,103.88), is $62,776.12.

### G. Variety's litigation with Jade

120. After Nike accused the Accused Goods of being counterfeit, Variety stopped payment to Jade for these goods. Jade then sued Variety in state court in Texas to recover payment. Variety removed the case to federal court, and filed a counterclaim against Jade to the effect that, if the goods were counterfeit, then Variety was not obligated to pay for them.

121. The Texas case has been voluntarily dismissed with leave to refile awaiting the resolution of the instant litigation.

## II. Conclusions of Law

### A. Variety sold and offered for sale counterfeit Nike products.

[1] The Lanham Act imposes liability for trademark counterfeiting on any person who shall "use in commerce . . . any counterfeit . . . of a registered mark in connection with the sale, offering for sale, distribution or advertising of any goods or services or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . ." 15 U.S.C. § 1114(1)(a). A counterfeit mark is defined as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C.

§ 1127. The Court finds as a matter of law that the Accused Goods and Offending Merchandise are counterfeit Nike products. The Accused Goods and Offending Merchandise bear marks identical to or substantially indistinguishable from registered Nike trademarks, yet these goods do not meet with Nike specifications.

The Offending Merchandise is counterfeit because it contains:

**The remainder of this paragraph shall be filed under seal.**

Nike has presented no evidence which would allow the Court to conclude that the goods Variety purchased from Undisclosed Vendors prior to the entry of the Settlement Agreement are counterfeit. The Court declines Nike's invitation to "infer" that such goods were counterfeit. *See* Doc. 94 at 17.

### B. Preclusive effect of Prior Action

[2] Variety argues that the dismissal of the Prior Action with prejudice precludes Nike from bringing any claims herein based on the counterfeit nature of the Offending Merchandise. The Court agrees. As the Eleventh Circuit has held:

Under res judicata, also known as claim preclusion, a final judgment on the merits bars the parties to a prior action from re-litigating a cause of action that was or could have been raised in that action. *See, e.g., Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). Res judicata may be properly applied only if certain prerequisites are met. In the Eleventh Circuit, a party seeking to invoke the doctrine must establish its propriety by satisfying four initial elements: (1) the

---

**7.** Variety sold only 5,881 of the 6,012 items that it purchased from Branco Enterprises. *See* Ex. 121. Variety's cost for the 6,012 items was $29,110.95. *Id.* Accordingly, Variety's cost per Branco item was $29,110.95 divided by 6,012, or $4.84. Variety's cost for the 5,881 Branco items that it actually sold was thus 5,881 multiplied by $4.84, or $28,476.63.

**1368**　　　274 FEDERAL SUPPLEMENT, 2d SERIES

prior decision must have been rendered by a court of competent jurisdiction; (2) there must have been a final judgment on the merits; (3) both cases must involve the same parties or their privies; and (4) both cases must involve the same causes of action. *See Israel Discount Bank Ltd. v. Entin*, 951 F.2d 311, 314 (11th Cir.1992); *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1550 (11th Cir.1990). The court next determines whether the claim in the new suit was or could have been raised in the prior action; if the answer is yes, res judicata applies. *In re: Piper Aircraft Corp.*, 244 F.3d 1289, 1296 (11th Cir.2001). All four elements are met. There is no question that this Court is a court of competent jurisdiction, that the Prior Action involved the same parties, and that the Prior Action involved Nike's same claims with respect to Variety's sale of the Offending Merchandise. Additionally, Nike cannot question the fact that this Court's dismissal of the Prior Action with prejudice served as a final judgment on the merits. *See Hunt v. Hawthorne Assoc.*, 119 F.3d 888, 911 n. 63 (11th Cir.1997) ("[A] stipulation of dismissal with prejudice ... at any stage of a judicial proceeding, normally constitutes a final judgment on the merits which bars a later suit on the same cause of action.") (citation omitted). Accordingly, res judicata applies to bar Nike from reviving its claims that Variety violated the Nike trademarks by selling and offering for sale the Offending Merchandise.

Variety also argues that the dismissal with prejudice of the Prior Action serves to bar any recovery by Nike of Variety's profits on the purported Nike goods that Variety purchased from the Undisclosed Vendors. As discussed above, there is no evidence on the present record from which the Court could conclude that such goods were counterfeit. Accordingly, the Court makes no determination of Variety's prof-

its with respect to such goods and therefore does not reach this question.

**C. Trademark Counterfeiting**

**1. Liability**

[3] "The Lanham Act prohibits, among other things, the use in commerce of a counterfeit trademark in a manner likely to cause confusion; and the Act further provides that anyone using a counterfeit trademark in such manner shall be liable in a civil action to the registrant of the trademark." *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1475 (11th Cir.1991) (citing 15 U.S.C.A. § 1114(1)(a)). Based on its conclusion that Variety sold and offered for sale goods bearing counterfeit Nike trademarks, the Court finds that Variety is liable for trademark counterfeiting pursuant to the Lanham Act. Variety's use of marks identical or substantially identical to the registered Nike trademarks was likely to cause confusion in the minds of potential buyers as to the source, affiliation or sponsorship of the Accused Goods. *See Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1178 (11th Cir.1994).

In determining whether there is a likelihood of confusion, the Court may consider "a variety of factors, including similarity of design, similarity of the products, identity of retail outlets and purchasers, similarity of advertising media, the defendant's intent and actual confusion." *Id.* (citation omitted). Application of these elements to the facts of this case compels the conclusion that Variety's sale of the Accused Goods is likely to confuse the public into believing that such goods are associated with Nike or that Nike sponsored, licensed or consented to the sale of such goods. *Id.* at 1179. The marks on the Accused Goods are identical or substantially identical to the Nike trademarks. The Accused Goods are "first quality" goods sold alongside

other branded apparel products. They were sold in the type of retail outlets where customers expect to find branded sporting apparel, thus making them more likely to cause confusion and mistake, and to deceive the consuming public into believing that they were purchasing authentic Nike apparel. It is impossible for someone with an untrained eye to discern that the Accused Goods are not genuine Nike products. Indeed, even Nike's director of security made his determinations that the Accused Goods were counterfeit not by examining the garments themselves, but rather by examining the subtleties of their wrappers, hang tags and neck labels. Finally, the types of goods at issue, sporting apparel, are minor purchases that may be categorized as "impulse" purchases. *Polo Fashions, Inc. v. Rabanne,* 661 F.Supp. 89, 95 (S.D.Fla.1986). Consumers do not scrutinize shirts, fleece and socks carefully to discern the differences between the symbols displayed on the garments, *id.,* let alone their wrappers, labels and hang tags.

[4] A showing of intent or bad faith is unnecessary to establish trademark counterfeiting in violation of § 1114. *Chanel,* 931 F.2d 1472, 1476. In other words, since the Accused Goods sold by Variety were counterfeit, Variety is plainly liable to Nike for Nike's claim of trademark counterfeiting under § 1114. *Id.* at 1475.

## 2. No willful blindness

Section 1117(a) of the Lanham Act entitles a plaintiff who prevails on a trademark counterfeiting claim to "recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Because Nike prevails on its trademark counterfeiting claim, it is entitled to recover its costs, any damages it sustained, and the costs of this action. Nike, however, seeks to recover three times Variety's profits as well as

attorneys' fees on the grounds that Variety was willfully blind in selling and offering for sale counterfeit Nike products. The Lanham Act provides for such treble damages when a defendant intentionally uses "a mark or designation, knowing such mark or designation is a counterfeit mark . . . in connection with the sale, offering for sale, or distribution of goods or services." 15 U.S.C.A. § 1117(b). Accordingly, in order for Nike to recover treble damages on its counterfeiting claim, it must demonstrate not only that Variety infringed a registered trademark in violation of 15 U.S.C. § 1114(1)(a), but also that Variety "intentionally used a mark, knowing such mark is a counterfeit mark." *Babbit,* 38 F.3d 1161, 1181 (citing 15 U.S.C. § 1117(b)).

[5, 6] In the Eleventh Circuit, "willful blindness" is sufficient to satisfy § 1117(b)'s intent requirement. *Chanel,* 931 F.2d 1472, 1476. Whether a defendant has been willfully blind, however, will depend on the circumstances. *Id.* To assess whether Variety has been willfully blind, the Court must determine what Variety knew. *Id.* at 1476–77. Under the doctrine of willful blindness, "knowledge can be imputed to a party who knows of a high probability of illegal conduct and purposefully contrives to avoid learning of it." *Williams v. Obstfeld,* 314 F.3d 1270, 1271 (11th Cir.2002); *see also Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.,* 955 F.2d 1143, 1149 (7th Cir.1992) (to be willfully blind, person "must suspect wrongdoing and deliberately fail to investigate"); *Louis Vuitton, S.A. v. Lee,* 875 F.2d 584, 590 (7th Cir.1989) (finding willful blindness when defendant failed to inquire further out of fear of the result of his inquiry); *Monsanto Co. v. Campuzano,* 206 F.Supp.2d 1271, 1275 (S.D.Fla.2002) (willful blindness occurs when person sus-

pects unlawful activity and deliberately fails to act).

[7] Willful blindness requires more than mere negligence or mistake. *Splunge v. Shoney's, Inc.*, 97 F.3d 488, 491 (11th Cir.1996); *Hard Rock*, 955 F.2d at 1151; *see also United States v. Adair*, 951 F.2d 316, 319 n. 6 (11th Cir.1992) ("A showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge."); *A Touch of Class Jewelry v. J.C. Penney Co., Inc.*, 2000 WL 1224804 (E.D.La. Aug.28, 2000) (gross negligence is not sufficient to support a finding of willful blindness). A negligence standard is an objective one which asks whether a reasonably prudent person in defendant's shoes would have known that the items were counterfeit. *Hard Rock*, 955 F.2d at 1151. By contrast, the willful blindness standard is a subjective one which asks what the defendant suspected, and what he did with such suspicion. *Id.*

[8] The Court finds as a matter of law that Variety was clearly, perhaps even grossly, negligent in failing to suspect that the Accused Goods might be counterfeit. A reasonably prudent company with 450 stores and nearly $600 million in annual gross revenue, which had been sued several times for trademark counterfeiting and infringement, had knowledge that labels and hangtags could be counterfeited, and was aware that counterfeit goods were available on secondary markets would have suspected that the Nike goods it purchased might be counterfeit. Moreover, a reasonably prudent company would not have entrusted an attorney who admittedly spent most of his time on "slip and fall" cases and who had minimal experience in trademark matters as the final arbiter of whether branded goods were authentic. Finally, a reasonably prudent company would not have expected Nike to inform it of whether particular Nike products were

genuine after Nike specifically had refused to accept such a responsibility.

Having considered the live testimony of Blackburn, a credible witness, and the deposition testimony of other Variety personnel, however, the Court concludes that Variety did not know of a high probability of illegal conduct and purposefully contrive to avoid learning of it. Additionally, the Court concludes that Variety did not fail to inquire further out of fear of the result of its inquiry. Accordingly, Variety was not willfully blind and treble damages are not available to Nike. It is beyond dispute that Variety did not obtain unsanitized invoices for every purchase of a purported Nike product. According to Nike, this fact must compel a finding of willful blindness. Yet Nike ignores the fact that Variety failed to insist on unsanitized invoices not out of a fear that such invoices would expose purported Nike products as counterfeit, but rather out of an honestly held belief that such insistence would be futile. However objectively unreasonable, Variety honestly believed that vendors refused to provide such invoices not to hide the fact that they were selling counterfeit products, but rather to preserve their own role as middlemen between manufacturers and Variety by refusing to identify any intermediate suppliers.

Moreover, Variety's buyers did make inquiries with respect to the source of purported Nike products, at least the first time they purchased purported Nike goods from a particular vendor. Variety's buyers did inquire as to whether the Nike goods they were buying were authentic, and requested assurances regarding such authenticity. Believing any invoices provided by vendors to be of little or no value, Variety instead required written letters of indemnification in which vendors attested to the authenticity of their product.

Once Blackburn understood from his conversation with Simpson that all authentic Nike products came with complete, uncut hang tags and neck labels, Variety never again purchased Nike products without such hang tags and neck labels. *Compare Chanel*, 931 F.2d 1472, 1476 (noting that defendant knew that Chanel goods were accompanied by indicia of authenticity and nevertheless purchased purported Chanel goods which lacked all such indicia). Variety bought genuine Nike goods and compared samples of all prospective purchases of Nike product to such genuine goods. Variety bought first quality goods which were not visibly inferior to genuine Nike products. *Compare Levi Strauss & Co. v. Diaz*, 778 F.Supp. 1206, 1208 (S.D.Fla.1991) (finding willful blindness when defendant bought goods "not of the type or quality normally produced by Levi Strauss."). Variety checked to make sure that the fabric, graphics and printing quality were all of the highest standard. Variety made sure that the goods were priced appropriately for branded goods, and Variety bought the purported Nike goods from vendors at a nationwide trade show. *Compare Vuitton*, 875 F.2d at 590 (finding willful blindness when defendant bought obviously poorly crafted goods from an itinerant peddler at bargain-basement prices).

Variety's past experiences with trademark infringement made its evidence of attempted verification of authenticity more believable. *See Chanel*, 931 F.2d 1472, 1477. The Court credits Blackburn's testimony that if Nike had shared with Variety its criteria with respect to genuine hang tags, neck labels and sock wrappers, Variety would have incorporated such verifying criteria into its own authentication process. Quite simply, Variety consciously took many steps to ensure that the Nike products that it bought were genuine. While Variety ultimately failed in this endeavor, such failure was caused by negligence, perhaps gross negligence, but not by willful blindness.

**D.   Trademark Infringement, Common Law Trademark Infringement, Unfair Competition and False Designation of Origin**

[9]   Variety is liable to Nike for trademark infringement under the Lanham Act, unfair competition and false designation of origin because the likelihood of confusion required for trademark counterfeiting under § 1114 is the prevailing legal standard applicable to such claims. *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258, 265 (5th Cir.1980)[8]; *see also Chanel*, 931 F.2d at 1475 n. 3 ("[T]he same facts support a cause of action for unfair competition as for trademark infringement."). Variety is liable to Nike for common law trade infringement for the same reason. *See Bd. Regents Univ. Sys. Ga. v. Buzas Baseball, Inc.*, 176 F.Supp.2d 1338, 1350–51(N.D.Ga.2001) (citing *Ackerman Sec. Sys., Inc. v. Design Sec. Sys.*, 201 Ga.App. 805, 412 S.E.2d 588 (Ga.App. 1991)).

**E.   Breach of Contract**

[10]   Variety is liable to Nike for breach of contract for having violated the Settlement Agreement by continuing to sell and offer for sale counterfeit Nike products after the Settlement Agreement was entered. *See Ex. 121 at ¶ 2.* Accordingly, pursuant to the terms of the Settlement Agreement, Nike is entitled to recover its costs and reasonable attorneys' fees that it has incurred in conjunction with the

---

**8.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

instant action, and to the entry of a permanent injunction enjoining Variety from the sale of goods bearing any unauthorized reproduction, copy, counterfeit or colorable imitation of the Nike Trademarks. *See* Ex. 121 at ¶ 13.

### F.  Trademark Dilution

[11, 12]  The Lanham Act provides that the "owner of a famous mark shall be entitled . . . to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c)(1). The elements of a dilution claim are that: (1) the plaintiff is the owner of a mark which qualifies as a "famous" mark; (2) the defendant is making commercial use; (3) in interstate commerce; (4) of a mark or trade name; (5) defendant's use began after the plaintiff's mark became famous; and (6) defendant's use causes dilution by lessening the capacity of plaintiff's mark to identify and distinguish goods or services. *Voice–Tel Enter., Inc. v. JOBA, Inc.*, 258 F.Supp.2d 1353, 1362 (N.D.Ga.2003); *Portionpac Chem. Corp. v. Sanitech Sys., Inc.*, 217 F.Supp.2d 1238, 1250–51 (S.D.Fla. 2002). A showing of actual dilution, rather than a likelihood of dilution, is required. *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 123 S.Ct. 1115, 1124, 155 L.Ed.2d 1 (2003).

[13, 14]  The Court has no difficulty in concluding that the Nike trademarks qualify as famous marks in light of the following factors: (1) the inherent distinctiveness of the marks; (2) the length of use of the marks (*see* ¶ 7, supra); (3) the extensive advertising on a worldwide basis; (4) the global presence of Nike apparel and products; (5) the lack of evidence of any third party use; and (6) the existence of federal trademark registrations for the marks. *See* 15 U.S.C. § 1125(c). The

Court further concludes that Variety made commercial use of the Nike trademarks in interstate commerce after the Nike trademarks had become famous. Finally, the Court concludes that Variety has diluted the Nike trademarks due to the identical or virtually identical character of the marks on the Accused Goods to the Nike trademarks. *See Moseley*, 123 S.Ct. at 1125 (it may not be necessary to present direct evidence of dilution "if actual dilution can reliably be proven through circumstantial evidence-the obvious case is one where the junior and senior marks are identical."); *see also Pinehurst, Inc. v. Wick*, 256 F.Supp.2d 424, 431 (M.D.N.C. 2003) (finding actual dilution where defendant used plaintiff's marks in its domain name because a customer using the internet "will be unable to discern any appreciable difference" between the defendant's domain name and the plaintiff's mark). Accordingly, Variety has diluted the Nike trademarks and Nike is entitled to an injunction, which is set forth in Section III(B) below.

## III.  Remedies

### A.  Damages

#### 1.  Variety's profits

[15]  Pursuant to § 1117(a) of the Lanham Act, "in assessing profits, the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." Accordingly, the plaintiff need show only the defendant's gross sales. *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 586 (5th Cir.1980). Thereafter, the burden shifts to the defendant to demonstrate that the plaintiff's sales calculations are fallacious. *Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir.1985). The defendant also bears the burden of proving any costs that should be deducted from the gross revenue of the sales of the goods.

*Maltina*, 613 F.2d at 586. In this Circuit, such costs may be deducted only when they are "actually related" to the sale of the infringing product. *Id.*

In the instant litigation, Nike has submitted documents, created by Variety, evidencing total sales of the Accused Goods (Ex. 143). These documents specifically accounts for Accused Goods which were sold and then returned, as well as any other Accused Goods which remain on hand at Variety. Based on the documents created by Variety and relied upon by Nike (Ex. 143), the Court finds that 393,-502 pieces of Accused Goods were sold by Variety-and were not returned to Variety-for a total sales revenue of $3,525,096. Variety paid $2,174,704 for these 393,502 garments. Accordingly, Variety's net profit on the Accused Goods was $1,350,392.

**[16]** Variety asks the Court to deduct various costs and expenses from its net profit on the Accused Goods. First, Variety asks the Court to deduct Corporate Overhead and Occupancy Costs-which the Court considers to be part of overhead. *See* Ex. ZZ. The Court declines to deduct these costs on the grounds that it appears that Variety would have incurred these costs even without selling the Accused Goods. *See Abbott Labs. v. Unlimited Beverages, Inc.*, 218 F.3d 1238, 1242 (11th Cir.2000) (finding no abuse of discretion in district court's refusal to deduct costs that "would have been incurred even without the sale of the prohibited product"). Moreover, "a proportionate share of overhead is not deductible when the sales of an infringing product constitute only a small percentage of total sales." *Maltina*, 613 F.2d at 586. Here, the revenue derived from the Accused Goods, roughly $3.5 million, constitutes only a small percentage of Variety's total sales, roughly $590 million. Accordingly, Variety's Occupancy Costs and Corporate Overhead shall not be de-

ducted from its net profits on the Accused Goods.

**[17]** Variety also asks the Court to deduct Payroll Costs, Advertising Expenses and Operating Expenses from its net profits on the Accused Goods. *See* Ex. ZZ. Again, the Court declines to make such deduction. First, the Court declines to award Variety a deduction for its advertising expenses on the grounds that no evidence was presented that Variety specifically advertised the Accused Goods. Sprunger, the only witness questioned with respect to advertising expenses, testified that he did not know whether Variety ever advertised any of the Accused Goods, or whether Variety advertised any branded goods at all. Next, the Court declines to deduct payroll costs on the grounds that Variety offered no evidence of which payroll costs pertained to the sale of the Accused Goods. Sprunger testified that he could not say whether any of Variety's payroll costs assisted in the sale of the Accused Goods and that he did not know whether Variety hired any additional personnel to accommodate the sale of the accused goods. Finally, the Court declines to deduct operating expenses for the same reason. Sprunger testified that he did not know whether any of the operating expenses identified by Variety actually assisted in the sale of the Accused Goods, and that he could not point out on Variety's general ledger an operating expense that pertained to any particular item. The Court finds that Variety has failed to meet its burden, required by § 1117(a), of proving the costs that it contends should be deducted from its profits on the Accused Goods.

Having rejected Variety's proposed deductions, the Court concludes that Variety is liable to Nike for $1,350,392 in profits for the Accused Goods.

**2. Statutory damages**

**[18]** As an alternative form of relief, Nike asks the Court to award it statutory damages pursuant to 15 U.S.C. § 1117(c). Section 1117(c) provides:

> In a case involving the use of a counterfeit mark ... in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits ..., an award of statutory damages ... in the amount of—
>
> (1) not less than $500 or more than $100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or
>
> (2) if the court finds that the use of the counterfeit mark was willful, not more than $1,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

15 U.S.C. § 1117(c). The option of statutory damages serves as an alternative to traditional awards based on actual losses under subsections 1117(a) and (b). *See Sara Lee Corp. v. Bags of N.Y., Inc.*, 36 F.Supp.2d 161, 165 (S.D.N.Y.1999).

The Court finds that Nike is entitled to $900,000 in statutory damages. This represents $100,000 for Variety's use of: (1) NIKE on socks; (2) NIKE on shirts; (3) NIKE/SWOOSH DESIGN on shirts; (4) NIKE/SWOOSH DESIGN on sweatpants; (5) SWOOSH DESIGN on sweatpants; (6) SWOOSH DESIGN on sweatshirts; (7) SWOOSH DESIGN on socks; (8) SWOOSH DESIGN on shirts; and (9) NIKE/SWOOSH/AIR DESIGN on shirts. Nike will have ten (10) days from the date of this Order to elect the award of statutory damages under § 1117(c) or the award of profits under § 1117(a). If no election is made, the Court will enter judgment for the profits assessed under § 1117(a).

**B. Permanent Injunction**

Variety, its representatives, agents, servants, employees, affiliates, divisions and subsidiaries, and all others in direct or indirect concert or participation with Variety, shall hereby be PERMANENTLY ENJOINED AND RESTRAINED from:

(1) selling, offering for sale, advertising, promoting, marketing and distributing the Offending Merchandise and Accused Goods; and

(2) importing, exporting, distributing, circulating, selling, offering for sale, advertising, promoting or displaying any unauthorized reproduction, counterfeit, copy or colorable imitation of any of the Nike trademarks, or any marks confusingly similar thereto, either individually or in conjunction with other words, marks or designs.

**C. Attorneys' fees and costs**

Because Variety is not the prevailing party in this action, the Court hereby DENIES Variety's motion for attorneys' fees as prevailing party (Doc. 76).

Nike, however, is entitled to reasonable attorneys' fees pursuant to the Settlement Agreement. Additionally, pursuant to § 1117(a), Nike is entitled to recover its costs associated with this action. Within fifteen (15) days of the date of this Order, Nike SHALL submit to the Court a detailed summary of the costs and **reasonable** attorneys' fees it has incurred in conjunction with this action. Variety may file a reply within seven (7) days of Nike's submission. Thereafter, the Court shall schedule a hearing, if necessary, to determine the extent of Nike's reasonable attorneys' fees.

**[19, 20]** The Court specifically declines to award Nike its attorneys' fees pursuant

to the Lanham Act, which authorizes an award of fees only in "exceptional cases." 15 U.S.C. § 1117(a). An exceptional case is one in which "the infringing party acts in a 'malicious,' 'fraudulent,' 'deliberate,' or 'willful' manner." *Burger King Corp. v. Pilgrim's Pride Corp.,* 15 F.3d 166, 168 (11th Cir.1994). As discussed above, Variety's actions, though clearly negligent, do not meet such requirements.

### CONCLUSION

For the foregoing reasons, the Court hereby: DENIES the parties' motions for summary judgment (Docs. 60, 65); DENIES the parties' motions in limine (Docs. 83, 92); DENIES as MOOT Nike's motion for an assignment of trial (Doc. 98); and DENIES Variety's motion for attorneys' fees (Doc. 76). The Court, however, GRANTS Variety's motion for leave to submit proposed post-trial findings of fact and conclusions of law (Doc. 128). The Court finds for Nike on its trademark counterfeiting, trademark infringement, false designation of origin, unfair competition, trademark dilution and breach of contract claims. The Court awards Nike a total of $1,350,392, representing Variety's profits on the Accused Goods. Alternatively, Nike is entitled to $900,000 in statutory damages. The Court permanently enjoins Variety from using counterfeit Nike products as set forth in Section (III)(B) above. The Court ORDERS Nike to submit a detailed summary of its reasonable attorneys' fees within fifteen (15) days of the date of this Order and ORDERS Variety to file a reply, if any, within seven (7) days thereof. After considering such submissions and holding a hearing if necessary, the Court SHALL award reasonable attorneys' fees to Nike.

So ORDERED.



COMMODITIES FUTURES TRADING COMMISSION, Plaintiff,

v.

George HEFFERNAN, Defendant.

No. CV101–141.

United States District Court,
S.D. Georgia,
Augusta Division.

Aug. 4, 2003.

Commodity Futures Trading Commission (CFTC) filed civil complaint against commodity futures trading advisor who sold day trading instructional products on Internet, alleging violations of Commodity Exchange Act (CEA), various CFTC regulations, and earlier CFTC consent order. The District Court, 245 F.Supp.2d 1276, Bowen, Chief Judge, granted partial summary judgment for CFTC, finding both statutory and regulatory violations. CFTC moved for disgorgement, monetary penalty, and permanent injunction. The Court held that: (1) requested disgorgement could not be reduced by expenses absent evidence of expenses; (2) evidence of inability to pay warranted reduction in requested civil penalty; and (3) permanent injunction was warranted, in form of requiring notice of CEA and CFTC regulation violations at advisor's current web site.

Motion granted in part.

**1. Commodity Futures Trading Regulation ⚷79**

Court's power to order disgorgement in Commodity Futures Trading Commission (CFTC) case extends only to amount with interest by which defendant profited from his wrongdoing.

# EXHIBIT B

| Case Name | NIKE Marks Recognized | Fame Recognition | NIKE's Marks | Other Party Marks/Infringing Goods |
|---|---|---|---|---|
| Nike, Inc. v. Top Brand Co. Ltd.<br><br>Case No. 00-Civ.-8179-KMW-RLE<br><br>Dated: 2005 – July 13 | **NIKE**<br><br>**Swoosh Design** | *Recognized as a famous mark pursuant to 15 U.S.C. Section 1125(c).*<br><br>"Plaintiffs Nike and Adidas manufacture, advertise, and sell sportswear, apparel, footwear, and sporting goods under various trademarks that are **distinctive and recognized throughout the world.**" [p.1]<br><br>"Plaintiffs have sold 'billions of dollars of merchandise under [the] various trademarks,' and that the marks are '**distinctive** and are recognized as **famous marks in the United States and throughout the world.**'" [p.5]<br><br>"It is undisputed that Plaintiffs' trademarks are **famous and distinctive**, that Defendants' use of them was a 'commercial use in commerce,' and that Defendants' use began after Plaintiffs' marks had become famous. Furthermore, Defendants' use of Plaintiffs' **famous** marks did lessen the capacity of the marks 'to identify and distinguish goods or services.'" [p.7] | **Infringement Based On:**<br>NIKE<br>(Reg. 1277066, Cl. 25; Reg. 1945654, Cl. 25)<br><br>Swoosh Design<br>(Reg. 1284385, Cl. 25)<br><br>NIKE & Swoosh Design<br>(Reg. 1237469, Cl. 25) | **Infringing Goods:**<br>Counterfeit Nike T-shirts |
| Nike, Inc. v. Variety Wholesalers, Inc.<br><br>Case No. CV-402-182<br><br>Dated: 2003 – July 22 | **NIKE**<br><br>**Swoosh Design**<br><br>**NIKE & Swoosh Design**<br><br>**AIR & Swoosh Design**<br><br>**NIKE AIR & Swoosh Design** | *Recognized as a famous mark pursuant to 15 U.S.C. Section 1125(c).*<br><br>"The Nike trademarks are **well known** to the consuming public and trade as identifying and distinguishing Nike exclusively and uniquely as the source of high quality products to which such trademarks are applied." [p.7]<br><br>"The Nike trademarks are **famous** as trademarks for apparel and sporting goods in the United States." [p.7] | **Infringement Based On:**<br>NIKE<br>(Reg. 1277066, Cl. 25; Reg. 1945654, Cl. 25)<br><br>Swoosh Design<br>(Reg. 1284385, Cl. 25)<br><br>NIKE & Swoosh Design<br>(Reg. 1237469, Cl. 25)<br><br>AIR & Swoosh Design<br>(Reg. 2068075, Cl. 25; Reg. 2203050, Cl. 25)<br><br>NIKE AIR & Swoosh Design<br>(Reg. 1571066, Cl. 25) | **Infringing Goods:**<br>Counterfeit Nike T-shirts |
| Nike, Inc. v. "JUST DID IT ENTERPRISES" and Michael Stanard.<br><br>6 F.3d 1225 (7th Cir. 1993); 28 USPQ2d 1385<br><br>Dated:<br>1993 – Sept. 28 | **JUST DO IT**<br><br>**NIKE**<br><br>**Swoosh Design** | *General Reference to Fame.*<br><br>"trademarks, **now known to nearly every athlete and sports fan in the world.**" [p.1126]<br><br>"NIKE, the swoosh design, and JUST DO IT have gained **widespread public acceptance and recognition**" [p.1126-27]<br><br>"Nike's trademarks are **widely recognized** and deserve protection" [p. 1231] | **Opposition Based On:**<br>JUST DO IT<br>(Not registered at the time of this decision).<br><br>NIKE<br>(Reg. No. 1277066, Cl. 25)<br><br>NIKE & Swoosh Design<br>(Reg. No. 1237469, Cl. 25)<br><br>Swoosh Design<br>(Reg. No. 1284385, Cl. 25) | **Opposed Mark:**<br>MIKE & Swoosh Design<br>Just Did It<br>(Not registered) |

| Case Name | NIKE Marks Recognized | Fame Recognition | NIKE's Marks | Other Party Marks/Infringing Goods |
|---|---|---|---|---|
| (Withdrawn) Nike, Inc. v. Nikepal Int. Inc.<br><br>84 USPQ2D 1521 (E.D. Cal. 2007)<br><br>Dated:<br>2007 – Sept. 10 | **NIKE** | ***Recognized as a famous mark pursuant to 15 U.S.C. Section 1125(c)(2)(A) and Cal. Bus. And Prfo. Code Sect. 14330.***<br><br>"Since the early 1990's, NIKE has been consistently ranked as a **top brand in brand surveys in the United States and the world.**" [p. 1526]<br><br>"[T]he Court concludes that NIKE was **famous** under 15 USC Section 1125(c)(2)(A), prior to Nikepal's first use of the NIKEPAL mark" [p.1526]<br><br>"**The degree of recognition of NIKE is quite strong**…the evidence demonstrates that NIKE is **readily recognized.**" [p.1528]<br><br>"[I]f relief is not granted to Nike under its dilution claim, it will face an escalating erosion of its **famous** mark" [p.1528]<br><br>Note: This case has been withdrawn from publication. | **Opposition Based On:**<br>NIKE<br>(29 Word Mark and Composite Registrations) | **Opposed Mark:**<br>NIKEPAL<br>(Ser. No. 76123346, Cl. 35) |
| Nike, Inc. v. Nikepal Int. Inc.<br><br>TTAB Opp. No. 91124869<br><br>Dated:<br>2005 – Apr. 21 | **NIKE** | ***Recognized as a famous mark pursuant to 15 U.S.C. Section 1125(c)(2)(A).***<br><br>"The **fame** of opposer's NIKE mark entitles it to a broad scope of protection against competing marks." [p.9]<br><br>"[W]e have given…NIKE the substantial weight that must be accorded to **famous** marks" [p.14]<br><br>"[W]e have no hesitation in finding that opposer's mark NIKE is **famous** for dilution purposes…**there is no question that opposer's mark became famous** prior to the filing date of applicant's application." [p.15]<br><br>"NIKE is **extremely famous** such that the public in general associates ther term 'NIKE' with opposer." [p.16] | **Opposition Based On:**<br>NIKE<br>(29 Word Mark Only and Composite Registrations) | **Opposed Mark:**<br>NIKEPAL<br>(Ser. 76123346, Cl. 35) |
| Leviton MFG. v. Universal Sec. Instruments<br><br>409 F. Supp.2d 643 (D.Md. 2006)<br><br>Dated:<br>2006 – Jan. 18 | **Swoosh Design** | ***General Reference to Fame.***<br><br>"[I]t is clear that Nike 'Swoosh' has attained secondary meaning and **indeed, is 'famous'**" [p.652 fn.12] | N/A | N/A |

| Case Name | NIKE Marks Recognized | Fame Recognition | NIKE's Marks | Other Party Marks/Infringing Goods |
|---|---|---|---|---|
| AU-TOMOTIVE Gold Inc. v. Volkswago of America Inc. et al.<br><br>457 F.3d 1062 (9th Cir. 2006); 80 USPQ2D 1293<br><br>Dated: 2006 – Aug. 11 | **Swoosh Design** | ***General Reference to Fame.***<br><br>"**Famous** trademarks have **assumed an exalted status** of their own in today's consumer culture that cannot neatly be reduced to the historic function of trademark to designate source. Consumers sometimes buy products bearing marks such as the Nike Swoosh...for the appeal of the mark itself, without regard to whether it signifies the origin or sponsorship of the product." [p. 1067] | N/A | N/A |
| Wal-Mart Stores Inc. v. Samara Brothers Inc.<br><br>54 USPQ2d 1065, 529 US 205<br><br>Dated: 2000 – March 22 | **NIKE**<br><br>**Swoosh Design** | ***NIKE and Swoosh used as gold standard.***<br><br>"The breadth of the definition of marks registrable under Section 2, and of the confusion-producing elements recited as actionable by Section 43(a), has been held to embrace not just word marks, such as 'Nike,' and symbol marks, such as Nike's 'Swoosh' symbol, but also 'trade dress'-a category that originally included only the packaging, or 'dressing,' of a product, but in recent years has been expanded by many courts of appeals to encompass the design of a product." | N/A | N/A |

# EXHIBIT C

# United States Patent Office

**977,190**
Registered Jan. 22, 1974

## PRINCIPAL REGISTER
### Trademark

Ser. No. 414,177, filed Jan. 31, 1972



BRS, Inc. (Oregon corporation)
6175 SW. 112th Ave.
Beaverton, Oreg.   97005

For: ATHLETIC SHOES WITH SPIKES AND ATH-
LETIC UNIFORMS FOR USE WITH SUCH SHOES,
in CLASS 22 (INT. CL. 25).

For: ATHLETIC SHOES WITHOUT SPIKES AND
ATHLETIC UNIFORMS FOR USE WITH SUCH
SHOES, in CLASS 39 (INT. CL. 25).

First use June 18, 1971; in commerce June 18, 1971.

**Int. Cl.: 42**

**Prior U.S. Cl.: 101**

## United States Patent and Trademark Office

**Reg. No. 1,238,853**
Registered May 17, 1983

### SERVICE MARK
Principal Register



Nike, Inc. (Oregon corporation)
3900 SW. Murray Blvd.
Beaverton, Oreg. 97005, by merger from
BRS, Inc. (Oregon corporation)
Beaverton, Oreg.

For: RETAIL FOOTWEAR AND APPAREL STORE SERVICES, in CLASS 42 (U.S. Cl. 101).
First use Feb. 1972; in commerce Feb. 1972.

Ser. No. 302,506, filed Mar. 23, 1981.

JAMES H. JOHNSON, Examining Attorney

Int. Cl.: 42

Prior U.S. Cl.: 101

## United States Patent and Trademark Office

Reg. No. 1,264,529
Registered Jan. 17, 1984

### SERVICE MARK
**Principal Register**



Nike, Inc. (Oregon corporation)
3900 SW. Murray Blvd.
Beaverton, Oreg. 97005, by merger from
BRS, Inc. (Oregon corporation)
Beaverton, Oreg.

For: RETAIL FOOTWEAR AND APPAREL
STORE SERVICES, in CLASS 42 (U.S. Cl. 101).
First use Feb. 1972; in commerce Feb. 1972.

Ser. No. 304,174, filed Apr. 3, 1981.

JAMES H. JOHNSON, Examining Attorney

Int. Cl.: 25

Prior U.S. Cl.: 39

## United States Patent and Trademark Office

Reg. No. 1,323,342
Registered Mar. 5, 1985

### TRADEMARK
**Principal Register**



Nike, Inc. (Oregon corporation)
3900 SW. Murray Blvd.
Beaverton, Oreg. 97005, by merger from
BRS, Inc. (Oregon corporation)
Beaverton, Oreg.

For: FOOTWEAR, in CLASS 25 (U.S. Cl. 39).
First use Jun. 18, 1971; in commerce Jun. 18, 1971.
Owner of U.S. Reg. Nos. 977,190 and 1,145,473.

Ser. No. 302,507, filed Mar. 23, 1981.

PAUL F. GAST, Examining Attorney

Int. Cl.: **25**

Prior U.S. Cl.: **39**

**United States Patent and Trademark Office**

Reg. No. **1,323,343**
Registered Mar. 5, 1985

## TRADEMARK
### Principal Register



Nike, Inc. (Oregon corporation)
3900 SW. Murray Blvd.
Beaverton, Oreg. 97005, by merger from
BRS, Inc. (Oregon corporation)
Beaverton, Oreg.

For: FOOTWEAR, in CLASS 25 (U.S. Cl. 39).
First use Jun. 18, 1971; in commerce Jun. 18, 1971.
Owner of U.S. Reg. Nos. 977,190, 1,145,473 and others.

Ser. No. 304,275, filed Apr. 3, 1981.

PAMELA RASK, Examining Attorney

Int. Cl.: 25

Prior U.S. Cl.: 39

**United States Patent and Trademark Office**

Reg. No. 1,325,938
Registered Mar. 19, 1985

**TRADEMARK**
**Principal Register**



Nike, Inc. (Oregon corporation)
3900 SW. Murray Blvd.
Beaverton, Oreg. 97005, by merger from
BRS, Inc. (Oregon corporation)
Beaverton, Oreg.

For: FOOTWEAR, in CLASS 25 (U.S. Cl. 39).
First use Jun. 18, 1971; in commerce Jun. 18, 1971.
Owner of U.S. Reg. Nos. 977,190, 1,153,938 and
others.

Ser. No. 302,503, filed Mar. 23, 1981.

ERNEST H. LAND, Examining Attorney

# EXHIBIT D

# United States Patent Office

**978,952**
Registered Feb. 19, 1974

## PRINCIPAL REGISTER
### Trademark

Ser. No. 414,176, filed Jan. 31, 1972

# NIKE

BRS, Inc. (Oregon corporation)
6175 SW. 112th Ave.
Beverton, Oreg.  97005

For: ATHLETIC SHOES WITH SPIKES AND ATHLETIC UNIFORMS FOR USE WITH SUCH SHOES, in CLASS 22 (INT. CL. 25).

For: ATHLETIC SHOES WITHOUT SPIKES AND ATHLETIC UNIFORMS FOR USE WITH SUCH SHOES, in CLASS 39 (INT. CL. 25).

First use June 18, 1971; in commerce June 18, 1971.

Int. Cl.: 25

Prior U.S. Cl.: 39

**Reg. No. 1,214,930**

United States Patent and Trademark Office

Registered Nov. 2, 1982

## TRADEMARK
### Principal Register

## NIKE

BRS Inc. (Oregon corporation)
3900 SW. Murray Blvd.
Beaverton, Oreg. 97005

For: FOOTWEAR, in CLASS 25 (U.S. Cl. 39).
First use Jun. 18, 1971; in commerce Jun. 18, 1971.
Owner of U.S. Reg. Nos. 978,952 and 1,153,938.

Ser. No. 302,504, filed Mar. 23, 1981.

ERNEST H. LAND, Primary Examiner

**Int. Cl.: 42**

**Prior U.S. Cl.: 100**

Reg. No. 1,243,248

## United States Patent and Trademark Office

Registered Jun. 21, 1983

### SERVICE MARK
#### Principal Register

## NIKE

Nike, Inc. (Oregon corporation)
3900 SW. Murray Blvd.
Beaverton, Oreg. 97005, by merger from
BRS, Inc. (Oregon corporation)
Beaverton, Oreg.

For: RETAIL FOOTWEAR AND APPAREL
STORE SERVICES, in CLASS 42 (U.S. Cl. 100).
First use Feb. 1972; in commerce Feb. 1972.
Owner of U.S. Reg. Nos. 978,952, 1,153,938 and
others.

Ser. No. 302,505, filed Mar. 23, 1981.

JAMES H. JOHNSON, Examining Attorney

# United States of America

## United States Patent and Trademark Office

# NIKE

**Reg. No. 6,124,779**

**Registered Aug. 11, 2020**

**Int. Cl.: 35**

**Service Mark**

**Principal Register**

Nike, Inc.  (OREGON CORPORATION)
One Bowerman Drive
Beaverton, OREGON 97005

CLASS 35: retail store services and on-line retail store services featuring apparel, apparel accessories, footwear, footwear accessories, headwear, eyewear and accessories, sporting goods and equipment, bags, sports bags, sports and fitness products and accessories

FIRST USE 2-00-1972; IN COMMERCE 2-00-1972

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

OWNER OF U.S. REG. NO. 1243248, 1238853

SER. NO. 88-831,783, FILED 03-12-2020



Director of the United States
Patent and Trademark Office

